UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------------------------x

MICHAEL ANDERSON,                                    :

                                                     :   CIVIL ACTION NO. 2:21-cv-12990

             *Plaintiff,*                             :

                                                     :

vs.                                                  :

                                                     :

WHOLE FOODS MARKET, INC., ELITE                      :
INVESTIGATIONS, LTD., JOHN DOES 1-10,                :
JANE DOES 1-10, ABC CORPORATION 1-10                 :
ABC, LLC 1-10, ABC LLP 1-10, jointly, severally,     :
individually,                                        :

                                                     :

             *Defendants.*                            :

---------------------------------------------------------------------x

**CERTIFICATION OF BRIAN W. BROWN, ESQ. IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

I, Brian W. Brown, Esq., hereby certify as follows:

1.  I am an attorney at law duly authorized to practice before this Court and am an associate with the law firm of Lewis Brisbois Bisgaard & Smith LLP, attorneys for Defendants, Whole Foods Market, Inc., and Elite Investigations, Ltd.

2.  I am one of the attorneys charged with the responsibility of defending this matter and in such capacity am fully familiar with the facts stated herein.

3.  I am submitting this Certification in support of Defendants' within motion for summary judgment.

4.  Attached hereto as **Exhibit A** is a true and accurate copy of Plaintiff's Complaint.

5.  Attached hereto as **Exhibit B** is a true and accurate copy of the Court's opinion in Ali v. Hillstone Rest. Grp., 2022 U.S. Dist. LEXIS 106272 (D.N.J. 2022).

6.  Attached hereto as **Exhibit C** is a true and accurate copy of the relevant portions of the deposition transcript of Manny Lopez.

7.   Attached hereto as **Exhibit D** is a true and accurate copy of the Elite Investigations incident report.

8.   Attached hereto as **Exhibit E** is a true and accurate copy of the relevant portions of the Plaintiff Michael Anderson's deposition transcript.

9.   Attached hereto as **Exhibit F** is a true and accurate copy of the video footage from the incident. *The video footage has been emailed directly to chambers.*

10. Attached hereto as **Exhibit G** is a true and accurate copy of still-frame images from this incident.

11. Attached hereto as **Exhibit H** is a true and accurate copy of the Newark Police Report.

12. Attached hereto as **Exhibit I** is a true and accurate copy of the Elite/Whole Foods contract.

13. Attached hereto as **Exhibit J** is a true and accurate copy of the relevant portions of the deposition transcript of Kendrick Nguyen.

14. Attached hereto as **Exhibit K** is a true and accurate copy of the affidavits of Kendrick Nguyen and Kevin Burrows.

15. Attached hereto as **Exhibit L** is a true and accurate copy of the discovery requests sent by Defendants to Plaintiff.

16. Attached hereto as **Exhibit M** is a true and accurate copy of the relevant portions of the deposition transcript of Eric Kiefer.

17. Attached hereto as **Exhibit N** is a true and accurate copy of the emails between Plaintiff and Eric Kiefer.

18. Attached hereto as **Exhibit O** is a true and accurate copy of the Court's opinion in <u>Myers v. Atl. Health Sys.</u>, 2017 U.S. Dist. LEXIS 7884 (D.N.J. 2017).

19. Attached hereto as **Exhibit P** is a true and accurate copy of the Patch.com article.

137417626.1

I hereby certify that the foregoing statements made by me are true to the best of my knowledge.

I am aware that if any of the foregoing statements made by me are willfully false, I am subject

to punishment.

By: /s/ *Brian W. Brown, Esq.*

Brian W. Brown, Esq.

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
One Riverfront Plaza, Suite 800
Newark, NJ 07102
(973) 792-8723
*Counsel for Defendants, Whole Foods and Elite Investigations*

Dated: March 8, 2024

137417626.1

# EXHIBIT A

137417626.1

Christopher Roberts (#001351995)
Attorney at Law
7 Glenwood Avenue
Suite 401
East Orange, New Jersey 07017
(973)-673-0600
Attorneys for Plaintiff

---

Michael Anderson,

        Plaintiff,

v.

Whole Foods Market, Inc., Elite Investigations, Ltd,
JOHN DOES (1-10), JANE DOES (1-10),
ABC CORPORATION (1-10), ABC, LLC
(1-10), ABC LLP (1-10), JOINTLY,
SEVERALLY, INDIVIDUALLY

        Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: ESSEX COUNTY
DOCKET NO:

Civil Action

COMPLAINT AND JURY DEMAND

---

Plaintiff Michael Anderson residing in the City of Newark, County of Essex, State of New Jersey, complaining of defendant(s), alleges as follows:

## PARTIES

1. Plaintiff is a black man and resides in Newark, New Jersey, in the County of Essex, State of New Jersey, and complaining of Defendants Whole Foods Market, Inc, Elite Investigations, Ltd., John Does (1-10), Jane Does (1-10) and ABC Corp (1-10) as follows:

1

2.  Defendant Whole Foods Market, Inc. (hereinafter "WF") is an entity duly organized and existing under the laws of this State of New Jersey, having their principal places of business at 633 Broad Street, Newark, New Jersey 07088. State of New Jersey and is engaged in the business of selling foods, food products, merchandise to public.

3.  Defendant Elite Investigations, Ltd is an entity duly organized and existing under the laws of this State of New Jersey, having their principal places of business at 2001 Central Park, Yonkers, NY 10710, State of New York and is engaged in the business of providing security services to private companies.

4.  At all relevant times, defendants Whole Foods Market, Inc., Elite Investigations, Ltd., John Does (1-10), Jane Does (1-10), ABC Corporation (1-10), ABC, LLC (1-10), ABC LLP (1-10), were in the employ of Defendant WF whose location is at the Newark store located at 633 Broad Street, Newark, New Jersey 0708. .At all relevant times, defendants John Does(1-10), Jane Does (1-10), ABC Corporation (1-10), ABC, LLC (1-10), ABC LLP (1-10), were the agents, employees, representatives, servants of Defendants WF and Elite Investigations, Ltd.

5.  This action is brought pursuant to the New Jersey Law Against Discrimination 10:5-4 et seq. which prohibits discrimination against a person in the terms, conditions, or privileges of public accommodation on the basis of a person's race.

6.  Upon information and belief, at all relevant times Defendant WF employed more than five (5) persons, bringing defendant within the parameters of the New Jersey Law Against Discrimination. prohibiting their respective agents from discriminating against patrons on the basis of race and exercising a protected right.

7.  Defendants conduct as alleged in this complaint constitutes an unlawful public accommodation practice in violation of N.J.S.A. 10:5-4 et seq.

8. This action is also an action under the laws of the State of New Jersey for false arrest, assault and battery.

9. As a direct, foreseeable, and proximate result of defendants' discriminatory acts, plaintiff has suffered and continues to suffer humiliation, embarrassment, mental and emotional distress, discomfort and economic damages.

## FACTS IN COMMON TO ALL CLAIMS

1. On or about October 3, 2020, Plaintiff Michael Anderson walked into the Whole Foods Market store located at 633 Borad Street, Newark, NJ wearing sweatpants, a hoodie and possessed an item that he had purchased at another store.

2. As Plaintiff Michael Anderson was leaving the store after paying for his purchase, an armed security office collided into Plaintiff and pushed Plaintiff backwards. Two other WF employees approached Plaintiff including a manager. Several minutes passed before Plaintiff was finally told why he was being detained and he was told by Defendant WF and Elite Investigations, Ltd.'s employees and/or agents that he was in possession of a stolen item. The employees of Defendant WF and Elite Investigations, Ltd. had falsely accused Plaintiff of shoplifting the item.

3. Plaintiff, a Harvard University graduate, produced his receipt and handed it to the WF employees. Throughout the interaction, the security guard kept his hand on near his gun.

4. The General Manager of Defendant WF at the 633 Broad Street location was verbally abusive to Plaintiff and berated while he was being detained by the security guards.

3

Eventually, Plaintiff was allowed to leave after producing his receipt for the alleged stolen item.

5. Upon information and belief, Plaintiff contends that if it is the protocol of Defendant WF to racially profile and then blamed the outsourced staff for false arrests, then Defendant WF should be liable for the false arrest.

6. Upon information and belief, Plaintiff contends that Defendants WF and Elite Investigations, Ltd. racially profiled him when they assaulted, detained him and falsely accused him of shoplifting.

7. Upon information and belief, Defendant Elite Investigations, Ltd. and its employees and/or agents were acting on behalf of Defendant WF and were located on the premises of Defendant WF.

8. Upon information and belief, a spokesperson for Defendant WF acknowledge that Plaintiff's experience was unacceptable and that the actions of the Defendant Elite Investigations, Ltd.'s security guards and/or employees were in violation of WF's protocol.

9. Upon information and belief, Plaintiff has suffered damages resulting in the loss of compensation and benefits, physical injury and mental injury.

10. Defendants have committed the aforementioned acts oppressively, willfully and maliciously, entitling plaintiff to an award of punitive damages.

## COUNT ONE

(NEW JERSEY LAW AGAINST DISCRIMINATION N.J.S.A. 10:5-4 et seq.)

1. Plaintiff refers to the allegations set forth in the fact statement of the complaint and by such reference repleads and incorporates them as though fully set forth herein.

2. Defendants WF and Elite Investigations, Ltd 's conduct as alleged in this complaint which aided and abetted the unlawful public accommodation discrimination, discriminatory practice, disparate treatment, hostile public accommodation environment, race discrimination, retaliation, in violation of the New Jersey Law Against Discrimination 10:5-1 et seq.

## COUNT TWO

### (FALSE ARREST)

1. Plaintiff refers to the allegations set forth in the fact statement of the complaint and Count One and by such reference repleads and incorporates them as though fully set forth herein.

2. On or about October 3, Defendants WF, Elite Investigations, Ltd, John Does(1-10), Jane Does (1-10) who were acting within the scope of their employment and as agents, servants and/or servants of Defendant WF and Elite Investigations. Ltd. falsely, wrongfully, and maliciously and without warrant, authority law or probable cause, against Plaintiff's wishes and without probable cause caused Plaintiff to be detained and thereafter caused Plaintiff to be deprived of his liberty.

3. By reason of the foregoing arrest, false imprisonment and unlawful detention, Plaintiff was deprived of his liberty, suffer mental anguish and was exposed to public embarrassment and greatly injured in his reputation, caused him to suffer mental anguish and physical pain.

5

## COUNT THREE

## (ASSAULT & BATTERY)

1. Plaintiff refers to the allegations set forth in the fact statement of the complaint and Counts One and Two by such reference repleads and incorporates them as though fully set forth herein.

2. Defendant WF and Elite Investigations Ltd.'s act of forcibly detaining Plaintiff by colliding into him was a harmful and offensive contact to Plaintiff's person and created a reasonable apprehension in Plaintiff of further harm to his person.

3. Defendants WF and Elite Investigations Ltd. allow their employees to physically detain consumers knowing that such contact would be harmful or offensive.

4. As a result, Plaintiff suffered mental anguish and was exposed to public embarrassment and greatly injured in his reputation, caused him to suffer mental anguish and physical pain.

## COUNT FOUR

## (NEGLIGENCE)

1. Plaintiff refers to the allegations set forth in the fact statement of the complaint and Counts One, Two and Three by such reference repleads and incorporates them as though fully set forth herein.

2. The security guards' actions were performed within the scope of employment and in the interest of Defendants WF and Elite Investigations, Ltd.

6

3. The security guards were acting under the supervision and control of Defendant WF and Elite Investigations, Ltd. through its managers and store supervisors.

4. Defendants WF and Elite Investigations, Ltd. have a duty to its consumers, including Plaintiff, to properly supervise, direct and control its employees so that their actions would not present a risk of harm or danger to its consumers.

5. Defendants WF and Elite Investigations, Ltd., had a duty to provide aid and assistance to Plaintiff but Defendants WF and Elite Investigations, Ltd., had failed to adequately train its employees and/or security guards who perform loss prevention-related acts, failed to ensure their employees and/or security guards apply objective standards before performing loss prevention-related acts and failed to properly supervise employees or adequately monitor their interaction with customers, particularly employees and/or security guards who perform loss prevention-related acts, failed to establish and implement adequate standard operating procedures and regulations designated to eliminate the risk of innocent customers being physically assaulted by WF and Elite Investigations, Ltd., Inc employees and/or security guards performing loss prevention-related acts.

## COUNT FIVE

### (VICARIOUS LIABILITY)

1. Plaintiff refers to the allegations set forth in the fact statement of the complaint and Counts One, Two, Three and Four by such reference repleads and incorporates them as though fully set forth herein.

2. At all relevant times Defendants WF and Elite Investigations, Ltd. are vicariously responsible for the actions or omissions of its employees and/or security guards and probable consequences of their actions or omissions.

7

3. As a direct and proximate result of the actions and omissions of Defendant WF and Elite Investigations, Ltd.'s employees and/or security guards, Plaintiff has suffered damages.

## COUNT SIX

### (NEGLIGENT HIRING/RETENTION)

1. Plaintiff refers to the allegations set forth Counts One, Two, Three, Four, and Five, by such reference repleads and incorporates them as though fully set forth herein.

2. Defendant WF and Elite Investigations, Ltd., Inc's , in committing the above-described acts, hired and retained employees who either harassed and/or assaulted previous customers and continued to remain employed with Defendant WF and Elite Investigations, Ltd..

3. As a direct result of the outrageous acts and omissions, conduct, harassment and discrimination, plaintiff became distraught and suffered damages.

## COUNT SEVEN

### (INVASION OF PRIVACY, DEFAMATION SLANDER PER SE)

1. Plaintiff refers to the allegations set forth Counts One, Two, Three, Four, Five and Six above and by such reference repleads and incorporates them as though fully set forth herein.

2. Defendants WF and Elite Investigations, Ltd., in committing the above-described acts, intended to and did defame the character of the plaintiff and place him in a false light per se. Defendants acted with reckless disregard in defaming plaintiff's character and placing him in a false light.

3. As a direct result of the outrageous acts and omissions, conduct, harassment and discrimination, plaintiff became distraught and he suffered damages.

8

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for Judgment against all Defendants WF and Elite Investigations, Ltd., individually, jointly, severally and each of them for all aforementioned claims, for the following injunctive and monetary relief as follows:

1. An order compelling Defendants to take prompt appropriate and effective corrective measures, including those that effect all supervisors and personnel, to prevent abuse, harassment, bullying and discrimination complained of in this Complaint by any employee, agent, and/or representative toward any member of the community.

2. Any other prospective injunctive relief that the Court deems just and appropriate

3. For compensatory damages including lost wages and benefits, and emotional distress damages

4. Punitive damages

5. Pain and suffering

6. Attorney fees and costs, plus interest

7. For such other and further relief as the Court deems proper.

By: _____
Christopher C. Roberts, Esq.

Dated: June 21, 2021

9

## DESGINATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Christopher Roberts, Esq., is hereby designated as trial counsel for the Plaintiff in this matter.

By: _____

Christopher C. Roberts, Esq.

Dated: June 21, 2021

## CERTIFICATION OF NO OTHER ACTIONS

Pursuant to Rule 4:5-1, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of appending arbitration pending arbitration proceeding to the best of our knowledge or belief. Also, to the best of our belief, no other action or arbitration proceeding is known of no other parties that should be joined in the above action. In addition, we recognize the continuing obligation of each party to file and serve on all parties and the Court an amended certification if there is a change in the facts stated in this original certification.

By: _____

Christopher C. Roberts, Esq.

Dated: June 21, 2021

## JURY DEMAND

Plaintiff hereby demands trial by a jury on all triable issues raised in this complaint, pursuant to R. 1:8-2 and R. 4:35-1(a)

By: _____

Christopher C. Roberts, Esq.

Dated: June 21, 2021

10

# EXHIBIT B

137417626.1

**ℹ Cited**
As of: March 8, 2024 3:33 PM Z

# *Ali v. Hillstone Rest. Grp.*

United States District Court for the District of New Jersey

June 14, 2022, Decided; June 14, 2022, Filed

Civ. No. 20-10547 (KM) (ESK)

**Reporter**
2022 U.S. Dist. LEXIS 106272 *; 2022 WL 2128681

RASHIDAH ALI, Plaintiff, v. HILLSTONE RESTAURANT GROUP and/or HILLSTONE RESTAURANT GROUP d/b/a HOUSTON'S RESTAURANT and/or HOUSTON'S, its agents, servants, employees, NICK SEGAL, ABC CORP 1-5, and/or JOHN DOE 1-5 and/or JANE DOE 1-5, Defendants.

**Subsequent History:** The Docket Number of this Case has been Corrected by the Court June 17, 2022.

**Counsel:** [*1] For RASHIDAH ALI, Plaintiff: ROSEMARIE ARNOLD, LEAD ATTORNEY, FORT LEE, NJ.

For HILLSTONE RESTAURANT GROUP, doing business as, HOUSTON'S RESTAURANT, HOUSTON'S, NICK SEIGAL, Defendants: RUSSELL MARC YANKWITT, LEAD ATTORNEY, MICHAEL HAYDEN REED, YANKWITT LLP, WHITE PLAINS, NY.

**Judges:** Kevin McNulty, United States District Judge.

**Opinion by:** Kevin McNulty

# Opinion

**KEVIN MCNULTY, U.S.D.J.**:

Plaintiff Rashidah Ali had lunch with three friends at a Houston's restaurant owned by defendant Hillstone Restaurant Group. (Defendants are referred to herein as "Hillstone.") After eating a late lunch and spending more than three and a half hours at their table, Ali's group was asked to leave

the restaurant to make room for waiting diners. Ali brought this case, claiming that the restaurant's request that she leave was motivated by her race, in violation of the *New Jersey Law against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 et seq.* Defendants now move jointly for summary judgment. (DE 27.)[1]

For the reasons set forth below, Hillstone's motion for summary judgment is **GRANTED**.

## I. Background

On March 4, 2020, Rashidah Ali and three friends had lunch at a Houston's restaurant in Hackensack, NJ, which is owned by defendant Hillstone. (DSOMF ¶ 1, 8, 12.) Defendant [*2] Nick Siegel is an employee of the Houston's restaurant.[2] (DSOMF ¶ 28.) Ali and two of her friends are African-American, and the fourth member of their party is white. (*Id.* ¶ 8.) The party was seated at their table at 2:22 P.M. (*Id.* ¶ 12.) The four ordered and ate lunch and at 4:01 P.M., approximately 90 minutes after they were seated, they paid the bill. (*Id.* ¶ 13.) The friends remained seated, however,

---

[1] For ease of reference, certain key items from the record will be abbreviated as follows:

"DE_" = Docket Entry in this Case

"Def. Br." = Defendant's Brief in Support of Summary Judgment (DE 27-1)

"Opp." = Plaintiff's brief in opposition to Summary Judgment (DE 30)

"DSOMF" = Defendants' statement of material facts (DE 27-2)

"Video" = Video taken by plaintiff Ali, DE 27-9, Ex. F.

[2] Siegel's name is misspelled in the caption.

and approximately an hour later, at 5:06 P.M., they ordered another round of drinks. (*Id.* ¶ 14-15.) A second check was brought shortly after this second round of drinks was served. (*Id.* ¶ 16.) The party then ordered a third round of drinks, which arrived along with another, updated check, at 5:22 P.M. (*Id.* ¶ 17.) That second check was paid at 5:35 P.M. but the party again remained at the table. (*Id.* ¶ 18, 20.)

At this time, the dinner hour had begun, and the restaurant was quite full, with at most three open tables. (*Id.* ¶ 21.) Around 6:00 P.M. the party attempted to order another round of drinks. (*Id.* ¶ 22.) Their server went to her manager, Molly Kornfield, and informed Kornfield that the table had been seated for several hours and wanted to again reopen their bill. (*Id.* ¶ 24.) Kornfield **[*3]** determined that the party had been there for over three and a half hours and informed them that they could not reopen their check yet again, but instead had to leave the restaurant. (*Id.* ¶ 25-26.) Although the restaurant's policy is to ask diners in this type of situation to relocate to the bar, no one asked Ali and her friends to do so.[3] (*Id.* ¶ 29.) After Ali reacted negatively to the request that the group leave the restaurant, Kornfield requested assistance from Nick Siegel, another manager. (*Id.* ¶ 27-29.)

At this point, the interaction between Ali and the restaurant staff became contentious. Ali stated that she was being subjected to "an act of racism" and began to film the encounter with her cell phone. (*Id.* ¶ 30-31.) Siegel asked Ali's party to "start wrapping it up because we don't have enough tables to accommodate walk-ins and reservations." (*Id.* ¶ 32.) Ali and Siegel then went back and forth, Ali expressing her party's desire to have another round of drinks and Siegel insisting that they leave now because other guests were waiting. (*Id.* ¶ 33-35.)

As the party left the restaurant, Ali filmed a second video showing that three tables were empty. (*Id.* ¶

40.) Defendants claim that **[*4]** two of the tables were not available because the restaurant was short-staffed, and that a party was seated at the third table a minute or two after Ali and her party left the restaurant. (*Id.* ¶ 42-45.)

In addition, Ali has submitted the affidavit of Aisha Wilson, who worked at Houston's for eighteen years until January 2018. (DE 31.) Wilson asserts that she never asked patrons to leave for remaining too long at their table, that she had been passed over for promotion because of her race, and that Houston's had made policy and menu changes, such as a dress code disallowing sports jerseys, that she believes were meant to dissuade African Americans from dining there. (DE 31 ¶ 4-7.)

Ali brought this case in New Jersey Superior Court, Bergen County - Law Division on July 16, 2020. (DE 1-1.) Defendants timely removed the action to this court on August 14, 2020. (DE 1.) The complaint contains four Counts. Count 1 is for race or national origin discrimination under the NJLAD (DE 1-1 p. 1-4.) Counts 2 and 3 are for failure to remedy and failure to have an effective anti-discrimination policy, also under the NJLAD. (*Id.* p. 5-7.) Count 4 is for intentional and negligent infliction of emotional **[*5]** distress. (*Id.* p. 7-8.) Ali has agreed to dismiss Counts 2, 3, and 4, leaving only the NJLAD race discrimination Count.[4] (Opp. at 18-19.) Discovery proceeded and was completed on September 8, 2021 (DE 24) and defendants moved jointly for summary judgment on October 13, 2021 (DE 27). Ali filed a brief in opposition (DE 30) and submitted the Wilson

---

[3] Kornfield testified that she did ask Ali's party to relocate to the bar, but this is contested. For the purpose of this motion, I assume the truth of Ali's claim that she was not offered the option to relocate to the bar. (Def. Br. at 6 n.2.)

---

[4] While seeming to acknowledge that infliction of emotional distress claim is subsumed by her NJLAD race discrimination claim, Ali also appears to argue separately the merits of a claim of infliction of emotional distress. (Opp. at 18-20.) The case law is clear, however, that "[w]hen a common law claim of intentional infliction of emotional distress is based on the same allegations supporting Plaintiff's LAD claim, Plaintiff is not entitled to relief because supplementary common law causes of action may not go to the jury when a statutory remedy under the LAD exists." *Valentine v. Bank of Am., No. CIV.A. 09-262 (SDW), 2010 U.S. Dist. LEXIS 8546, 2010 WL 421087, at *6 (D.N.J. Feb. 1, 2010).* I believe that Ali has agreed to dismiss Count 4, but if not, I would grant summary judgment in favor of defendants on that Count because it is preempted by the NJLAD.

affidavit (DE 31). Defendants filed a reply (DE 32.) This motion is now fully briefed and ripe for decision.

## II. Standard of Review

*Federal Rule of Civil Procedure 56(a)* provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; see also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Kreschollek v. S. Stevedoring Co., 223 F.3d 202, 204 (3d Cir. 2000)*. In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. See *Boyle v. County of Allegheny Pennsylvania, 139 F.3d 386, 393 (3d Cir. 1998)*. The moving party bears the burden of establishing that no genuine issue of material fact remains. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." **[*6]** *Celotex, 477 U.S. at 325*.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson, 477 U.S. at 248*; see also *Fed. R. Civ. P. 56(c)* (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990)*; *see also Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001)* ("A

nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992)* (quoting *Celotex, 477 U.S. at 322-23*).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide **[*7]** the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson, 477 U.S. at 249*. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)*. The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. That "evidentiary burden" is discussed in detail below.

## III. Discussion

With Ali's well-judged dismissal of Counts 2, 3, and 4, we are left with the heart of her claim: Count 1, the claim that defendants discriminated against Ali on the basis of her race in a place of public accommodation in violation of the NJLAD. Defendants seek summary judgment on this claim. Analyzing that claim within the *McDonnel Douglas* burden shifting framework, I conclude that summary judgment must be **GRANTED** in favor of defendants.

### a. *McDonnell Douglas* burden-shifting framework

Ali argues that Hillstone discriminated against her

on the basis of her race. As is common, she lacks substantial direct evidence of discriminatory intent (such as contemporaneous biased statements by Hillstone's employees), and therefore seeks to prove Hillstone's discriminatory **[*8]** intent through circumstantial evidence.[5]

When a plaintiff seeks to prove discrimination on behalf of the proprietor of a public accommodation under the NJLAD, courts evaluate motions for summary judgment under the specialized burden-shifting framework set out in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. *See Maultsby v. RIH Acquisitions NJ, LLC, No. CIV.A. 09-4376, 2011 U.S. Dist. LEXIS 148267, 2011 WL 6779556, at *8 (D.N.J. Dec. 27, 2011)*. The *McDonnell Douglas* test was formulated "to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins, 490 U.S. 228, 271, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)* (O'Connor, J., concurring).

The *McDonnell Douglas* analysis is divided into three phases, shuttling the burden between the plaintiff and the defendant.

*Step One: The Prima Facie Case.* At the outset, a plaintiff must state a *prima facie* case of discrimination. *Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013)*. A *prima facie* case of discrimination in a place of public accommodation has three essential elements: "(1) defendant operates a place of public accommodation; (2) the plaintiff is a member of a protected class; and (3) he or she was denied equal treatment on the basis of his or her membership in a protected class." *Vandeusen v. Mabel Realty of Bordentown, LLC,*

No. 12-0330, 2012 U.S. Dist. LEXIS 66567, 2012 WL 1664116, at *3 (D.N.J. May 11, 2012)* (citing *N.J. Stat. Ann. § 10:5-12(f)*; *Dasrath v. Continental Airlines, Inc., 2006 U.S. Dist. LEXIS 9707, 2006 WL 372980 (D.N.J. Feb. 16, 2006)*).

*Step Two: Legitimate Non-Discriminatory Reason.* If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant, who must articulate a legitimate (*i.e.*, nondiscriminatory) **[*9]** basis for the actions to which plaintiff objects. *Burton, 707 F.3d at 426*; *Rodriguez v. Nat'l R.R. Passenger Corp., 532 Fed. Appx. 152, 153 (3d Cir. 2013)*. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the ... action for a non-discriminatory reason." *Burton, 707 F.3d at 426* (internal quotations omitted).[6]

*Step Three: Pretext.* Once the defendant has offered a non-discriminatory reason, the burden of production shifts back to the plaintiff. Now the plaintiff must present evidence sufficient to show that the defendant's stated reason is merely a pretext for discrimination. *Id.*[7]

---

[5] A plaintiff may also seek to establish her case by the more difficult route of direct evidence. Where plaintiff proffers direct evidence, "the quality of evidence required to survive a motion for summary judgment is that which if believed, proves [the] existence of [a] fact in issue *without inference or presumption*." *Bergen Commercial Bank v. Sisler, 157 N.J. 188, 723 A.2d 944, 954 (N.J. 1999)* (internal quotations omitted); *see also Kirschling v. Atl. City Bd. of Educ., 10 F. Supp. 3d 587 (D.N.J. 2014)* (drawing this distinction); *Pray v. New Jersey Transit, 2014 N.J. Super. Unpub. LEXIS 358, 2014 WL 684592, at *10 (N.J. Super. Ct. App. Div. Feb. 24, 2014)* (same).

[6] Indeed, at this stage, "the defendant need not prove that the articulated reason actually motivated its conduct." *Id.* (internal quotations omitted).

[7] The plaintiff can do that in either of two ways: (1) she can discredit defendant's proffered reason; or (2) she can offer evidence that discrimination was more likely than not a motivating or determinative factor in the action. *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)*. To meet that burden, the plaintiff may rely on direct or circumstantial evidence.

Here plaintiff relies on the first method (discrediting the defendant's proffered reasons) and she thus faces a demanding standard: she must present evidence that allows a factfinder "reasonably to infer that *each* of the [proprietor's] proffered non-discriminatory reasons ... was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (internal quotations and citations omitted). The plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [proprietor's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Iadimarco v.*

### b. Merits Analysis

Defendants argue that Ali has failed to provide sufficient evidence to support her *prima facie* case and, in the alternative, that she cannot demonstrate that defendants' legitimate non-discriminatory reason was pretextual. (Def. Br. at 13-18.) Ali, in contrast, argues that she has made a *prima facie* case and that fact issues preclude summary judgment on whether defendants' explanation was pretextual. (Opp. at 15-17.) On the first, closer question, I find that Ali has failed to make out a *prima facie* case. But even assuming that there is a *prima facie* case, she has failed to provide evidence demonstrating that **[*10]** defendants' non-discriminatory explanation was pretextual, and has failed to identify any disputed issues of material fact that could preclude summary judgment.

*Prima Facie Case*. I find that Ali has not presented a *prima facie* case that her party was asked to leave the restaurant because of her race. It is uncontested that the restaurant is a place of public accommodation, and that Ali is a member of a protected class. The remaining element is whether she was denied "equal treatment on the basis of ... her membership in a protected class." *Vandeusen, 2012 U.S. Dist. LEXIS 66567, 2012 WL 1664116, at *3*. It appears that Ali and her party were some of the only, if not the only, African-American diners in the restaurant and that they were asked to leave. Nowhere in the record, however, is there evidence that any employee of Hillstone expressed explicit bias against Ali and her party. Ali therefore must attempt to make her case through circumstantial evidence.

Ali points to several pieces of evidence to establish her *prima facie* case. First, citing the video she took, Ali claims that it reveals 1) "numerous Caucasian patrons who were dining at the restaurant and not repeatedly brought their checks after each round of drinks without having asked for **[*11]** them or told they had to leave before they were done consuming what they had ordered" as

*Runyon, 190 F.3d 151, 166 (3d Cir. 1999)* (internal quotations omitted).

well as 2) "empty tables where Defendant could have easily sat the guests purportedly waiting for Plaintiff's table."[8] (Opp. at 15.) In addition, Ali claims that the issue of whether the restaurant was enforcing its 90-minute dining time limit is an issue of fact for the jury, and that the Wilson affidavit demonstrates that Houston's had earlier put other policies in place to dissuade African-American patrons from dining there. (*Id.* at 16.)

None of these facts suffice to demonstrate that Ali was denied equal treatment on the basis of her race. First, Ali's cellphone video, which is approximately 90 seconds long, shows the other tables at the restaurant for only a few seconds each. It reveals nothing about how long white patrons sat, when white patrons were given their checks, or more generally how they were treated by defendants. Nor is there any testimony as to those issues. Vitally, to demonstrate that she and her party were denied equal treatment, Ali must show that *similarly situated* white patrons were treated differently. "Although 'similarly situated' does not mean identically **[*12]** situated, the comparator must be similar in all relevant respects." *Durst v. City of Philadelphia, 798 F. App'x 710, 713 (3d Cir. 2020)*. Here, Ali has produced no evidence to demonstrate that the white diners were similarly situated with respect to the critical issue: the length of time they had spent in the restaurant. Ali has presented no evidence that any of the other diners had been sitting for a length of time that approached the roughly three and a half hours her party had been sitting. Indeed, Ali herself testified that she did not know how long any of the other restaurant patrons sat at their tables during her visit. (DE 30-2 at 109:11-13.) It is uncontested that Houston's had a race-neutral, written policy that reserved the right to ask a party to leave if the restaurant was busy and the party had dined for more than ninety minutes. (DSOMF ¶

---

[8] As discussed below, I find that the relevance of the empty table issue is relevant not to the *prima facie* case of discrimination but rather is relevant to Ali's attempt to demonstrate that defendants' race-neutral explanation was a pretext for discrimination. Even if there were no empty tables, for example, Ali could potential have made a *prima facie* case if she had convincing evidence of bias.

5; DE 27-13, Ex. 1.) Without evidence that her party was treated differently from a non-African-American party that had also been dining for several hours, Ali cannot make out a *prima facie* case of discrimination.

The information contained in the Wilson affidavit, though concerning, does not rescue Ali's *prima facie* case, for three key reasons. (DE 31.) First, Wilson has no direct knowledge of the events **[\*13]** surrounding Ali's removal from the Houston's restaurant, and cannot rebut the evidence of any of the participants. Second, on March 4, 2020, more than two years had passed since Wilson had been employed at the Hackensack Houston's. (*Id.* ¶ 3.) Concededly, her knowledge was based on 18 years' experience as an employee, but any information about discriminatory attitudes or practices at Houston's was more than two years out of date. She states, for example, that there was no 90-minute policy in effect when she worked at the restaurant, and that she had never personally asked patrons to leave because they had sat for too long; it is uncontested, however, that there *was* such a policy on March 4, 2020.

Third, Wilson's testimony, offered to document discriminatory intent in an overall sense, is somewhat general. Ms. Wilson does not state that Houston's had ever before removed African-American diners for discriminatory reasons. Rather, she states that an unidentified supervisor or supervisors had evinced discriminatory attitudes by criticizing her braided hair style and passing her over for promotion. In addition, she points to practices, such as a dress code prohibiting sports jerseys and the **[\*14]** dropping of certain menu items, that she infers were racially motivated. The affidavit does not give names, places, or dates, attributing discrimination over an 18-year period to "management," "my supervisor," or "employees." (DE 31 ¶ 4-7.) Critically, Wilson does not link up any of her assertions to the person(s) alleged to have discriminated against Ali on March 4, 2020—*i.e.*, the relevant decision makers in this case.[9] In

short, the Wilson affidavit comes closer to the mark, but is still insufficient; general allegations of discrimination stretching back for years, not linked to the particular persons involved here, cannot carry Ali's burden to show she was denied equal treatment on the basis of her race on March 4, 2020.

For this reason, I must grant summary judgment in favor of defendants, as Ali has not presented evidence **[\*15]** to meet her burden to present a *prima facie* case at trial. *See* Katz, 972 F.2d at 55.

*Non-discriminatory reason and pretext.* There is a second, independent reason to grant summary judgment for defendants, even assuming that Ali has made out a prima facie case. I here address the evidence of defendants' non-discriminatory reason for Ali's removal from the restaurant and Ali's attempt to demonstrate that this explanation

---

offer specific evidence of any comparable situation. Even in the employment discrimination context, however, where another employee is offered as a comparator, summary judgment will not be denied unless the situations are parallel and involve the same relevant decisionmaker:

> "Employees are not considered comparable where the discipline was imposed by different decision makers," so [co-employee] is not a suitable comparator. Nguyen v. AK Steel Corp., 735 F. Supp. 2d 346, 376 (W.D. Pa. 2010) (citations omitted); *see also* Parker v. Farley, 625 F. App'x 77, 83 (3d Cir. 2015) (recognizing that it is "very difficult" for a plaintiff "to establish any inference of discrimination" where proposed comparators were disciplined by different supervisors).

Tamburello v. City of Allentown, No. 5:20-CV-06153-JMG, 2022 U.S. Dist. LEXIS 22023, 2022 WL 377400, at *6 (E.D. Pa. Feb. 7, 2022) (footnote omitted).

Davis v. Cleary, No. CIV. 09-0925 AET, 2011 U.S. Dist. LEXIS 108302, 2011 WL 4435697 (D.N.J. Sept. 22, 2011), cited in defendants' reply, is not on point, but is illustrative of the governing principles. There, a school administrator made a claim of racial discrimination in employment. Judge Thompson granted defendants' motion for summary judgment, noting, *inter alia*, that the lack of any other African-American administrators did not, without more, demonstrate discrimination, and that an insensitive joke by the school superintendent, which had occurred more than a year before and did not involve the relevant decisionmakers regarding employment, did not suffice, either. 2011 U.S. Dist. LEXIS 108302, [WL] at *4-*5.

---

[9] Presumably, defendant Siegel or possibly Kornfield. As noted, Wilson speaks of discrimination generally, and does not

2022 U.S. Dist. LEXIS 106272, *15

was pretextual. I find there is not sufficient evidence to create a jury question as to whether defendants' explanation for her removal—that she and her party had been sitting for an excessive period of time and the restaurant wanted the table for other guests—was pretextual.

As noted above, plaintiff chooses here the method of discrediting the defendant's proffered nondiscriminatory reasons for the action it took. That method requires proof that those reasons were fabrications, or that they are so improbable that a fact finder could find them unworthy of credence. *See Iadimarco v. Runyon, 190 F.3d 151, 166 (3d Cir. 1999)*; *Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)* (quoted more fully at pp. 7-8 & n.6, *supra*).

Defendants claim that Ali and her party were asked to leave the restaurant where they had sat for more than three and a half hours, not on the basis of race, but because Hillstone **[*16]** wanted to free up tables for dinner patrons. (Def. Br. at 6.) At the time, Houston's had a written policy that reserved the right to ask diners to leave after ninety minutes if other patrons were waiting.[10] (DSOMF ¶ 5; DE 27-13, Ex. 1.) Defendants thus proffer that their actions had nothing to do with Ali's race, but only related to the length of time she had spent in the restaurant. This suffices to meet defendants' "relatively light" burden to state a race-neutral explanation. *See Burton, 707 F.3d at 426*. The real battleground here is whether the defendants' race-neutral explanation was pretextual.

Ali attempts to demonstrate that this explanation was pretextual by making two distinct arguments. First, she argues that by providing her party with separate bills after the meal and two rounds of drinks, defendants "tried to force Plaintiff to leave the restaurant on three separate occasions." (Opp. at 17.) Second, she argues that because there were three empty tables at which waiting guests could have been seated, the defendants must be lying when they state that the restaurant needed Ali's table for its arriving dinner patrons. (Opp. at

---

[10] That policy no longer appears on Hillstone's website, but was published on the website as of March 4, 2020.

17-18.) Both of these arguments fail to persuade, for the following reasons. **[*17]**

Now it is undoubtedly true, on this record, that the Houston's staff presented the bill in the expectation that Ali and her party would pay it and leave, as would be typical. The staff, however, did nothing to press the issue for several hours, until the dinner hour arrived. Such indulgence does not bespeak a pretextual stratagem to force African-American patrons out of the restaurant. Furnishing a patron with a check, moreover, is consistent with the restaurant's 90-minute policy. No inference of racial discrimination naturally arises from a restaurant's providing the check when it appeared to the servers that Ali's party had long ago finished their meal.

It is true that the presence of three empty tables could under some circumstances support an inference that Ali's table was not truly needed for other guests. Here, however, the uncontradicted record evidence supports defendants' explanation. Ali testified she does not know how many reservations were made that night, and the record does not contradict the restaurant's position that it needed to seat a surge of patrons arriving for the dinner hour. (The last, refused attempt to order another round of drinks seems to have occurred at **[*18]** around 6:00 p.m.) (DE 30-2 at 155:8-14.) It is quite plausible that a restaurant would permit patrons who had finished a late lunch to linger through the afternoon, but not through the dinner hour. So this fact, even viewed in isolation, does little to demonstrate that the defendants' nondiscriminatory explanation was pretextual.

Moreover, defendants provide significant affirmative evidence in support of their position. First, the evidence is uncontradicted that mere minutes after Ali and her party left, a dinner party was indeed seated at one of the three tables. (DSOMF ¶ 51-52.) Second, uncontradicted evidence shows that the other two tables were out of service that night, for reasons having nothing to do with plaintiff or the allegations in this case. Defendants explain that there were not enough servers for the restaurant's 39 tables; 12 servers were working that evening, and the restaurant generally limits servers to working three tables at a

time. (*Id.* ¶ 42-49.) Indeed, Ali's own video supports defendants' statement that two of the three tables were not in use that evening. One table, the one at which a party was seated immediately after Ali's departure, was clearly set for a **[*19]** meal; on it were four place settings, a candle, salt and pepper shakers, and what appears to be a bottle of hot sauce. (Video at 1:22.) In contrast, the other two tables were not set for a meal. On one of them was a large decorative bowl, a pile of coffee table books, and what appear to be four bottles of wine or olive oil. (Video at 0:55.) On the other was a large tray containing an ice bucket, some type of large decorative jug, and a large pile of silverware (as opposed to a place setting) wrapped in cloth napkins. (Video at 1:01.)

In short, the defendants offer evidence, Ali's video evidence tends to confirm, and Ali after suitable discovery is in no position to contradict, that two of the empty tables were out of service. The third table, the only one actually available for diners, was immediately filled just minutes after Ali and her party left the restaurant, corroborating that the dinner crowd was arriving.[11] The presence of three empty tables therefore does not demonstrate that the defendants' explanation was pretextual, and Ali has not demonstrated that any material facts related to pretext are disputed. So even if Ali had made a *prima facie* case of discrimination, I would still **[*20]** grant summary judgment in favor of defendants because their non-discriminatory explanation for their actions has not been rebutted.

## IV. Conclusion

On the facts as Ms. Ali relates them, one can easily understand her embarrassment and irritation. Table turnover is an important key to profitability, and a modern restaurant in a mall may be unable to offer the leisurely accommodation of a Left Bank café. That is regrettable, but the issue here is not whether the restaurant behaved graciously; it is whether drawing the line at three and one half hours was shown to be a pretext for

[11] The race of the persons thereafter seated for dinner is not stated.

racial discrimination. On this record, it was not.

Defendants' joint motion for summary judgment (DE 27) is therefore granted. An appropriate order follows.

Dated: June 14, 2022

/s/ Kevin McNulty

Kevin McNulty

United States District Judge

## ORDER

**THIS MATTER** having come before the Court on defendants' joint motion for summary judgment (DE 27); and the Court having considered the submissions of the parties (DE 27, 30, 31, 32) without oral argument pursuant to *Fed. R. Civ. P. 78(b)*; for the reasons stated in the accompanying Opinion, and for good cause shown;

**IT IS** this 14th day of June 2022,

**ORDERED** that defendants' joint motion for summary judgment **[*21]** (DE 27) is **GRANTED**.

The Clerk shall close the file.

/s/ Kevin McNulty

Kevin McNulty

United States District Judge

---

**End of Document**

Brian Brown

# EXHIBIT C

137417626.1

## In The Matter Of:

*Michael Anderson v*
*Whole Foods Market, Inc., et al*

*Manuel Lopez*
*July 26, 2023*

*GAF Legal Services, Inc.*
*40 Eagle Rock Avenue - Unit B*
*East Hanover, NJ 07936*
*(PH) 973-618-0500      (FAX) 973-618-0808*

Original File 726gtc231.txt
**Min-U-Script® with Word Index**

Case 2:21-cv-12990-SRC-JRA     Document 58-3     Filed 03/11/24     Page 26 of 115
PageID: 172

Michael Anderson v
Whole Foods Market, Inc., et al

Manuel Lopez
July 26, 2023

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO:  2:21-cv-12990

- - - - - - - - - - - - - - -

MICHAEL ANDERSON,

Plaintiff,

v.

WHOLE FOODS MARKET, INC.,
ELITE INVESTIGATIONS, LTD,
JOHN DOES 1-10, JANE DOES
1-10, ABC CORPORATION 1-10,
ABC, LLP 1-10, jointly,
severally and individually,

Defendants.

- - - - - - - - - - - - - - -

REMOTE VIDEO TELECONFERENCED ZOOM

DEPOSITION OF MANUEL LOPEZ, taken by and before

TERESA CLINE, a Certified Court Reporter of the

State of New Jersey, on Wednesday, July 26, 2023,

commencing at 10:01 in the forenoon.


GAF LEGAL SERVICES, INC.
COURT REPORTING * VIDEOGRAPHY * INTERPRETING
40 Eagle Rock Avenue - Unit B
East Hanover, New Jersey 07936
(PH) 973-618-0500     (FAX) 973-618-0808

---

Page 2

A P P E A R A N C E S:

LAW OFFICES OF CHRISTOPHER ROBERTS
BY:   CHRISTOPHER ROBERTS, ESQ.
7 Glenwood Avenue - Suite 401
East Orange, New Jersey 07017
(973) 573-0600
Appearing on behalf of the Plaintiff

FISHMAN MC INTYRE LEVINE SAMANSKY, PC
BY:   MARK N. KEDDIS, ESQ.
120 Eagle Rock Avenue
East Hanover, New Jersey 07936
(973) 560-9000
Appearing on behalf of the Defendant
Whole Foods Market Group, Inc.,
i/p/a Whole Foods Market, Inc.

LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
BY:   BRIAN W. BROWN, ESQ.
One Riverfront Plaza - Suite 800
Newark, New Jersey 07102
(973) 577-6260
Appearing on behalf of the Defendant
Elite Investigations, Limited

---

Page 3

I N D E X

WITNESS                                              PAGE

MANUEL LOPEZ

Direct Examination by Mr. Roberts:                    5

Cross-Examination by Mr. Keddis:                     41

Cross-Examination by Mr. Brown:                      49

Redirect Examination by Mr. Roberts:                 50

Recross Examination by Mr. Brown:                    51

Further Redirect Examination by Mr. Roberts:  51

Recross Examination by Mr. Keddis:                   52

---

Page 4

E X H I B I T S

NUMBER              DESCRIPTION              PAGE

Lopez 1          Email dated 10/4/20          14

Lopez 2          Email dated 10/3/20          31

Michael Anderson v
Whole Foods Market, Inc., et al

Manuel Lopez
July 26, 2023

Manuel Lopez                                                    Page 13

went to see what was going on just on the customer service side of it.

At that point, I already saw that my STL, Store Team Leader, that was already present as well as security guards and I heard a lot of yelling and commotion from Mr. Anderson. Again, but at that time I didn't know his name. Just he was questioning if Odette was the general manager. He didn't think that she was. He had her business card in his hand where it said "Store Team Leader" and he didn't understand. He was a little more dismissive, in my opinion, that she was not the store manager because it said "Store Leader."

But that is the language or the verbiage that we use for general managers. We use Store Leaders.

So I tried to explain that to him several times and then I offer him just a refund for the purchase that he had made. And as he, you know, was walking away, again, it was just brief interaction that I had with him on that.

Q.    Do you remember what Mr. Anderson looked like?  Can you describe him?

A.    If I can remember, it will be thin build, maybe five-nine, five-ten, gentleman,

Manuel Lopez                                                    Page 14

African-American.

Q.    Do you remember what he was wearing?

A.    I do not.

Q.    Or his hairstyle?

A.    I don't remember his hairstyle.

MR. ROBERTS: Teresa, can I have the document that as marked "Manny Lopez email"?  We can call it Lopez 1.

(Document is marked Exhibit Lopez 1 for identification.)

Q.    Mr. Lopez, I'm showing you what's been marked as Lopez 1.

Do you recognize this document?

A.    I do.

Q.    And what is Lopez 1?

A.    Lopez 1 appears to be an email, a recap, of the incident that I sent.

Q.    Did you draft Lopez 1?

A.    Yes.

Q.    Did anybody assist you?

A.    No.

Q.    Why did you draft Lopez 1?

A.    It's our procedures whenever we have an incident just to have recollection of it.

Q.    When you say procedures, what do you

Manuel Lopez                                                    Page 15

mean; is there a company policy?

A.    No, this is what I was always told by my -- my superior Odette, to write a recap when there's an incident.

Q.    When did she ask you or tell you to write a recap?

A.    In the beginning, when I started with the company as part of what I was told.  If there's an incident, just to write a recap.

Q.    Had you written recaps prior to October 4, 2020, regarding shoplifting?

A.    No.

Q.    Was this your first recap of a shoplifting incident while you were employed by the Newark location?

A.    Yes.

Q.    Did Ms. Odette Jarrett ask you to write Lopez 1?

A.    No.

Q.    You wrote it -- you took it upon yourself to write Lopez 1?

A.    Yes.

Q.    Again, why did you write it?

A.    When I started working for the company, I was told that when there is an incident

Manuel Lopez                                                    Page 16

of any type just to write a recap.

Q.    Had there ever been a shoplifting incident at Whole Foods at the Newark location during your tenure?

A.    There were others, but I wasn't involved to write a recap.

Q.    Do you know approximately how many other shoplifting incidents there were?

A.    I don't have a number.

Q.    Do you have an estimate?

A.    If I have to estimate, perhaps maybe a dozen.

Q.    Do you know the racial makeup of those individuals, of that dozen?

A.    There was a mix as far as racial makeup.

Q.    All right.  Do you know what that mix was?

A.    I don't have the exact numbers, but it was a mix between Hispanics, African-American, Asians, Caucasians.

Q.    Out of that 12, do you know how many were Hispanic?

A.    I don't have an exact number.

Q.    Do you know how many were

Case 2:21-cv-12990-SRC-JRA     Document 58-3     Filed 03/11/24     Page 28 of 115
PageID: 174

Michael Anderson v
Whole Foods Market, Inc., et al

Manuel Lopez
July 26, 2023

Manuel Lopez                                                         Page 17

African-American?

A.    Don't have an exact number.

Q.    Asian?

A.    Don't have an exact number.

Q.    Caucasian?

A.    Don't have an exact number.  It's just a mix.

Q.    Of those 12, do you know if more were one race than the other?

A.    -- to say.

Q.    Say that again?

A.    I wouldn't be able to say.

Q.    Do you know if there were write-ups or incident write-ups regarding those shoplifting incidents?

A.    I'm not aware of any.

Q.    Who would be aware?

A.    Usually it would be security that would write anything for their company.

Q.    Do you know if there were any write-ups by Whole Foods employees?

A.    I'm sorry, by whom?

Q.    Whole Foods employees.

A.    I'm not aware of any.

Q.    Back to your memo, or your email, it

Manuel Lopez                                                         Page 18

looks like you wrote it on Sunday, October 4, 2020; is that correct?

A.    That's correct.

Q.    Do you know if that was the date of the incident or a date following the incident?

A.    I believe this is the day after.

Q.    Why did you write it, your report, the day after the incident as opposed to the day of the incident?

A.    I believe I left immediately after the incident.

Q.    Who did you send this to or who did you send Lopez 1 to?

A.    It appears it was sent to Odette, my immediate supervisor.  The other cc that is mentioned there, Orlando Lawful, is another Associate Team Leader at the time and Leslie Lorquet is our loss prevention coordinator for Whole Foods.  Wayne Tripp is Elite contact.

Q.    And, again, tell me who is Leslie Lorquet?

A.    She's Whole Foods Market loss prevention/asset protection coordinator.  She may have a different title.  I know her as the coordinator.

Manuel Lopez                                                         Page 19

She's our -- the best way I can describe it would be, she's our corporate contact for asset protection.

Q.    Why did you feel the need to write her?

A.    Because this involved an asset protection issue.

Q.    Do you know if Whole Foods has an asset protection policy?

A.    They do.

Q.    Is it a written policy?

A.    They do.

Q.    Have you seen it?

A.    While back.  I can't recall exactly where it is, but, yes, they do have a policy.

Q.    Do you recall what's in the policy?

A.    I don't.

MR. ROBERTS: I don't know if counsel can produce this but, Mr. Keddis, I would like to make a request for that policy.

MR. KEDDIS: That's fine.  You can just send a letter to Chris McIntyre and he'll respond.

Q.    Did anybody tell you to write to -- is it Ms. Leslie Lorquet or Mr. Leslie Lorquet?

Manuel Lopez                                                         Page 20

A.    Miss.

Q.    Did anyone tell you to write to Ms. Lorquet?

A.    Again, when I started with the company, just the process they have.  Anything involving asset protection it was for her to be contacted.

Q.    Do you know if the -- of the other dozen shoplifting incidents, do you know if anyone from Whole Foods wrote to Ms. Lorquet?

A.    I don't know.

Q.    Did Ms. Lorquet ever respond or say anything to you in response to your October 4, 2020, email?

A.    I can't recall if she responded to me.

Q.    Did you have any phone communications with Ms. Lorquet about the incident involving Mr. Anderson?

A.    No.

Q.    And Mr. Wayne Tripp, who's that?

A.    He works for -- at the time for Elite.

Q.    Say that again?

A.    He worked for Elite.  He was our

Michael Anderson v
Whole Foods Market, Inc., et al

Manuel Lopez
July 26, 2023

---

Manuel Lopez                                                      Page 33

Who is Mr. Green?

A.    Mr. Green is what we would call the undercover.

Q.    Undercover what?

A.    The undercover officer, plain clothes.

Q.    Was he there at the scene or the incident?

A.    Yes, he was the one that made the stop.

Q.    Previously I believe you testified that it was Chris and the other gentleman that you couldn't name.  Was there a third officer involved?

A.    No.  The undercover is what we -- internally we call them "Mr. Green."

Q.    Oh.  Okay.  So is Mr. Green an actual person or just a title?

A.    It's a nickname or a name that we call within Whole Foods.  So, like, if we are paging them, we're not actually saying undercover.

Q.    Is there a written policy as to the nicknames, or how did that come about?

A.    When I came on board with the company, that's what I was told that they were

---

Manuel Lopez                                                      Page 34

called.

Q.    Do you have any training in loss prevention?

A.    I do not other than what Whole Foods provided.

Q.    And what was that?

A.    As far as policy and procedures.

Q.    Do you know if -- do you know if those policies and procedures include any type of profiling techniques to apprehend potential shoplifters?

A.    Whole Foods Market team members of any kind are not allowed to make any stop or apprehend or detain.

Q.    So according to -- so under their policy, Whole Foods' policy, only officers are allowed to detain shoplifters?

A.    Their undercovers are the only ones can make the stop.

Q.    I understand what you're saying about only the officer can make the stop, but I'm trying to figure out whether or not are there any profiling policies within Whole Foods' anti-loss or anti-theft policy; if you know?

MR. KEDDIS: I'm just going to object

---

Manuel Lopez                                                      Page 35

to the form.

But, Manny, to the extent you can answer it, you may do so.

A.    I'm not sure what you mean as far as profiling practices.

Q.    Well, like, for an example, if somebody -- I'll just give an example.

Let's say if somebody is wearing a trench coat in the summer and they're in the aisles by themselves.  Does that person trigger any type of profiling surveillance or any type of surveillance in which an officer watches them to see if they're putting anything in their coat?

A.    Not --

MR. KEDDIS: Objection to form again, but you can answer if you can do so.

A.    Not to me.  You know, this happened around six months from when I started with the company in the middle of COVID.  The training was pretty much as simple as any type of assumption of that matter is solved by the undercover and the security company that we have.

Us in Whole Foods, we don't get involved in that other than just, you know, provide support if they ask for it in a sense.  But we

---

Manuel Lopez                                                      Page 36

don't get involved in those.

Q.    Did you have any discussions about this incident with anybody other than Odette?

A.    No, other than just a recap and then once we sent that over, obviously, it's a bigger issue.  So then asset protection would take care of it.

Q.    When you say it's a bigger issue, what does that mean?

A.    In the sense that, you know, it was security involved.  It was a lot of yelling, created a scene in the front of the store and in the sense of this is why we write the recap.  And then we're told that they'll take it from there because it was the security company, not us.

Q.    Do you know who told you they would take care of it from there?

A.    In the beginning it was just part of the conversations of my training as far as once we write the recap and they'll reach out if they have any other questions.

Q.    Did anybody ever reach out to you with any other questions?

A.    Not to me.

Q.    Did you have any discussions about

---

Case 2:21-cv-12990-SRC-JRA    Document 58-3    Filed 03/11/24    Page 30 of 115
PageID: 176

Michael Anderson v
Whole Foods Market, Inc., et al

Manuel Lopez
July 26, 2023

Manuel Lopez                                    Page 49

has any.

MR. BROWN: Just real quick. Just real quick, Mr. Lopez.

* * * * *

CROSS-EXAMINATION

BY MR. BROWN:

Q.    While you were at -- while you came over to the incident with Mr. Anderson, did any of the Whole Foods employees who were the guards that were involved, did any of them take out a cell phone and record what was going on?

A.    No. If we would have seen that, we probably would have said that's not allowed.

Q.    Did any of the parties involved in the incident with Mr. Anderson tell what was going on to any of the other customers in the store?

A.    No. We would focus on him in the sense, again, he was yelling a lot and very animated in the sense when he took bottle out and, again, just trying to calm him down.

If the refund, if that's what you need, I can give you that.

Q.    Right. Okay. I don't have anything else.

MR. ROBERTS: I just have a couple.

Manuel Lopez                                    Page 50

* * * * *

REDIRECT EXAMINATION

BY MR. ROBERTS:

Q.    I believe you testified that Mr. Anderson took the coconut oil out -- coconut oil bottle out of his left pocket.

Left pocket of what? Pants? Jacket?

A.    Pants.

Q.    I asked you do you recall what he was wearing. Do you recall --

A.    I don't recall what the actual outfit was.

Q.    Who told you that Mr. Green made the stop?

A.    After the fact Odette had told me that Mr. Green had made a stop.

Q.    Forgive me for not asking this earlier.

How long has the Newark location of Whole Foods been in existence?

A.    Obviously it was there when I started. I don't know the exact date that it opened.

MR. ROBERTS: No further questions.

* * * * *

Manuel Lopez                                    Page 51

RECROSS EXAMINATION

BY MR. BROWN:

Q.    Mr. Lopez, did you see any of the guards or the Whole Foods employees put their hands on Mr. Anderson?

A.    No, there was no one who touched Mr. Anderson.

Q.    And the only one yelling was Mr. Anderson, correct?

A.    That's correct.

MR. BROWN: Nothing else.

MR. ROBERTS: I just have one more on that.

* * * * *

FURTHER REDIRECT EXAMINATION

BY MR. ROBERTS:

Q.    Did you have -- while you were with the group, the officer didn't touch -- you didn't see the officers touch Mr. Anderson.

Do you know if officers touched Mr. Anderson prior to you arriving?

A.    I wasn't there. I wouldn't be able to say if they did or did not. I wouldn't think they did. It's not -- again, it's our policies, I would think. No, I wouldn't --

Manuel Lopez                                    Page 52

Q.    But you don't know?

A.    No, I'm not aware that they touched him beforehand.

MR. ROBERTS: No questions. No further questions.

MR. KEDDIS: Sorry. I just have one. Really, just one. Literally one.

* * * * *

RECROSS EXAMINATION

BY MR. KEDDIS:

Q.    Manny, is Mr. Green the one who decides to make a customer stop?

A.    Yes.

MR. KEDDIS: Okay. Thank you.

MR. BROWN: Sorry.

THE WITNESS: It's okay.

MR. BROWN: Can you just repeat the question?

MR. KEDDIS: Sure.

The question was, was Mr. Green the one who decides to make a customer stop?

MR. BROWN: Okay.

MR. KEDDIS: And the answer, sorry, Manny, can you repeat the answer?

THE WITNESS: The answer is, yes.

# EXHIBIT D

137417626.1

## PATROL DIVISION
## INCIDENT REPORT

| 1. Client Name<br><br>**Whole Foods Market - Newark, NJ** | | | | | | | | 2. Client Notified<br><br>**Yes** | | 3. Complaints Signed<br><br>**No** | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4. Name - First - Middle - Last<br><br>**Unknown Black Male** | | | | | | | | 5. Phone | | 6. Alias | |
| 7. Full Address – Number – Street – City – State – Zip Code | | | | | | | | | 8. Place of Birth | | |
| 9. Date of Birth | 10. Age | 11. Sex<br><br>**Male** | 12. Race<br><br>**Black** | 13. Height<br><br>**6' 3"** | 14. Weight<br><br>**aprox- 170** | 15. Hair<br><br>**L-Dreads** | 16. Eyes<br><br>**brown** | 17. Complexion<br><br>**Medium** | | 18. Marital Status<br><br>**Unknown** | |
| 19. Other Descriptive Information<br><br>**Lt. Blue Sweat Hoodie, Black Sweatpants, Black/White Nike Sneakers** | | | | | | | | | 20. Driver's License Number | | |
| 21. Employer | | | | | | 22. Occupation | | | 23. Social Security Number | | |
| 24. Employer's Address | | | | | | | | 25. Business Phone | | | |

## INCIDENT DETAILS

| 26. Date<br><br>**10-3-2020** | 27. Time<br><br>**1721hrs** | 28. Location of Incident<br><br>**Whole Foods   633 Broad Street Newark, N.J. 07102** | | | | 29. Town<br><br>**Newark** |
|---|---|---|---|---|---|---|
| 30. Type of Incident | | | | | | |
| 31. Complaint's Name and Address – Zip Code | | | | | | 32. Phone Number |
| 33. Crime Date | 34. Time | 35. Location of Crime | | | | 36. Municipal Code |
| 37. How Responded | | | | | | |
| 38. Own | 39. Multiple | 40. Printed | 41. Photo | 42. Previous Record | 43. Reported Month and Year | |
| 44. Vehicle Information – Year – Make – Model – Body Type – Plate Number & State – (Other Descriptive Information) | | | | | | |

## POLICE NOTIFICATION

| 45. Date | 46. Police Department Notified | 47. Person Notified |
|---|---|---|
| 48. Time | 49. Results | 50. Case Number |

## NARRATIVE

### 51. Narrative

On the above date and time while working the front end, I was notified by Loss Prevention Officer Bambe Adbyinka that he was watching a guy that was presently checking out at register 5. Bambe further stated that this individual had consumed a drink and that he had oil in his pocket that he was waiting to see if he pays for it. I later went to register 5 and spoke to Nadia (cashier) and asked if the customer above had paid for the drink that was described to me. Nadia responded that the customer is going to pay for the drink. I went back to LPO Bambe and advised him of the same. LPO Bambe stated that this individual had consumed one drink and got another and furthermore still had the oil in his pocket which can be seen in his left front sweatpants pocket. I informed LPO Bambe that if he needed to make a stop to let me know. LPO Bambe later stated that subject did not pay and he was going to make a stop. ---> continued

| 52. Signature | 53. Badge No. | 54. Completed<br><br>**Yes** | 55. Date of Report<br><br>**10-4-2020** | 56. Reviewed By |
|---|---|---|---|---|

ELITE000001

Case # _____        Whole Foods Market Newark, N.J. - 10/3/2020 @ Approximately 1721hrs

## Officer Narrative *(Continued)* *Use additional pages as needed.*

During this time I advised SL Odette that LPO Bambe was going to make a stop. Sometime later, I proceeded towards the entrance door of the store. LPO Bambe exited the store via the store exit and waited outside the main store entrance until the subject exited. As the the subject exited the store, LPO Bambe stopped the subject and I stood next to LPO Bambe and stated to the subject that LPO Bambe would like to talk to him. LPO Bambe began to address this subject and he became very irate and turned around and began to head back through the entrance door, yelling somebody get your camera and record this. Upon reentering the store, LPO Bambe was hanging in the back of me and I advised him that he needed to stay with his subject and continue his stop. This subject stopped by the customer service area and turned to address me and I advised him that he shouldn't be addressing me and I further stated that he should be addressing LPO Bambe. During this time, this subject began to be very loud and continued to rant/rage about Prudential, Whole Foods and Black owned businesses, slavery etc. He also yelled asking for the community manager. When SL Odette identified herself to this subject, he said he wanted to speak to the GM/DM. SL Odette responded and identified herself to this subject and he refused to except this information from SL Odette and continued to ask her name after she had given it to him more than several times. This subject, began yelling very loudly , "what is your name (continuously), "what is your last name" continuously) while moving back in forth in SL Odette's face. This subject would not allow SL Odette to speak and continued to rant about political issues. Sometime later, this subject began to shout what are you going to do for me? During this time, this subject stated that he makes $1,000.00 per hour and further stated that he has been here for about 15min or so and he wanted to receive $250.00 - $500.00. This subject also stated that he wanted to return his grocery purchase and take everything he purchased for free.This subject continued to use abusive language in the store and disrespect SL Odette/others and would not let SL Odette get a word in. Finally, SL Odette offer this subject her business card and a return because he requested it. a short time later, this subject declined the refund by walking away from the area and exiting the store.

Page ___ of ___

ELITE000002

Case # _____　　　　Whole Foods Market Newark, N.J. - 10/3/2020 @ Approximately 1721hrs

## Officer Narrative *(Continued)  Use additional pages as needed.*

10/4/20 - Upon arrival for my shift, I was approached by Officer L. Dominguez (woman) of the City of Newark Police

Department while standing in the area of Customer Service. Off. Dominguez stated that she was here in reference

to a man claiming that he was assaulted on Saturday and accused of shoplifting. Dominguez asked if I was familiar

with this incident. Dominguez further stated that this man referred to stated that he was stopped by security and a

Whole Foods employee and was assaulted and accused of shoplifting and furthermore came to the Police

Department and wants to file charges. Dominguez also began to ask what the policy was on security making a stop.

Dominguez further stated that their policy is that they can not make a stop. I informed Off. Dominguez that this

man was stopped by Loss Prevention and that he was not assaulted by no one at no time. I also informed Off.

Dominguez that there is clear video footage of the stop by Loss Prevention and this man's contact in the store. I

then contacted ASL Manny to assist Officer Dominguez with her inquiry. During this inquiry by Off. Dominguez, I

advised her that I will speak for me as security, "I don't make any stops".

Page __3_ of _3_

ELITE000003

# EXHIBIT E

137417626.1

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 2:21-CV-12990

MICHAEL ANDERSON,                    :
                                     :          REMOTE
                                     :    DEPOSITION UPON
Plaintiff,                           :  ORAL EXAMINATION
                                     :          OF:
          vs.                        :
                                     :  MICHAEL ANDERSON
WHOLE FOODS MARKET, INC.,            :
ELITE INVESTIGATIONS,                :
LTD. JOHN DOES 1-10, JANE            :
DOES 1-10, ABC                       :
CORPORATION 1-10, ABC,               :
LLC 1-10, ABC, LLP 1-10,             :
jointly, severally,                  :
individually,                        :
                                     :
                                     :
Defendants.                          :
-------------------------

        T R A N S C R I P T of the remote
deposition of MICHAEL ANDERSON, before DANIELLE L.
STEVENSON, a Registered Professional Reporter and
Certified Court Reporter of the State of New Jersey,
via Zoom Videoconferencing, on Tuesday, May 9, 2023,
commencing at 10:12 in the forenoon.

Page 209

questions, go ahead.  I'll be quiet for a couple of minutes.

CROSS-EXAMINATION BY MR. ROBERTS:

Q.    I just have a couple of questions, Mr. Anderson.

On the day of the incident, what were you wearing?

A.    Man, I don't remember, sir.

Q.    Okay.

A.    Maybe like a hoodie.  I don't know.  I don't know.  A shirt, a T-shirt.  I don't know.  I wasn't wearing a suit.

Q.    Okay.  You could have been wearing a hoodie?

A.    I'm not sure what I was wearing.  I could have, but I wasn't wearing a suit.  So I don't remember like the details, but I know I wasn't like dressed like a formal -- I wasn't wearing what's termed as business casual or business clothing.  I was wearing like --

Q.    You testified that you had been there to that Whole Foods location many times?

A.    Yeah, I mean, I was in Whole Foods magazine for the yoga movement.  I have a drink company sold in Whole Foods that I cofounded.  I've

Page 210

been there a bunch.

Q.    Okay.  And those previous times, have you seen the security guard that stopped you before that, the day of the incident?

A.    No question.

Q.    How many times do you think you've seen him?

A.    A couple of times.  I've seen it.

Q.    Had you had any interaction with him before the day of the incident?

A.    Nothing negative.

Q.    Anything positive?

A.    You know what, I think it was all positive.  I think it was all positive prior.  I think it was like, I never felt anything like -- yeah, it was love.  It's Whole Foods.  You are going in to get healthy things.  Typically people like that attracts more positive energy.

Q.    Okay.  Do you know if Whole Foods sell lock oil?

A.    Hell, no, they don't sell that.

Q.    Why do you say that?

A.    Because that's like a -- that's -- Whole Foods doesn't sell lock oil because that's not what they do.  Whole Foods is not geared toward African

Page 217

individuals that -- well, strike that.

You said that one Whole Foods employee pointed to the lock oil.  Did they communicate to you that that was the reason why you were stopped?

A.    The Whole Foods employee communicated to me that, yeah, that was something that I had stolen was why I was stopped.

Q.    Were those exact words or close to it?

A.    No, those were not his exact words.

Q.    Do you remember --

A.    I don't remember his exact words, but I know that he pointed to -- he pointed at me and, yeah, there was, like, chatter about me stealing something from other people.  It wasn't like the first guy, he was like -- I think he was like, respectfully, maybe not a native English speaker, and there were other people that articulated more clearly the grievance or the alleged theft.

Q.    How long were you, for lack of a better word, detained?  How long did this incident take?

A.    I think I was in the store for like 10 to 15.  I cannot tell you the exact amount of time, but I believe it was like 10 or 15 minutes, if I had to guess.

Q.    And how did this incident come to a

# EXHIBIT F

VIDEO FOOTAGE- EMAILED DIRECTLY TO CHAMBERS

137417626.1

# EXHIBIT G

137417626.1











# EXHIBIT H

137417626.1

# NEWARK POLICE DEPARTMENT

31 Green Street  Newark, NJ  07102                                                                Tel:973-733-6000

## Incident Detail Report

| | | | |
|---|---|---|---|
| **Incident#:** | P20465987 | **Call Date / Time:** | 10/04/2020 14:26:44 |
| **Location:** | WHOLE FOOD'S MARKET - 633 BROAD ST, NEWARK NJ 07102 | | |
| **Zone:** | PREC 3 | **Subzone:** | 312 |
| **Initial Call Type:** | ▓▓▓ - ASSAULT REPORT W/ SERIOUS INJURY CODE 2 | **Final Call Type:** | ▓▓▓ ASSAULT REPORT W/ SERIOUS INJURY CODE 2 |
| **Call Origination:** | PHONE / PHONE | **Call Disposition:** | ▓▓ REPORT SUBMITTED |
| **Call Entry Time:** | 10/04/2020 14:39:14 | **Incident Status:** | CLEARED |
| **1st Unit Dispatched:** | 10/04/2020 14:59:11 | **Last Unit Cleared:** | 10/04/2020 17:32:03 |
| **Call Taker:** | SANTANGELO, ANTHONY | **Create ID / Terminal:** | SANTANGELOAN / CT10 |
| **CC#:** | C20041785 | **Primary Unit:** | 316B |

**Linked Case(s):**

### Narratives

| Narrative | Created | 10/04/2020 | 14:39:14 | SANTANGELO, ANTHONY |
|---|---|---|---|---|

CALLER IS CURRENTLY HOME AT 540 BROAD ST // HE CLAIMS THAT HE WAS ASSAULTED BY STAFF AT WHOLE FOODS YESTERDAY AT AROUND 6PM OVER SUSPICION OF SHOPLIFTING

### Assigned Officers

| Unit | Officer Name | Vehicle | Total Time On Call |
|---|---|---|---|
| 316B | DOMINGUEZ, LORAMNY G | 313 | 2:32:52 |

### Incident Summary

| Unit | Status | Change Location / Notes | ID | Date | Time | Terminal |
|---|---|---|---|---|---|---|
| 316B | DISP | | gardnerc | 2020-10-04 | 14:59:11 | PD3 |
| 316B | ENR | | | 2020-10-04 | 14:59:46 | |
| 316B | ARR | | | 2020-10-04 | 15:10:57 | |
| 316B | CLR | | | 2020-10-04 | 17:32:03 | |

### Caller(s)

| Name | Address | Callback # |
|---|---|---|
| ANDERSON, MICHAEL | 540 BROAD ST, NEWARK NJ 07102 | ▓▓▓▓ |

### Parties Involved

| Name | Address | Callback/Cell Phone |
|---|---|---|
| ANDERSON, MICHAEL UNIT#362 | 540 BROAD ST, NEWARK NJ 07102 | |

### Party Information

**ANDERSON, MICHAEL**    540 BROAD ST, NEWARK NJ 07102          H - ▓▓▓▓▓▓        C ▓▓▓▓▓

**WORK ADD / PHONE:**

**EMAIL:**

| | | | | |
|---|---|---|---|---|
| **SS#:** | **DOB:** | **AGE:** | **JUV IND:** N | |
| **DL#:** | **DL ST:** | **DL EXP:** | **POB:** | |
| **SEX:** | **RACE:** | **ETHNICITY:** | **HGT:** | **WGT:** |

# NEWARK POLICE DEPARTMENT

31 Green Street  Newark, NJ  07102                                                          Tel:973-733-6000

## Incident Detail Report

| FBI#: | SBI#: | ID#: | CA#: |
|---|---|---|---|

JACKET#:

ROLES:    CALLER for a new event in CAD, Reported Crime

---

**ANDERSON, MICHAEL**          540 BROAD ST, NEWARK NJ 07102                    H

WORK ADD / PHONE:

EMAIL:

| SS#: | DOB: | AGE: | 33 | JUV IND: N |
|---|---|---|---|---|
| DL#: | DL ST: | DL EXP: | | POB: |
| SEX:  FEMALE | RACE: BLACK | ETHNICITY: NON-HISPANIC | | HGT: | WGT: |
| EYES: | HAIR: | BUILD: | | COMP: |
| FBI#: | SBI#: | ID#: | | CA#: |

JACKET#:

ROLES:   Victim

---

## Article Information

| SERIAL#: | MANUFACTURER: | MODEL: | COLOR: |
|---|---|---|---|

DESCRIPTION:    C.D CONTAINING VIDEO FOOTAGE OF THE INCIDENT

ROLES:    Evidence

| SERIAL#: | MANUFACTURER: | MODEL: | COLOR: |
|---|---|---|---|

DESCRIPTION:    BAG#EE-046753

ROLES:    Evidence

# NEWARK POLICE      INCIDENT REPORT

**FILL OUT COMPLETE REPORT WHEN LISTED IN CLASSIFICATION LIST AND REPORT GUIDE AS 802 (NO ASTERISK).**
**DO NOT FILL OUT SHADED PORTION WHEN LISTED 802* (WITH ASTERISK).**

| 1. VICTIMS OR COMPLAINANTS NAME | 2. TELEPHONE | 17. STATUTE OF ORDINANCE | 18. SECTOR | 19. PRECINCT | 20. CENT COMPLT NO |
|---|---|---|---|---|---|
| ANDERSON, MICHAEL | 310-310-5325 | 2C:12-1A(1) | 312 | PREC3 | C20041785 |

| 3. RESIDENT NUMBER (STREET) (FLOOR OR APT) | 21. REPORTING OFFICER (NAME) | ID NO | (COMMD) |
|---|---|---|---|
| 540 BROAD ST, NEWARK NJ 07102 | PO DOMINGUEZ, LORAMNY G | 11113 | 3rd Prec |

| 4. SEX | 5. RACE/ETHNICITY | 6. AGE | 7. OCCUPATION | 8. INJURY |
|---|---|---|---|---|
| F | B N | 33 | | ☐ YES ☑ NO |

**4A. DO YOU IDENTIFY AS A MEMBER OF THE LGBTQ+ COMMUNITY?**
☐ YES ☐ NO ☑ PREFER NOT TO DISCLOSE

**22. INCIDENT:** ASSAULT - SIMPLE, PURPOSELY, RECKLESS

**22A. OCC ON PUB. HOUS. PROP?** ☐ YES ☑ NO

| 9. SOBRIETY OF VICTIM | 10. CAN VICT IDENT OFFENDER |
|---|---|
| ☑ SOBER ☐ HAD BEEN DRINKING ☐ INTOXICATED | POSSIBLY |

**23. LOCATION:** WHOLE FOOD'S MARKET - 633 BROAD ST, NEWARK NJ 07102

**GANG RELATED** ☐ YES ☑ NO

| 11. PERSON REPORTING CRIME | 12. TELEPHONE NO |
|---|---|
| ANDERSON, MICHAEL | |

**24. TIME OF OCCURRENCE (ON OR BET)**

| HOUR | DAY OF WEEK | MONTH | DAY | YEAR |
|---|---|---|---|---|
| 18:00 | Sat | 10 | 03 | 2020 |
| 18:30 | Sat | 10 | 03 | 2020 |

**25. WAS FORCE USED?** ☑ YES ☐ NO ☐ NOT KNOWN

**13. RESIDENCE OF PERSON REPORTING CRIME:** 540 BROAD ST, NEWARK NJ 07102

**26. WAS A WEAPON USED?** ☐ YES ☑ NO ☐ NOT KNOWN

| 14. MONTH DAY YEAR | 15. TIME REP'T | 16. OCCURRED ON VIEW | 27. TYPE OF PREMISES OR PROPERTY ATTACKED |
|---|---|---|---|
| 10/04/2020 | 16:38 | ☑ YES ☐ NO | Commercial |

| 28. HOW ATTACKED | 29. MEANS OF ATTACK |
|---|---|
| Physical Force - no weapon | Physical Force Used |

| 30. OBJECT OF ATTACK (IF VEHICLE ANTI-THEFT DEVICE INSTALLED.) | 31. MODUS OPERANDI |
|---|---|
| Unknown ☐ YES ☐ NO ☐ UNK | SEE NARRATIVE |

| 32. VEHICLE INVOLVED IN CRIME | YEAR | MAKE | MODEL | LIC NUMBER | STATE | COLOR | BODY TYPE | VEHICLE VIN NUMBERS |
|---|---|---|---|---|---|---|---|---|
| ☐ STOLEN ☐ USED BY OFFENDER | | | | | | | | |

| 33. NAME OF SUSPECT | (ALIAS) | (RESIDENCE) |
|---|---|---|
| | | |

| SEX | RACE / ETHNICITY | AGE | HEIGHT | WEIGHT | COLOR OF HAIR | COLOR OF EYES | DESCRIBE CLOTHING WORN AND PECULIARITIES |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| EVENT # | CAMERA VISIBLE? |
|---|---|
| P20465987 | ☐ YES ☐ NO |

**34. ADDITIONAL INFORMATION (DO NOT REPEAT INFORMATION LISTED IN NUMBERED BLOCKS)**

ON OCTOBER 4, 2020, I POLICE OFFICER LORAMNY DOMINGUEZ ID#: 11113, WORKING AS UNIT 316B, WAS DISPATCHED TO AN ASSAULT REPORT AT 663 BROAD STREET. I RESPONDED TO 540 BROAD STREET WHICH IS THE VICTIM'S RESIDENCE.

UPON ARRIVAL I MET WITH VICTIM MR. MICHAEL ANDERSON. MR. ANDERSON STATED THAT ON OCTOBER 3, 2020 AT APPROXIMATELY 1830 HOURS HE WAS ASSAULTED INSIDE OF THE WHOLE FOODS LOCATED AT 663 BROAD STREET....

| 34A. STRANGER TO STRANGER CRIME | 34B. DOMESTIC VIOLENCE RELATED | 34C. REPORT SOURCE | 34D. VEHICLE INSURANCE COMPANY & POLICY NUMBER |
|---|---|---|---|
| Stranger | N | ☑ DISPATCH ☐ PHONE ☐ WALK-IN ☐ OTHER | |

| 35. ESTIMATED VALUE BY TYPE OF PROPERTY | A. CURRENCY | B. JEWELRY | C. FURS | D. CLOTHING | E. LOCAL AUTOS | F. MISCELLANEOUS | G. TOTAL |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 36. OTHER OFFICERS AT SCENE (NAME) RANK | VEH NO | COMMAND | (I O NO) | 37. OTHER REPORTS SUBMITTED |
|---|---|---|---|---|
| | | | | ☐ DP 1 152 PROPERTY |
| | | | | ☐ DP 1 152-1 AUTO |
| | | | | ☐ DP 1 225A STATEMENT |
| | | | | ☐ DP 1 600 ARREST |
| | | | | ☐ DP 1 795 CONT |

| 38. PERSONS ARRESTED (NAME) | CENT. ARR. NO. | 39. WITNESSES (NAME AND RESIDENCE) | (TELEPHONE NO) |
|---|---|---|---|
| | | | |

| 40. TELETYPE ALARM NUMBER | 41. NAME OR DETECTIVE NOTIFIED | 42. SIGNATURE OF REPORTING OFFICER |
|---|---|---|
| | | PO DOMINGUEZ, LORAMNY G    11113 |

**43. STATUS OF OFFENSE**
☐ UNFOUNDED ☐ CLEARED BY ARREST ☐ NOT CLEARED ☐ EXCEPTIONAL CLEARANCE

**44. CLEARED BY ARREST OF (CHECK APPROPRIATE BOX OR BOXES)**
☐ ADULT ☐ JUVENILE ☐ ADULT AND JUVENILE ☐ NARCOTIC OFFENDER

**45. STATUS OF CASE**
☐ PENDING ACTIVE ☐ PENDING INACTIVE ☐ CLOSED

| 46. CLASS | 47. RE CLASS | 48. KEY PUNCHED BY | 49. VERIFIED BY |
|---|---|---|---|
| | | | |

| 50. SUPERVISOR APPROVING & CLASSIFYING | (DATE) | 51. TIME APPROVED | 52. INDEXED BY | 53. NUMBER OF PAGES |
|---|---|---|---|---|
| 9294 LT DASILVA, MARIO | 10/4/2020 | 23:12 | | |

**NEWARK POLICE**

C20041705

**INCIDENT REPORT**

Event#:      P20465987

MR. ANDERSON STATED THAT ACTOR ONE WAS DRESSED IN WHAT SEEMED TO BE A SECURITY OFFICER UNIFORM. ACTOR ONE WAS ARMED WITH A FIREARM.

HE STATED THAT AS HE WAS LEAVING THE BUSINESS HE WAS APPROACHED BY TWO AFRICAN AMERICAN INDIVIDUAL. ACTOR 1 BLOCKED MR. ANDERSON FROM LEAVING THE PREMISE. ACCORDING TO MR. ANDERSON THE UNKNOWN ACTOR PUSHED HIM WITH HIS CHEST. MR. ANDERSON STATED THAT THE INDIVIDUAL CONTINUALLY PUT HIS HAND ON HIS FIREARM CAUSING HIM TO FEEL THREATENED.

ACTOR 1 TOLD MR. ANDERSON THAT ACTOR 2 NEEDED TO SPEAK TO HIM. ACTOR 2 SIMPLY POINTED AT MR. ANDERSON'S POCKET INSINUATING THAT HE HAD SHOPLIFTED. MR. ANDERSON STATES THAT HE CALMLY REACHED FOR HIS POCKET AND SHOWED THE TWO INDIVIDUALS THAT THE ITEM IN HIS POCKET WAS A BOTTLE OF COCONUT OIL HE PURCHASED AT ANOTHER LOCATION.

MR. ANDERSON IMMEDIATELY ASKED FOR THE GENERAL MANAGER.
MS. ODETTE JARRETT RESPONDED TO MR. ANDERSON'S LOCATION HOWEVER, MR. ANDERSON STATES THAT SHE WAS NOT OF ANY ASSISTANCE.

I RESPONDED TO WHOLE FOODS AND WAS ABLE TO OBTAIN THE INFORMATION FOR THE GENERAL MANAGER. SHE IS THE PERSON THAT WOULD BE ABLE TO HAVE POLICE ACCESS THE VIDEO FOOTAGE.

ODETTE JARRETT, STORE TEAM LEADER,
PHONE NUMBER:
ODETTE.JARRETT@WHOLEFOODS.COM

BODY WORN CAMERA ACTIVATED

## NEWARK POLICE                    CONTINUATION

| SPECIFIC OFFENSE | DIST COMPLAINT NO | CENTRAL COMPLAINT NO |
|---|---|---|
| SIMPLE ASSAULT | 3RD | C20041785 |

| STATUTE OR ORDINANCE (RS, N J S, REV, ORD) | LOCATION OF OFFENSE | DATE OF OCCURRENCE |
|---|---|---|
| 2C:12-1A(1) | WHOLE FOOD'S MARKET - 633 BROAD ST, NEWARK NJ 07102 | 10/04/2020 |

EVENT NO.   P20465987/ COMPLAINANT: MICHAEL ANDERSON 310-310-5325

TYPE OF OFFENSE / SUMMARY:

SIMPLE ASSAULT.

VICTIM STATED THAT HE WAS SHOPPING AT THE WHOLE FOOD'S SUPERMARKET LOCATED AT 633 BROAD ST. THE VICTIM FURTHER STATED THAT HE PLAYED FOR HIS GROCERIES AND WAS WALKING OUT OF THE STORE HE WAS DETAINED BY TWO STORE SECURITY GUARDS AT THE EXITED DOOR.  THE SECURITY AND MANAGER OF THE STORE FURTHER ADVISED HIM THAT HE WAS BEING DETAINED IN REFERENCE TO HIM SHOPLIFTING. HE ALSO STATED THAT ONE OF THE GUARDS PUSHED HIM AND CONTINUALLY PUT HIS HAND ON HIS FIREARM CAUSING THE VICTIM TO FEEL THREATENED. AFTER FURTHER INVESTIGATION BY THE STORE MANAGER IT WAS DETERMINED THAT THEY HAD MADE A MISTAKE AND APOLOGIZED TO THE VICTIM.

DETAILS OF INVESTIGATION:

UPON RECEIVING THIS INVESTIGATION ON OCTOBER 03, 2020, I CALLED THE VICTIM, AT WHICH TIME HE STATED THAT THE INCIDENT WAS CAPTURED ON THE STORE VIDEO SURVEILLANCE CAMERAS.
ON THE SAME DAY, I RESPONDED TO THE SCENE OF THE INCIDENT TO START MY CANVASS. DURING MY CANVASS, I SPOKE TO ORLANDO THE WHOLE FOOD'S STORE MANAGER ABOUT THE INCIDENT. ORLANDO PROVIDED ME WITH THE VIDEO FOOTAGE OF THE INCIDENT AND STATED THAT IT WAS A MISUNDERSTANDING IN THEIR PART. HE FURTHER STATED THAT THEY APOLOGIZED TO THE VICTIM AND THAT HIS SECURITY GUARDS NEVER PUSH THE VICTIM OR PUT THEIR HANDS ON THEIR SERVICE WEAPON.
ON OCTOBER 05, 2020, I ALONG WITH SERGEANT J. DOPAZO VIEWED THE VIDEO FOOTAGE OF THE INCIDENT AND WE WERE ABLE TO OBSERVE THAT THE SECURITY GUARDS NEVER PUSH OR PUT THEIR HANDS ON THEIR WEAPONS DURING THE ENTIRE INCIDENT.
ON OCTOBER 06, 2020, THE VICTIM RESPONDED TO THE 3RD PRECINCT AT WHICH TIME SGT. DOPAZO SHOWED HIM THE VIDEO FOOTAGE OF THE INCIDENT AND AT NO TIME HE PUSHED OR ANY OF THE  SECURITY GUARDS PLACED THEIR HANDS ON THEIR SERVICE WEAPONS.
A COPY OF THE VIDEO FOOTAGE WAS PLACED INSIDE BAG# EE-045753 AND SUBMITTED ACCORDINGLY AT THE 3RD PRECINCT.
DISPOSITION:

I REQUEST THIS MATTER BE UNFOUNDED SINCE AFTER VIEWING THE VIDEO FOOTAGE OF THE INCIDENT AN ASSAULT NEVER TOOK PLACE. ON THE SAME DAY, THE VICTIM WAS ADVISED OF THE DISPOSITION ON THE CASE.

| AMENDED PROPERTY VALUATION | A  CURRENCY | B  JEWELRY | C FURS | D CLOTHING | E  LOCAL AUTO | F MISCELLANEOUS | G TOTALS |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| RANK | SIGNATURE OF OFFICER SUBMITTING REPORT | COMMAND | BADGE NUMBER |
|---|---|---|---|
| DET CABEZAS, ONOFRE | | 3RD | 7951 |

| STATUS OF OFFENSE | | | | STATUS OF CASE | | |
|---|---|---|---|---|---|---|
| ☐ UNFOUNDED | ☐ CLEARED BY ARREST | ☐ NOT CLEARED | ☐ EXCEPTIONALLY CLEARED | ☐ PENDING ACTIVE | ☐ PENDING INACTIVE | ☐ CLOSED |

| CLEARED BY ARREST OF | | | | CLASSIFICATION | RECLASSIFICATION |
|---|---|---|---|---|---|
| ☐ JUVENILE | ☐ ADULT | ☐ JUVENILE & ADULT | ☐ NARCOTIC OFFENDER | | |

| READ CLASSIFIED AND APPROVED BY | Date | TALLIED BY | INDEXED BY |
|---|---|---|---|
| 7237      SGT WRIGHT SR, KEVIN | 3/24/2021 11:25: | | |
| | | FILED BY | PAGE NUMBER | NO OF PAGES |

# POLICE DEPARTMENT    PROPERTY EVIDENCE RECEIPT    NEWARK, NJ

| (1) FOUND OR RECOVERED BY | (2) SECTOR | (3) COMMAND | (4) DISTRICT NO. | (5). CENTRAL COMPLAINT NO. |
|---|---|---|---|---|
| UNIT#362 | 312 | EAST | 3RD | C20041785 |

| (6) LOCATION | (7) TIME AND DATE FOUND OR RECOVERED |
|---|---|
| 633 BROAD ST, NEWARK NJ 07102 | Mar 24, 2021 12:47 |

| (8) OWNER'S NAME | (9) ADDRESS AND ZIP CODE | (10) TELEPHONE NO. |
|---|---|---|
| | | |

**(11) BRIEF EXPLAINATION OF FINDINGS AND RECOVERY**

COMPACT DISC CONTAINING VIDEO FOOATGE OF THE INCIDENT.

| (12) PRISONER (A) | C.A NUMBER | AGE | DATE OF ARREST | (13) ENVELOPE CONTROL NUMBER |
|---|---|---|---|---|
| ADDRESS | | CHARGES | | |
| PRISONER (B) | C.A NUMBER | AGE | DATE OF ARREST | (13) ENVELOPE CONTROL NUMBER |
| ADDRESS | | CHARGES | | |
| PRISONER (C) | C.A NUMBER | AGE | DATE OF ARREST | (13) ENVELOPE CONTROL NUMBER |
| ADDRESS | | CHARGES | | |
| PRISONER (D) | C.A NUMBER | AGE | DATE OF ARREST | (13) ENVELOPE CONTROL NUMBER |
| ADDRESS | | CHARGES | | |

| (14) ITEM # | (15) QTY | (16) EVIDENCE SOURCE | (17) ARTICLE DESCRIPTION | (18) ESTIMATED CASH VALUE |
|---|---|---|---|---|
| 1 | 1 | | C.D CONTAINING VIDEO FOOTAGE OF THE INCIDENT | |
| | | | BAG#EE-045753 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| (19) NARC. FIELD TEST BY | COMMAND | COCAINE - RESULTS | HEROIN - RESULTS |
|---|---|---|---|
| | | | |

**(20) PROPERTY**  [✓] ARREST-EVIDENCE  [ ] FOUND  [ ] DECEDENTS  [ ] STOLEN  [ ] PERSONAL PROPERTY OF PRISONER

| (21) CURRENCY | JEWELRY | FURS | CLOTHING | MISCELLANEOUS | TOTAL | TOTAL NO. OF PROP. && EVID. RECEIPTS |
|---|---|---|---|---|---|---|
| | | | | | | (22)    OF    RECEIPTS |

| (23) OFFICER EXECUTING RECEIPT | | COMMAND | (24) SUPERIOR RECEIVING RECEIPT | COMMAND |
|---|---|---|---|---|
| DET CABEZAS, ONOFRE | 7951 | 3RD | | |

## BELOW FOR PROPERTY ROOM USE ONLY - RECORD OF PROPERTY MOVEMENT

(25) PROPERTY LOCATION

| (26) PROSECUTOR'S RELEASE | PHOTO TAKEN BY DATE. OK TO RELEASE ITEMS BY | (27) SIGNATURE OF PROPERTY OFFICER | DATE |
|---|---|---|---|
| SENT    RECEIVED | | | |

| (28) DATE | ITEM NO. | PRINT NAME | SIGNATURE | TO | SEALED YES/NO/BY | ENVELOPE NUMBER / COMMENTS | PROP. OF |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

## I HEREBY ACKNOWLEDGE RECEIVING FROM THE POLICE DEPARTMENT THE PROPERTY LISTED BELOW

| NAME | ADDRESS | ITEM NO. | DATE |
|---|---|---|---|
| | | | |

# EXHIBIT I

137417626.1

## AGREEMENT

This AGREEMENT ("Agreement"), dated as of the 15th day of January, 2004, is entered into by and between Elite Investigations Ltd. ("Elite"), a New York Corporation with offices at 538 W. 29th Street, New York, New York, 10001, and Whole Foods Market Group, Inc., a Delaware corporation with regional offices in Needham, Massachusetts (the "Company").

## WITNESSETH

WHEREAS, the Company desires to engage Elite for guard services at the Company's stores in New York City, and Elite desires to provide such guard services to the Company upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and intending to be legally bound, the parties hereto agree as follows:

### 1. ENGAGEMENT AND TERM

The Company hereby retains Elite to provide guard services on behalf of the Company and to provide advisory and consultative services to the Company, and Elite hereby agrees to provide guard services and act as a consultant and advisor to the Company commencing January 15, 2004. This Agreement shall continue until it is terminated by either Elite or the Company in accordance with the terms of Section 6 hereof.

### 2. SERVICES

2.1.    Without limiting the generality of the provisions of this Section 2.1, Elite shall provide guard services as mutually agreed upon by both parties in writing, in accordance with the rate structure listed in Section 3 of this Agreement.

In addition, during the term of this Agreement, Elite shall be available at its office, in person and by telephone, to render such consultation and advisory services to the Company at such reasonable and mutually agreeable time or times and at such place or places as the officers or executives of the Company shall reasonably request, which shall, in terms of the amount of time to be provided by Elite, be in accordance with the rate structure listed in Section 3 of this Agreement.

2.2.    Elite agrees that during the term of this Agreement it will provide the Company with written reports, upon the specific request of the Company on a timely basis, describing in reasonable detail such matters as have come to its attention that may be relevant or of interest or importance to the Company and of any matters which have been the subject of any services provided by Elite as a result of instructions from the Company. The Company agrees to

**ELITE000004**

provide Elite with such data, documents, and information, in verbal and written form, as Elite reasonably requires to successfully complete the services contracted hereby.

2.3.    Elite hereby agrees that the Company shall have the right and option to request Elite to render services, upon reasonable notice, which shall involve Elite's time beyond the initial provisions of Section 2.1 of this Agreement, for which services Elite will be compensated in accordance with the rate structure in Section 3.

2.4.    The Company shall direct the appropriate members of its staff to cooperate with Elite in a prompt, diligent, and complete manner with respect to knowledge or information that the Company's staff may have or possess which impacts or effects the provision of services by Elite to the Company hereunder, during the term of this Agreement.

2.5.    The principal place of performance of the guard services to be provided by Elite for the Company shall be at the Company's stores in New York City, located at 2 Columbus Circle and 250 Seventh Avenue and 250 Seventh Avenue (collectively, the "Stores"). Consulting and/or advisory services provided by Elite to the Company pursuant to this Agreement shall be provided at Elite's offices or at such other locations as to which the parties hereto may agree.

2.6.    The Company shall have the right to dismiss a guard from the Stores upon twenty-four (24) hours written notice to Elite. Elite shall replace such dismissed guard within twenty-four (24) hours of its receipt of notice of dismissal from the Company.

3.    COMPENSATION

During the term of this Agreement, the Company agrees to compensate Elite for services rendered pursuant to this Agreement in accordance with the following schedule:

| | |
|---|---|
| Plainclothes Store Detective | $21.86 Per Hour Regular |
| | $32.79 Per Hour Holidays/Overtime |
| Basic Unarmed Uniformed Guard Service | $14.83 Per Hour Regular |
| | $22.25 Per Hour Holidays/Overtime |
| Armed Guard Service | $30.00 Per Hour Regular |
| | $45.00 Per Hour Holidays/Overtime |
| CCTV/Alarm Monitor/Supervisor | $21.86 Per Hour Regular |
| | $32.79 Per Hour Holidays/Overtime |
| Consultative/Advisory Services differently on a case by case basis in writing. | $75.00 Per Hour unless negotiated |

2

ELITE000005

Case 2:21-cv-12990-SRC-JRA     Document 58-3     Filed 03/11/24     Page 57 of 115
PageID: 203

Services will be billed weekly. Payment is due and payable within thirty (30) days of the invoice date. It is agreed that, for purposes of Sections 3 and 5, time is of the essence. Overtime coverage may apply for additional coverage requests with less than (72) seventy-two hours prior notice.

Open balances exceeding each thirty (30) day period will be assessed a finance charge of 2% as of the thirtieth (30th) day and an additional 2% for each thirty (30) days the balance remains open.

The Company shall have no liability or indemnification obligation to Elite for any costs, expenses, lost business, or damages caused by any complete or partial closure of the Stores that is due to any reason, including but not limited to any Act of God, work stoppage, fire, earthquake, emergency, flood, criminal act, or act of war or terrorism.

4.     **ELITE'S OBLIGATIONS**

4.1.     Elite, at its own expense, is responsible for complying with any and all local, state, or federal laws, rules, or regulations relating to the performance of its obligations under this Agreement, including but not limited to the laws and regulations relating to building and safety codes, health and safety, employment and labor, and immigration. Elite agrees to provide to the Company, upon request by the Company, reasonable evidence that it is complying with all federal, state, and local laws, rules, and regulations.

4.2.     Elite is solely responsible for the hiring, qualifications, appropriate training, and payment of personnel for work at the Stores at all times during the term of this Agreement. None of Elite's employees are, or will be, considered employees of the Company, and Elite is solely responsible for the supervision, management, reviewing of qualifications, training, and payment of all salaries, compensation, withholding taxes, unemployment insurance premiums, workers' compensation insurance premiums, health and welfare benefits, or similar charges associated with the employment of its employees and Elite's compliance with all laws relating to its employees. Compensation and benefits payable by Elite to or on account of its employees must be provided by Elite in accordance with such policies and procedures as Elite, in its sole discretion, adopts, but all such compensation and benefits must comply with all applicable local, state, and federal laws. Elite agrees to do criminal background checks on all personnel in its employ and to certify to the Company, prior to those employees' being permitted to work at the Stores, that those employees have no prior criminal record.

3

ELITE000006

(Page 4 of 11)
03/18/2004 16:50 FAX 9144480248        BMBM WHTPLNS                    @006/016
MAR. 18. 2004   4:14PM

Case 2:21-cv-12990-SRC-JRA     Document 58-3     Filed 03/11/24   Page 58 of 115
NO. 7804   P. 9/35
PageID: 204

4.3.  Nothing in this Agreement shall be construed to constitute either party as an employee/employer, partner or joint venturer of the other. Each party is an independent contractor retaining complete control over and complete responsibility for its own operations and employees.

## 5.  EXPENSES

The parties agree that any expenses incurred in connection with the provision of services pursuant to this agreement will be the sole responsibility of Elite.

## 6.  TERMINATION

6.1.  Elite or the Company may terminate this Agreement at any time during the term of this Agreement, for any reason, by giving written notice of ten (10) business days to the other party. In such event, Elite shall only be entitled to receive compensation pursuant to Section 3 hereof for services rendered up to the date of termination. The date of termination shall be five (5) business days after the date notice of termination is given in writing to the other party.

6.2.  Notwithstanding the foregoing, this Agreement may be terminated without further notice prior to its expiration by either party: (i) in the event of a material breach of a provision of this Agreement by the other party, which breach is not cured within fifteen (15) business days after written notice is received by the other party (for the purpose of this provision "material breach" shall include, but not be limited to, any breach of any of Elite's obligations under Section 4 of this Agreement); or (ii) in the event of the insolvency or bankruptcy of either party.

## 7.  CONFIDENTIAL INFORMATION

Elite recognizes that, during the performance of its duties hereunder, Elite, its employees, officers, directors, and agents may obtain or be provided with confidential information relating to the business of the Company information which is used in the business of the Company or results from its activities or is information that is private or confidential in that it is not generally known to the public ("Confidential Information"). Elite covenants that it, its employees, officers, directors, and agents will use reasonable efforts not to disclose any such Confidential Information to any third party whatsoever without written consent of the Company, provided, however, that Elite shall not be deemed to have violated this Agreement to the extent that information is disclosed which becomes known to Elite from a source other than the Company or which is required to be disclosed by operation of law or governmental authority. Elite further covenants and agrees that, upon the expiration or sooner termination of this Agreement, it

4

and each of its employees, officers, directors, and agents will promptly deliver to the Company all materials (including all copies thereof) received by it from the Company or its employees in connection with or related to the services being provided hereunder and which are in Elite's possession or under its control. Elite may retain copies of any of its work product. Elite shall provide each of its employees, officers, directors, and agents with a copy of this provision.

## 8.   INSURANCE

Elite warrants that it will at all times during the term of this Agreement carry with responsible insurance carriers approved by the Company, and pay for, the following insurance:

8.1.   *Worker's Compensation and Occupational Disease* - Worker's compensation and occupational disease insurance as required by the laws of the jurisdictions in which services are performed, and employer's liability insurance with a limit of not less than $100,000 each accident, $500,000 disease policy limits, and $100,000 disease each employee. Coverage will be provided by Elite, and Elite will immediately provide a certificate of insurance showing proof of coverage.

8.2.   *Commercial General Liability* - Commercial general liability insurance will be maintained by Elite at its sole expense, and subject to deductibles no higher than $25,000 per occurrence, including, but not limited to, contract coverage for all of the provisions of this Agreement. Such contract coverage is intended to relate to but not be limited to the indemnification provisions of this Agreement. Policies under this provision shall have limits of at least $2,000,000 general aggregate, $3,000,000 products/completed operations aggregate, $4,000,000 personal injury or advertising injury per offense, and $4,000,000 each occurrence. Elite will provide commercial general liability insurance naming the Company, at its own expense, as an additional insured by endorsement, detailing the extent and nature of such coverage and requiring that such coverage may not be canceled or materially modified without at least sixty (60) days advance written notice to the Company. If greater limits are required, Elite will provide the same in accordance with the Company's requirements.

8.3.   *Automobile Public Liability* - Automobile public liability insurance, for purposes of this Agreement, is not required. However, if this Agreement is amended to include duties requiring the use of automotive equipment by Elite, required coverage will be provided by Elite, and a certificate of insurance covering this

5

ELITE000008

requirement will be immediately provided to the Company by Elite.

8.4. *Certificates* - Upon execution of this Agreement, Elite shall deposit with the Company certificates of insurance evidencing that such coverage including contract coverage is in force and reflecting the Company's status as an additional insured by endorsement as to all coverages. If for any reason delivery of these certificates is delayed, Elite warrants that it will assume full liability in accordance with this section until such time as said certificates are provided.

9.    INDEMNIFICATION

9.1. Elite hereby agrees to indemnify and hold the Company harmless from and against any and all demands, claims, losses, costs (including attorney's fees and expert fees), liabilities, injuries, damages and expenses (collectively "Claims") of any kind incurred or suffered by, or asserted against, the Company or any of its directors, officers, employees, agents, stockholders or affiliates arising from Elite's performance of its duties under this Agreement, including but not limited to the following:

(i)    Claims based upon or arising out of the condition of the work or any alleged or actual defect in the work;

(ii)   Claims based upon or arising out of an actual or alleged injury caused by an act or omission related to the work;

(iii)  Claims based upon or arising out of the actual or alleged negligence, fraud, or dishonesty of Elite or its employees;

(iv)   Claims based upon or arising out of any actual or alleged violation by Elite of any federal, state or local statute, ordinance, administrative order, rule or regulation;

(v)    Claims based upon or arising out of Elite's breach of any of its duties under this Agreement

(vi)   Claims arising from any alleged personal injury suffered by any Elite employee or contractor on property owned, leased, or operated by the Company; and

(vii)  Claims based upon or arising out of the employment, presence or activities of Elite's agents, employees or contractors at the Stores for any purpose related to this Agreement, including but not limited to all wage and hour, wrongful termination, harassment or discrimination,

6

ELITE000009

Case 2:21-cv-12990-SRC-JRA    Document 58-3    Filed 03/11/24    Page 61 of 115
PageID: 207

personal injury, workers compensation, disability, tort or contract claims or demands made by any employee, applicant or contractor of Elite.

9.2.  Elite's obligation to indemnify and hold harmless the Company is expressly conditioned upon the following: (i) the Company shall provide reasonably prompt notice to Elite of any claim for which the Company seeks indemnification; and (ii) the Company shall provide available information to, and reasonably cooperate with, Elite in the defense and/or settlement of such claim.

9.3.  Elite further specifically agrees to indemnify and defend the Company and hold it harmless from and against any and all claims demands, damages, liabilities, costs, and expenses including half of all attorneys' fees and expenses, which may be suffered by, accrued against or charged to the Company, its employees, officers, directors, and agents by SecPro Services, Inc. or any of its employees officers, directors, and agents arising out of the Company's business relationship with Elite.

9.4.  As used in Section 9 of this Agreement, any reference to *"the Company,"* unless otherwise specified, shall include Whole Foods Market Group, Inc., its predecessors and successors, and all of its past, present, and future stockholders, shareholders, directors, officers, employees, principals, investors, representatives, attorneys, agents, and assigns, in their respective capacities as such, and all of its affiliates, subsidiaries, parent, or controlling corporations and their affiliates and subsidiaries, including but not limited to Whole Foods Market Group, Inc., Fresh Fields, Nature's Heartland, and Bread & Circus. As used in this Agreement, any reference to *"Elite Investigations Ltd."* or *"Elite,"* unless otherwise specified, shall include Elite Investigations Ltd., its predecessors and successors, and all of its past, present, and future stockholders, shareholders, directors, officers, employees, principals, investors, representatives, attorneys, agents, subcontractors, and assigns, in their respective capacities as such, and all of its affiliates, subsidiaries, parent, or controlling corporations and their affiliates and subsidiaries.

9.5.  The provisions of this Section 9 shall survive the termination of this Agreement.

10.  NATURE OF CONSULTING/ADVISORY SERVICES

The Company acknowledges that Elite will not be providing legal, tax, or certified public accounting advice hereunder. The Company specifically acknowledges that Elite's services shall not include survey of criminal activity in the

7

ELITE000010

surrounding community which may affect the Company's security requirements. Such a survey is available at an additional charge upon the parties entering into a written agreement therefore. The Company agrees to retain such independent legal and tax counsel and accountants as the Company deems appropriate in connection with the services provided hereunder, and Elite agrees to work cooperatively with such counsel and accountants as needed.

## 11.    TERM

This Agreement shall be in effect for a term of one (1) year (the "Initial Term").

## 12.    MISCELLANEOUS

12.1.   Notices. Notices to either party hereto shall be deemed given to the other when given in writing and posted as registered or certified mail of the United States Post Office, with sufficient postage affixed thereto and addressed to the other party at the address shown below or to such other address as shall be substituted therefore by written notice in the manner hereinabove provided.

If to Elite:

Gary Weksler
Elite Investigations Ltd.
538 W. 29th Street
New York, NY 10001

With a Copy to:

Kevin D. Porter, Esq.
Heller, Jacobs & Kamlet, LLP
261 Madison Avenue, Suite 600
New York, NY 10016

If to the Company:

Otto Leuschel
Whole Foods Market Group, Inc.
250 7th Avenue
New York, NY 10001

With a Copy to:

Andrew L. Eisenberg, Esq.
Seyfarth Shaw LLP

8

ELITE000011

Case 2:21-cv-12990-SRC-JRA    Document 58-3    Filed 03/11/24    Page 63 of 115
PageID: 209

World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028

12.2. **Parties.** This Agreement shall inure to the benefit of and shall be binding upon the Company, its successors and assigns and shall be binding upon Elite, it successors and assigns, in accordance with the terms hereof.

12.3. **Representations.** Elite affirms that the only consideration for signing this Agreement is the terms stated herein and that no other promises or agreements of any kind have been made to or with it by any person or entity whatsoever to cause it to sign this Agreement. Elite and the Company represent that the individuals signing this Agreement have authority to bind their respective companies.

12.4. **Survival of Representations and Warranties.** Elite's representations and warranties in this Agreement shall survive the termination of this agreement and shall inure to the Company's successors and assigns.

12.5. **Conduct.** Each party agrees to act in a fair and ethical manner toward each other and toward their respective employees and customers.

12.6. **Assignment.** This Agreement may not be assigned by Elite, without the prior written consent of the Company, which consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement shall be for the benefit of and shall be binding on the parties hereto and their respective successors and assigns.

12.7. **Amendment.** This Agreement shall be binding upon the Parties and may not be released, discharged, abandoned, supplemented, amended, changed, or modified in any manner, orally or otherwise, except by an instrument in writing of concurrent or subsequent date, signed by a duly-authorized representative of each of the parties hereto.

12.8. **Validity.** Should any provision of this Agreement be declared or be determined by any court of competent jurisdiction to be illegal or invalid, the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term or provision shall be deemed not to be a part of this Agreement.

12.9. **Waiver.** The waiver by either party of a breach of any provision of this Agreement by the other party shall not be construed as a waiver of any subsequent or other breach by such other party.

9

ELITE000012

12.10. Governing Law and Construction. The terms of this Agreement are contractual in nature and not a mere recital, and it shall take effect as a sealed document. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without reference to conflict of law rules, and this Agreement shall be deemed to be executed and performed in New York and shall be enforceable in the New York courts. Captions herein are inserted for convenience, do not constitute a part of this Agreement, and shall not be admissible for the purposes of proving the intent of the Parties. The language of all parts of this Agreement shall, in all cases, be construed as a whole according to its fair meaning and without regard to which party drafted the same.

12.11. Entire Agreement. This Agreement contains and constitutes the entire understanding and agreement between the parties hereto respecting the issues herein and supersedes and cancels all previous negotiations, agreements, commitments, and writings in connection herewith.

13.    COUNTERPARTS.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and in pleading or proving any provision of this Agreement it shall not be necessary to produce more than one such counterpart.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first written above.

WHOLE FOODS MARKET GROUP, INC.    WITNESS:

BY _____    _____
       (Signature)

_____    _____
       (Name/Title)                              Date

ELITE INVESTIGATIONS LTD.    WITNESS:

10

ELITE000013

BY _____     _____
        (Signature)

_____     3/18/04
        (Name/Title)                Date

11

ELITE000014

# EXHIBIT J

137417626.1

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CIVIL ACTION NO. 2:21-cv-12990

MICHAEL ANDERSON,                        )

                                         )

                 Plaintiffs,     )

                                         )

     -vs-                        )  DEPOSITION OF:

                                         )

WHOLE FOODS MARKET, INC., ELITE  ) KENDRICK NGUYEN

INVESTIGATIONS, LTD, JOHN DOES   )

1-10, JANE DOES 1-10, ABC        )

CORPORATION 1-10, ABC, LLC       )

1-10, ABC LLP 1-10, jointly,     )

severally, individually          )


                 Defendants.


_____


        TRANSCRIPT of the stenographic notes of
the proceedings in the above-entitled matter, as
taken by and before PAMELA ADAMO, a Certified
Shorthand Reporter and Notary Public of the State of
New Jersey, held VIA VERITEXT VIRTUAL, on November
10, 2023, commencing at 9:00 a.m.

Nguyen - direct

Page 31

news link to you?

A.    I don't recall how I came across the news link.

Q.    Okay.  What was your first impression overall of the whole thing?

A.    Of the incident?

Q.    Yes.

A.    So around the time frame, I know that I had the understanding or the impression that this was of a very serious event for Mr. Anderson.  I otherwise did not have any separate or independent opinion.

Q.    Okay.  Do you remember if Mr. Anderson ever sent you any links to news articles from a website called Patch discussing this incident?

A.    I don't remember for sure but he probably did send me a link over the years.  Again, I don't remember for sure, but I would guess so, make an educated guess that he would share a link or links.

Q.    Okay.  Is it, can you make a fairly sound guess, you know, a fairly sound estimate that Mr. Anderson was the first one to tell you about this whole incident at Whole Foods?

A.    Yes, that would be my guess.

Nguyen - direct

Page 85

A.    Yes, I'm reading that now.

Q.    Okay.

A.    Makes sense.  Yes, next please.  Next, please.  Next, please.  Next, please.  Next, please.  Next, please.  Next, please.

Q.    Hold on.

A.    Yes.  Next, please.  Yes.  I've read the e-mail.

Q.    Sir, looks like a couple of these events that Anderson is suggesting to you in his August 15th, 2022 e-mail, he wants Republic to get involved with them in some way or fund or provide financing in some way, right?

A.    Yes, that's what I read the e-mail to say.

Q.    And then it looks like you have forwarded it to a woman named Kate McCutchen at Seeders?

A.    She's an employee, subsidiary of ours, Seeders.

Q.    And you are asking her to sponsor one of his events; is that correct?

A.    Yes, that is correct.

Q.    And you are holding Mr. Anderson out in your DEI partner, right?

Nguyen - direct

Page 86

A.    Yes, the industry partner, diversity, equity, inclusion, you know, just look to him to Share perspective and feedback.

Q.    So you had no hesitations or no reservations about referring Mr. Anderson and giving him a positive recommendation to other businesses in order for them to help him out; correct?

A.    I remember whatsoever, to be clear Seedrs is Republic, KateMcCutchen@seedrs.com that is our subsidiary.  This is an internal e-mail.

Q.    Okay.  So Republic owns Seedrs?

A.    Correct.

Q.    Okay.  And did this sponsorship agreement, did that ever happen?

A.    I believe so.  That's my recollection. I believe that the $5,000 sponsorship did take place.

Q.    As we have gone over a couple times now, you know, you were happy to promote Mr. Anderson and his company even in 2022, right?

A.    Happy to share the relationship and the belief in what Mr. Anderson and MPAC stands for.

Q.    Right.  Right.  Sir, this is going to be K-15.

(Whereupon K-15 was marked for identification.)

Nguyen - direct

Page 88

Q.      I can hear you, yeah.

A.      Okay.  Perfect.  Yes.  Brian, at one point in 2022, Mr. Anderson consult me on for legal advice.  Now, he did ask me to provide an affidavit and that wasn't in solicitation of a legal advice, just asking for an affidavit which I, of course, complied.

Q.      Right.  But you can't speak -- you can't speak to the plus or minus value that this Whole Foods incident has had on MPAC, right, because you have no idea about their financial situation?

A.      Can you ask the question again, Brian?

Q.      You can't -- earlier in the deposition you testified that you have no idea and you've never had any idea as to the financial situation, the dollar losses, profits that MPAC has; correct?

A.      Correct.

Q.      Okay.  So you can't quantify any sort of value whether it's plus or minus that this Whole Foods incident has had on MPAC; correct?

A.      It would be difficult for me to quantify precisely how the incident, the impact of the incident on MPAC's current value as of 2022.

Q.      Okay.  Okay.  And even after the incident in Whole Foods on October 20th, it's clear

Nguyen - cross - Roberts

Page 89

from all the evidence that we've reviewed today that you still associated and still dealt with Mr. Anderson, right?

A.    As I stated today and in the past being associated with Mr. Anderson and certain form of business collaboration that has never been a concern.

Q.    Okay.

MR. BROWN:  I have nothing else.

CROSS-EXAMINATION BY MR. ROBERTS:

Q.    I just have a couple of questions, Mr. Nguyen.  Chris Roberts, I represent Mr. Anderson in this matter.

Just briefly, I believe you testified that you were guessing or you guessed that Mr. Anderson was the first person to inform you about the Whole Foods incident?

MR. BROWN:  I'm going to object.  You can answer.

A.    I would assume so.

Q.    Okay.  And what's the basis of that assumption?

A.    It would either that I would read it in the news or have heard about it from Mr. Anderson or heard about it from someone else is very likely then that between those three options that I would have

# EXHIBIT K

137417626.1

LAW OFFICE OF
## CHRISTOPHER C. ROBERTS, LLC
7 GLENWOOD AVENUE
SUITE 401
EAST ORANGE, NEW JERSEY 07017

_____

(973)-673-0600
FAX (973)-673-0627

November 27, 2022

Christopher McIntyre, Esq.
Fishman McIntrye
120 Eagle Rock Avenue
East Hanover, NJ 07936

Afsha Noran, Esq.
Lewis Brisbois
One Riverfront Plaza, Suite 800
Newark, NJ 07102

   **RE: Anderson v. Whole Foods Market, Inc. et al.**
    **Civil Action No. : 2:21-CV-12990-KM-CLW**

Dear Counsel:

   Please amend Plaintiff's responses to Defendants' discovery request to include the enclosed certification from Kevin Burrows. If you have any questions or concerns, please contact me.

   Thank you for your time and your cooperation.

             Very truly yours,

             Christopher C. Roberts, Esq.

Enclosure

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

Michael Anderson,

       Plaintiff

**Civil Action No: 2:21-CV-12990-KM-CLW**

v.

**CERTIFICATION OF KEVIN BURROWS**

Whole Foods Market, Inc., Elite Investigations, Ltd,
JOHN DOES (1-10), JANE DOES (1-10),
ABC CORPORATION (1-10), ABC, LLC
(1-10), ABC LLP (1-10), JOINTLY,
SEVERALLY, INDIVIDUALLY

       Defendants.

I, Kevin Burrows, being at least 18 years of age and of sound mind, state as follows

1.    I am the founder and Chief Executive Officer of Diomedea Capital Advisors Co. Ltd. located at 34 Sanford Drive, Nassau, Bahamas which engages in the following activities: Investment Consultancy, Outsourced CIO and other Executive-In-Residence services.

2.    I am not a party to this case and I have no interest in the outcome of the case. I am making this certification voluntarily.

3.    I met Plaintiff Michael Anderson in or about 2018 and I was very impressed with him and his company which was at the intersection of finance, culture and entertainment. In or about 2020 or 2021 my company, which has a nexus with the oldest daughter and grandchildren of the founder of Adidas where I served as the outsourced Chief Investment Officer of the Adi Dassler International Family Office, was exploring the idea of establishing an Entertainment Fund to be marketed to professional athletes and entertainers as well as other

family offices. Based on my experience, Mr. Anderson's company could have played an important role in accessing this client base, resulting in significant referral revenue for his firm.

4.       However, I became aware from social that Mr. Anderson was accused of either stealing or shoplifting at Whole Foods so I decided not to pursue the referral arrangement because the negative publicity would have been unacceptable to the very private family. Therefore, I did not express my proposed business venture with Mr. Anderson to the Adidas family.

5.       I certify that the foregoing statements made by me are true to the best of my knowledge and I realize that if said statements are willfully false then I am subject to punishment.


_____

KEVIN BURROWS



Dated: November 27th, 2022

LAW OFFICE OF
## CHRISTOPHER C. ROBERTS, LLC
7 GLENWOOD AVENUE
SUITE 401
EAST ORANGE, NEW JERSEY 07017

(973)-673-0600
FAX (973)-673-0627

November 21, 2022

Christopher McIntyre, Esq.
Fishman McIntrye
120 Eagle Rock Avenue
East Hanover, NJ 07936

Afsha Noran, Esq.
Lewis Brisbois
One Riverfront Plaza, Suite 800
Newark, NJ 07102

**RE: Anderson v. Whole Foods Market, Inc. et al.**
**Civil Action No. : 2:21-CV-12990-KM-CLW**

Dear Counsel:

Please amend Plaintiff's responses to Defendants' discovery request to include the enclosed certification from Kendrick Nguyen. If you have any questions or concerns, please contact me.

Thank you for your time and your cooperation.

Very truly yours,

Christopher C. Roberts, Esq.

Enclosure

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

Michael Anderson,

       Plaintiff

    v.

Whole Foods Market, Inc., Elite Investigations, Ltd,
JOHN DOES (1-10), JANE DOES (1-10),
ABC CORPORATION (1-10), ABC, LLC
(1-10), ABC LLP (1-10), JOINTLY,
SEVERALLY, INDIVIDUALLY

       Defendants.

**Civil Action No: 2:21-CV-12990-KM-CLW**

**CERTIFICATION OF KENDRICK NGUYEN**

I, Kendrick Nguyen, being at least 18 years of age and of sound mind, state as follows

1.     I am the Co-Founder and Chief Executive Officer of OpenDeal Inc d/b/a Republic located at 149 Fifth Avenue 10th Floor, New York, New York, 10010.

2.     To my knowledge, Republic and its family of company is one of the top financial and investment firms in the United States where over USD $700 million have already been deployed into startups and companies via pooled vehicles and more than $1 billion have been deployed into over 1000 small businesses and early-stage companies through its US and UK funding platforms.

3.     I am not a party to this case and I have no interest in the outcome of the case. I am making this certification voluntarily.

4.     I met Plaintiff Michael Anderson in or about 2019 and I was very impressed with him and his company MPAC which aims to build a minority-focused investment and government-

contract-facilitation platform. In or about 2020 my team was exploring entering a partnership with Mr. Anderson about his company MPAC and I was considering the possibility of deploying north of $1M into his company and supporting his effort to raise a substantial venture funding round for MPAC. Based on my experience, such an investment in Mr. Anderson's company would have led to his company having the capital to operate and potentially become the leading platform in that market (which is estimated to have a total addressable market of over $1B), given Mr. Anderson's broad industry relationships in the business and government sectors.

In the process vetting Mr. Anderson before making the decision to invest in his company, I became aware that Mr. Anderson was accused of shoplifting at Whole Foods Market. In my field which is venture investment, negative images or publicity is a deterrent for us to make an investment in an early-stage company, because regardless of the veracity of the underlying situation, it raises a number of inherent risks that an investor is not able to fully assess. It would also distract the founder from committing fully to building his vision, making success that much more difficult to achieve.

So, because of the allegation of him being detained for shoplifting, my company decided not to pursue the conversations with Mr. Anderson and MPAC company about a substantial financing round.

5.    I certify that the foregoing statements made by me are true to the best of my knowledge and I realize that if said statements are willfully false then I am subject to punishment.

_Kendrick Nguyen_
KENDRICK NGUYEN

Dated: November 19, 2022

# EXHIBIT L

137417626.1

## Brown, Brian

| | |
|---|---|
| **From:** | Brown, Brian |
| **Sent:** | Friday, June 9, 2023 4:10 PM |
| **To:** | chrisr1969@comcast.net |
| **Cc:** | Tosti, Robert; Christopher McIntyre; mark@fishmanmcintyre.com |
| **Subject:** | Anderson v. Elite Investigations-- Discovery |
| **Attachments:** | Anderson-- Discovery Request to Plaintiff- 6.9(125456757.1).pdf |

Good afternoon—Please see the attached request for discovery. Have a good weekend. Thank you.

**Brian W. Brown**
**Attorney**
Newark
973.792.8723 or x9738723

1



LEWIS BRISBOIS BISGAARD & SMITH LLP

Brian W. Brown
One Riverfront Plaza, Suite 800
Newark, New Jersey 07102
Brian.Brown@lewisbrisbois.com
Direct: 973.792.8723

June 9, 2023

**VIA ELECTRONIC MAIL**
Christopher C. Roberts, Esq.
Law Offices of Christopher C. Roberts, LLC
7 Glenwood Avenue, Suite 401
East Orange, NJ 07017

> Re:    **Anderson v. Whole Foods Market, Inc. et. al.,**
>         **Civil Action No.: 2:21-CV-12990-KM-CLW**

Dear Mr. Roberts:

As you are aware this office represents Defendant Elite Investigations in the above referenced matter. Please accept this letter in lieu of a more formal Notice to Produce and please produce the following within the time allotted by the Court Rules.

1. Term sheets from private equity firms stating the value of plaintiff's services which plaintiff referred to on pg. 205 of his deposition transcript.

2. Tax returns for MPAC from 2018 to the present which were discussed on pg. 79 of plaintiff's deposition transcript.

3. Signed HIPAA for Healthspan in Miami which plaintiff discussed on pg. 184 of his deposition transcript.

4. Signed HIPAA for Reset by Therabody which plaintiff testified to on pg. 186 of his deposition transcript.

5. Signed HIPAA for the Newark Yoga Movement which was discussed on pg. 189 of plaintiff's deposition transcript.

6. Copies of all letters and emails sent by plaintiff to any employee at Whole Foods regarding this incident.

Christopher C. Roberts, Esq.
June 9, 2023
Page 2

7. All communications, charts, term sheets, proposals, etc. between plaintiff and Kendrick Nguyen regarding a potential business arrangement to be entered into between the two parties.

8. All communications, charts, term sheets, proposals, etc. between plaintiff and Kevin Burrows regarding a potential business arrangement to be entered into between the two parties.

   If defendant does not receive the requested items in a timely manner, defendant will take the appropriate course of action to defend it's interests. We appreciate your anticipated co-operation. Thank you.

Very truly yours,

*/s/ Brian Brown*

Brian W. Brown for
LEWIS BRISBOIS BISGAARD &
SMITH LLP

BWB

---

125456757.1

**Brown, Brian**

| | |
|---|---|
| **From:** | Brown, Brian |
| **Sent:** | Thursday, November 30, 2023 5:20 PM |
| **To:** | ccrlaw@verizon.net; chrisr1969@comcast.net |
| **Subject:** | Anderson v. Elite- Discovery Demand |
| **Attachments:** | Anderson- Discovery Letter to PC-- 11.30.pdf; Anderson- Discovery Request to PC-- 11.30.pdf |

Hello Chris—please see the attached. Thank you.



**Brian W. Brown**
**Attorney**
**Brian.Brown@lewisbrisbois.com**

**T: 973.792.8723 F: 973.577.6261**

One Riverfront Plaza, Suite 800, Newark, NJ 07102 | **LewisBrisbois.com**

**Representing clients from coast to coast. View our locations nationwide.**



This e-mail may contain or attach privileged, confidential or protected information intended only for the use of the intended recipient. If you are not the intended recipient, any review or use of it is strictly prohibited. If you have received this e-mail in error, you are required to notify the sender, then delete this email and any attachment from your computer and any of your electronic devices where the message is stored.

1



Brian W. Brown
One Riverfront Plaza, Suite 800
Newark, New Jersey 07102
Brian.Brown@lewisbrisbois.com
Direct: 973.792.8723

November 30, 2023

**<u>VIA ELECTRONIC MAIL ONLY</u>**
Christopher C. Roberts, Esq.
Law Office of Christopher C. Roberts, LLC
7 Glenwood Ave, Suite 401
East Orange, NJ 07017

> **Re:    <u>Anderson v. Elite Investigations, Ltd., et. al.,</u>**
> **Case No.: 2:21-cv-12990-SRC-JRA**

Dear Mr. Roberts:

A review of my file indicates that plaintiff's discovery responses are still incomplete. Plaintiff has not provided a response to Defendant Elite's 6/9/23 Notice to Produce.

Further, in plaintiff's 10/30/23 responses to Defendant's 7/21 Demand for Additional Discovery, plaintiff stated it is "still in the process of preparing list" in response to demand #25. We still have not received this list.

Please provide plaintiff's responses to the above within 10 days so that Defendant is not forced to bring these issues before the Court. If you wish to discuss, let me know.

Defendant has enclosed Supplemental Interrogatories to be answered by plaintiff. Please provide responses in a timely manner. Thank you.

Very truly yours,

*/s/ Brian Brown*

Brian W. Brown for
LEWIS BRISBOIS BISGAARD &
SMITH LLP

BWB

ARIZONA • CALIFORNIA • COLORADO • CONNECTICUT • DELAWARE • FLORIDA • GEORGIA • ILLINOIS • INDIANA • KANSAS • KENTUCKY • LOUISIANA

MARYLAND • MASSACHUSETTS • MINNESOTA • MISSISSIPPI • MISSOURI • NEVADA • NEW JERSEY • NEW MEXICO • NEW YORK • NORTH CAROLINA

OHIO • OREGON • PENNSYLVANIA • RHODE ISLAND • TENNESSEE • TEXAS • UTAH • VIRGINIA • WASHINGTON • WASHINGTON D.C. • WEST VIRGINIA

132541434.1

# EXHIBIT M

137417626.1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW JERSEY

~~~~~~~~~~~~~~~~~~~~

MICHAEL ANDERSON,

                    Plaintiff,

          vs.          Case No.  2:21-CV-12990

WHOLE FOODS MARKET, INC.,

et al.,

                    Defendants.

                    ~~~~~~~~~~~~~~~~~~~~

                    Remote deposition of

                         ERIC KIEFER

                    July 27, 2023

                      10:06 a.m.

                    Taken remotely at:

                    57 Lincolnshire Road

                      Gahanna, Ohio

          Christine M. Emery, Notary Public

Page 10

anticipate this will take very long, but if you need to take a break for any reason, let us know. Okay?

A. Will do.

Q. Okay. Now, what is your current address, Mr. Kiefer?

A. 57 Lincolnshire Road in Gahanna, Ohio.

Q. What's the town? I'm sorry?

A. Gahanna, G-A-H-A-N-N-A.

Q. G-A-H-A-N-A (sic)?

A. Yes.

Q. Okay. And do you also maintain some type of presence or residency in the state of New Jersey?

A. Yes.

Q. Okay. And is that at 366 Montross Avenue in Rutherford, New Jersey?

A. Yes.

Q. Okay. Mr. Kiefer, are you currently employed?

A. Yes.

Q. Okay. By whom are you employed?

A. Patch Media.

Q. And what's your title or in what

Page 11

capacity do you work for Patch Media?

A. I'm a local editor, full time.

Q. And what are some of your responsibilities or what do you do as a local editor?

A. Reporting and cultivating news and administrating the site.

Q. What was the last thing you said?

A. Also administrating the website, back end duties.

Q. And that's the Patch Media website?

A. Yes.

Q. Okay. And are -- when you report news do you do that on that website?

A. Yes.

Q. When you're reporting news do you do it on any other medium other than on the Patch Media website?

A. No.

Q. And how long have you worked for the Patch Media as a local editor?

A. About eight years.

Q. And were you working in that capacity back in October of 2020?

A. Yes.

Page 12

Q. Are you familiar with an individual named Michael Anderson?

A. Yes.

Q. How do you know Mr. Anderson?

A. He's an interviewed subject that I did a stor -- an article on in 2020.

Q. Did you know Mr. Anderson prior to him being an interviewed subject that you did an article on in 2020?

A. No.

Q. When is the last time you spoke with Mr. Anderson?

A. I believe it was right after that article, probably late October in 2020.

Q. And do you recall -- the article you mentioned about Mr. Anderson, do you recall what that article was generally about?

A. He was accused of shoplifting at Whole Foods, which Whole Foods responded to. The article also delved into some of his accusations about a lack of investments in the black community in Newark.

Q. The lack of investment in the black community in Newark?

A. Yes.

Page 13

Q. And how did you come to learn about his accusation of shoplifting at Whole Foods involving Mr. Anderson?

A. Mr. Anderson reached out to me with his e-mail, I believe it was on October 5th, which was a few days after the accusation or the alleged incident. And from that first e-mail contact and -- and several, you know, back and forth we kind of gathered new -- I gathered the information for the article.

Q. So Mr. Anderson was the one who made you aware about this incident?

A. Yes.

Q. Had you heard about the incident from anyone else or any other source prior to Mr. Anderson reaching out to you?

A. No.

Q. And do you know why he made you aware of the incident?

A. That would be speculation.

Q. Okay.

A. I --

Q. You don't -- you don't know why he reached out to you?

A. If you're asking me to speculate I

4 (Pages 10 - 13)

Page 58

had with them on that article, yes.

Q. Okay. Was the article already live on the website for people to review at that point?

A. Oh, yes.

Q. Okay. And Mr. Anderson was the first person to contact you and provide you with the initial information of this alleged incident; is that right?

A. Yes.

Q. And that was your first knowledge of this incident?

A. Yes.

Q. So Mr. Anderson started the whole ball rolling on your investigation in this matter; is that correct?

A. I suppose you could say that, yes.

Q. And but for him contacting you, you would not have known about this incident or published this story about it; is that fair?

A. I don't know if that's fair to assume. There is -- I may have heard about it a different way, but, you know, de facto is what started the incident. I don't know if I could say that I would not have written an

Page 59

article if it wasn't for him, but.

Q. Based on what actually occurred here, though, you ultimately published this article based on Mr. Anderson reaching out to you and providing you the initial information and the subsequent exchanges; correct?

A. Yes.

Q. Okay. That's all the questions I have, Mr. Kiefer. I don't know if the others have any further follow up for you, but thank you.

MR. BROWN: I don't have anything else.

MR. MCINTYRE: Mark, look at -- there's one more question for you, I put it in there.

MR. KEDDIS: Oh, okay. Oh, yeah. Sorry about that.

Q. Mr. Kiefer, one more. Whole Foods' comment that they provided to you that were incorporated into your article, they did not give any facts of the alleged incident or make any accusations against Mr. Anderson; is that correct?

A. No, the comment that you saw

Page 60

boldfaced was their entire reply.

Q. Okay. Thank you.

FURTHER EXAMINATION OF ERIC KIEFER BY MR. ROBERTS:

Q. And just one more follow-up regarding their -- Whole Foods' reply.

They never expounded or explained what the basis for their reply was, was it; did they?

A. No, that was the entire reply.

Q. Thank you, Mr. Kiefer. No further questions.

MR. KEDDIS: Brian, do you have any questions?

MR. BROWN: No.

MR. KEDDIS: Okay. Great. All right. Mr. Kiefer, thank you for your time. We're all set here. You're free to go, as they say.

THE WITNESS: Okay. Thank you.

(Discussion had off the record.)

MR. KEDDIS: Mr. Kiefer, normally, since this case is in federal court, normally the deponent has the opportunity to review their transcript for any inaccuracies,

Page 61

typographical or otherwise. And there is what's called an errata sheet that can be completed with any necessary corrections.

Is that something you would like to have the opportunity to do here?

THE WITNESS: I would like to have the opportunity to review the transcript, yes.

MR. KEDDIS: Okay.

So, Christine, how can we go about arranging for that? Can you send him a copy directly or should one of us send it to him?

COURT REPORTER: If the witness would provide his e-mail address, my office will reach out to him directly.

THE WITNESS: I will provide it to you right now.

COURT REPORTER: Okay. Thank you.

THE WITNESS: Again, it's going to be erickieferemail@gmail.

(Remote deposition concluded at 11:07 a.m.)

16 (Pages 58 - 61)

# EXHIBIT N

137417626.1

From: **Eric Kiefer** <eric.kiefer@patch.com>
Date: Tue, Oct 6, 2020 at 9:16 AM
Subject: Re: Whole Foods Newark Boycott - Flyer Attached
To: Michael Anderson <mikephilson908@icloud.com>

Thanks for reaching out... Haven't heard about this... Do you know the person involved, or know where video footage of the incident can be found?... Would need to talk to the person or see video to move forward with an article... Please feel free to pass them my email address or pass me a link to a social media post... Thanks, reach out any time!

Eric Kiefer
Editor (Essex County, NJ)
Patch Media Corporation
eric.kiefer@patch.com
>> Learn more about posting announcements or events to your local Patch site

On Mon, Oct 5, 2020 at 1:39 PM Michael Anderson <mikephilson908@icloud.com> wrote:
Whole Foods Newark is getting sued and boycotted for discrimination of Black customers. They assaulted and harassed a Black shopper for stealing, which he did not, in front of the entire store Saturday night. It was bad. Check in with #BlackDadsMatter and MPAC in

1

**EXHIBIT**

EK-2

# EXHIBIT O

137417626.1



Neutral
As of: March 8, 2024 3:34 PM Z

# *Myers v. Atl. Health Sys.*

United States District Court for the District of New Jersey

January 20, 2017, Decided; January 20, 2017, Filed

Civil Action No. 13-4712

**Reporter**
2017 U.S. Dist. LEXIS 7884 *; 2017 WL 253846

CORINNE MYERS, Plaintiff, v. ATLANTIC HEALTH SYSTEMS, et al, Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Reconsideration denied by *Myers v. Atl. Health Sys., 2017 U.S. Dist. LEXIS 101721 (D.N.J., June 30, 2017)*

**Prior History:** *Myers v. Atl. Health Sys., 2014 U.S. Dist. LEXIS 14748 (D.N.J., Feb. 4, 2014)*

**Counsel:** **[*1]** For RAMP, Movant: DAVID B. BECKETT, LEAD ATTORNEY, METS SCHIRO & MCGOVERN, LLP, WOODBRIDGE, NJ.

For CORINNE MYERS, Plaintiff: LYDIA B. COTZ, LEAD ATTORNEY, Ramsey, NJ; ADAM J. KLEINFELDT, Deutsch Atkins, PC, Hackensack, NJ.

For ATLANTIC HEALTH SYSTEMS doing business as MORRISTOWN MEDICAL CENTER, JOSEPH PASQUAROSA, DOROTHY ZARILLO, Defendants: STEVEN F. RITARDI, LEAD ATTORNEY, CARMAGNOLA & RITARDI, LLC, MORRISTOWN, NJ.

**Judges:** John Mihchael Vazquez, United States District Judge.

**Opinion by:** John Mihchael Vazquez

# Opinion

### John Michael Vazquez, U.S.D.J.

This matter comes before the Court by way of the motion for summary judgment filed by Defendants Atlantic Health Systems ("Atlantic"), Joseph Pasquarosa and Dorothy Zarillo (collectively "Defendants"). D.E. 108. Plaintiff Corinne Myers filed a brief in opposition (D.E. 118) to which Defendants replied (D.E. 121). The Court reviewed the submissions made in support and in opposition to the motion, and considered the motion without oral argument pursuant to *Fed. R. Civ. P. 78(b)* and *L. Civ. R. 78.1(b)*. For the reasons stated below, Defendants' motion is **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### 1. Factual Background[1]

During the relevant time period, Plaintiff was a part-time nurse on "J1," the surgical unit at Morristown **[*2]** Medical Center ("MMC"). MMC is owned by Atlantic. DSOMF ¶¶ 1, 8. As part of her duties, Plaintiff "routinely used an automated medication dispensing machine known as a Pyxis []..., [to] access and withdraw medications." *Id.* ¶ 15. The Pyxis is a "computerized device that links electronic medical records to the dispensation of medicines." Plf's Cert. ¶ 14 n.1.

Atlantic's Pharmacy Department circulated automated monthly reports, called "Pandora Data

---

[1] The factual background is taken from the record, including the following sources: (1) Defendants' Statement of Undisputed Material Facts ("DSOMF"), D.E. 108-2; (2) the Certification of Steven F. Ritardi ("Ritardi Cert.") and supporting exhibits, D.E. 108-3 to -5; (3) Plaintiff's Counterstatement to DSOMF ("Plf's Counterstatement"), D.E. 117; and (4) Plaintiff's Certification Opposing Summary Judgment ("Plf's Cert."), D.E. 116.

Systems Anomalous Usage Reports," to department managers that showed nurses' Pyxis medication activity. DSOMF ¶ 18; *see also* Certification of Thomas Carlough, Pharm ¶¶ 3-4, 6, D.E. 121-4 (explaining that he generated monthly reports). After receiving the October 2012 report, the J1 manager, Defendant Dorothy Zarillo, contacted Risk Management because she noticed that Plaintiff's use of Dilaudid, was "'significant' when compared to other nurses on the unit."[2] DSOMF ¶¶ 20-21. Zarillo's report was referred to security officer Manford Ayers, who created an incident report. *Id.* ¶¶ 21, 23. The incident report indicates that Human Resources representative Kathy Sortino was contacted, "briefed and agreed to [Plaintiff's] suspension, pending further **[*3]** investigation." *Id.* ¶ 24; Ritardi Cert. Ex. 13. As a result, on November 8, 2012, Ayers, Sortino, and an additional, unnamed security officer met with Plaintiff. Plaintiff was advised that Atlantic was investigating an issue with the Pyxis, and she was suspended while the investigation was pending. DSOMF ¶ 26.

The matter was referred to Atlantic's corporate investigations unit for further inquiry and was assigned to Defendant Joseph Pasquarosa. *Id.* ¶ 27. The end result of the investigation appears to be an internal confidential memorandum, dated November 13, 2012. DSOMF ¶ 29; Ritardi Cert. Ex. 17. The report concluded that there was insufficient information to "conclusively establish diversion," but that diversion was a possibility. As a result, the report recommended, among other things, further investigation by security. DSOMF ¶ 31. Pasquarosa then called Plaintiff and asked to meet with her on November 14, 2012. *Id.* ¶ 32. Due to Plaintiffs statements during the November 14 meeting, she was terminated. *Id.* ¶ 38.

The parties' have different accounts as to what occurred during the November 14 meeting. The parties do not dispute that Plaintiff voluntarily attended the meeting, which **[*4]** took place in Pasquarosa's office in the MMC security office. *Id.* ¶¶ 33-35; Plf's Cert. ¶ 18; Ritardi Cert. Ex. 4, 121:14-16. Plaintiff, Pasquarosa, Zarillo and at least one additional security officer were present. DSOMF ¶ 35; Plf's Cert. ¶ 18. The parties also do not dispute that during the meeting Plaintiff admitted to diverting drugs and signed a written statement admitting to the diversion. DSOMF ¶¶ 41-42; Plf's Cert. ¶¶ 19-20.

Plaintiff alleges that she was forced to falsely confess to diverting drugs at the November 14 meeting and participate in the Recovery and Monitoring Program ("RAMP"). At the time, she believed that if she did not do so, she would lose her nursing license, her job, and her pension.[3] Plf's Cert. ¶¶ 18-21. Plaintiff contends that she thought she could not leave the meeting until she made this false confession, testifying that Pasquarosa told her that she needed to sign the false confession before she left. *Id.*; Ritardi Cert. Ex. 20, 193:9-13. As a result, she "felt it to be understood that [she] could not leave." Ritardi Cert. Ex. 4, 166:1-18. Plaintiff also testified that during the meeting, there was a security officer standing behind her, between her and **[*5]** the door, and that during the meeting a second officer entered the office. Ritardi Cert. Ex. 20, 189:20-190:10. Plaintiff does not contend that anyone at the meeting physically touched her, restrained her from leaving, raised their voice, or verbally threatened her. Ritardi Cert. Ex. 4,166:12-18. In addition, Plaintiff was not told that she was prohibited from leaving and did not fear for her safety at any point. *Id.*, 157:10-15. Finally, Plaintiff also testified that she was told that there were multiple police officers in the hallway who were prepared to arrest her, and that if she changed her statement to say that she was giving the drugs to other people she would receive a "lesser"

---

[2] Dilaudid, a branded name for hydromorphone, is an opioid pain medication that is used to treat moderate to severe pain. *See* Dilaudid, *https://www.drugs.com/dilaudid.html* (last visited January 19, 2017).

[3] Plaintiff also alleges that she did not understand that she was terminated when the meeting concluded. Rather, she believed that by agreeing to participate in RAMP, a voluntary treatment program that is run by the State Board of Nursing, she would be allowed to continue working at MMC upon completion of the RAMP program. Plf's Counterstatement ¶ 12. Plaintiff did not understand that she was terminated until she had a phone conversation with Sortino later in November 2012. *See* Ritardi Cert. Ex. 4, 156:1-10.

punishment. *Id.*, 125:23-126:5; Plf's Counterstatement ¶ 18.

Defendants maintain that Plaintiff was terminated due to poor documentation and mismanagement of a controlled substance. DSOMF ¶ 38; Ritardi Cert. Ex. 29. Plaintiff, however, contends that she was terminated in retaliation for two whistleblowing activities.[4] DSOMF ¶ 68. The first incident involved the death of an elderly patient in late summer of 2012. Plaintiff alleges that she went to the patient's room to see if her assistance was needed **[*6]** because there was a "code, . . . meaning she was unresponsive." Plf's Cert. ¶ 8. Plaintiff states that when she got to the patient's room, nobody was attending to the patient, the doctor was on the phone discussing a DNR [Do Not Resuscitate order] with the patient's family, and the nurses were "standing around, waiting for orders." *Id.* After "a very long phone call," the family refused to authorize a DNR so the treating physician and nurses "began to attend to her and were able to get a pulse." *Id.* The patient was transferred to the ICU but allegedly died about twenty minutes later. *Id.* Plaintiff claims that she complained about this patient's care to three members of the nursing staff the day the incident occurred. *Id.* ¶ 9. Plaintiff also alleges that about a month later, in October 2012, she told educator Barbara Markt about the incident and that she wanted to report the incident. *Id.* ¶ 10.

The second incident concerned Plaintiffs refusal to work in "step-down." Step-down is "a category of beds on the [s]urgical floor reserved for people who had been moved out of ICU [the intensive care unit], but who were not yet ready for the general [s]urgical floor." SAC ¶ 7. Plaintiff alleges that in September **[*7]** 2012, she refused an assignment to work in step-down because Plaintiff did not feel competent to work in the unit without

---

[4] Defendants address two additional incidents that could potentially form the basis of a New Jersey Conscientious Employee Protection Act ("CEPA") claim; complaints regarding a change to the nurse to patient ratio and an anonymous letter criticizing Zarillo. *See* Defs' Br. at 14-15, 19. Plaintiff's opposition to the motion for summary judgment does not discuss these incidents in the context of her CEPA claim. The Court, therefore, will not construe these events as forming the basis of Plaintiff's CEPA claim.

prior training. Plf's Cert. ¶ 17. Plaintiff's refusal was allegedly reported to Zarillo, "who was angered by [her] refusal of the assignment." *Id.*

## 2. Procedural History

Plaintiff filed her complaint on August 6, 2013 and filed an amended complaint the following day. D.E. 1, 3. On October 18, 2013, Defendants filed a motion to dismiss, which was granted in part and denied in part.[5] D.E. 25. As a result, Plaintiff filed a second amended complaint on March 30, 2014 (the "SAC). D.E. 17. The SAC asserts (1) perceived disability claims under the Americans with Disabilities Act (the "ADA") and the New Jersey Law Against Discrimination (the "NJLAD") based on allegations that Defendants' perceived Plaintiff to be a drug addict; (2) wrongful termination claims under the New Jersey Conscientious Employee Protection Act ("CEPA") due to the alleged whistleblowing activities; and (3) tort claims for false imprisonment, defamation, intentional infliction of emotion distress ("IIED"), and negligent investigation. *Id.* After discovery was concluded, Defendants filed this motion for **[*8]** summary judgment on May 13, 2016. D.E. 108.

Defendants argue that Plaintiff does not establish tint *prima facie* elements of a CEPA claim for either of the alleged whistleblowing events because she fails to identify a law, rule, regulation, or public policy that she reasonably believes Defendants violated. Defs' Br. at 8-13, 15-18. Defendants contend that even if the Court concludes that Plaintiff establishes a *prima facie* CEPA claim, she does not raise a genuine issue of material fact demonstrating that Defendants' legitimate, non-retaliatory reason for her termination, that she mismanaged and poorly documented her use of a controlled substance, was a pretext. *Id.* at 19-22. Defendants next argue that summary judgment should be granted for Plaintiff's ADA and NJLAD claims because "by her own admission, none of

---

[5] In response to Defendants' motion to dismiss, Plaintiff filed a cross-motion seeking leave to amend. This motion was denied because the claim that Plaintiff sought to amend, a *Section 1983* claim, was dismissed. D.E. 13.

the defendants perceived or believed that she was a drug abuser." *Id.* at 24. As a result, Plaintiff fails to establish a *prima facie* perceived disability claim under either law. *Id.* at 22-28. Defendants also posit that Plaintiff cannot establish a claim for false imprisonment during the November 14 meeting because she cannot establish that she experienced a reasonable apprehension of the use of force to detain **[*9]** her. *Id.* at 28-30. As for Plaintiff's defamation claim, Defendants argue that summary judgment should be granted because she does not establish that Defendants' made any defamatory statements. *Id.* 30-33. Finally, Defendants posit that Plaintiff's claims for HED and negligent investigation are waived pursuant to CEPA because they arise out of the same events that are involved in her CEPA claim. *Id.* at 36.

Plaintiff argues that her objections regarding the care that was provided to the elderly patient and her refusal to work in step-down violated several provisions of the American Nurses Association ("ANA") Code of Ethics and New Jersey public policy. Therefore, Plaintiff alleges that she was a whistleblower under CEPA. Plf's Br. at 6-7. Plaintiff also argues that summary judgment should be denied for her tort claims because there are material issues of fact. *Id.* at 7-9. Plaintiff, however, fails to specifically identify any disputed issues of material fact. Plaintiff does not offer opposition to Defendants' arguments regarding her perceived disability claims or the CEPA waiver.

## II. SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material **[*10]** fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a

motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)* (quoting *Anderson, 477 U.S. at 255*)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson, 477 U.S. at 249*.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or **[*11]** by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id. at 324* (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson, 477 U.S. at 250*. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co., 122 F. Supp. 2d 523, 528 (D.N.J. 2000)* (quoting *Anderson, 477 U.S. at 249-50*)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp., 477 U.S. at 322*. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson, 477 U.S. at 250-51*.

## III. ANALYSIS

**1. CEPA Claim**

Defendants argue that Plaintiff does not establish the *prima facie* elements of a CEPA claim because she fails to identify a law, rule, regulation, or public policy that she reasonably believes was violated. Defs' Br. at 8-13,15-18. Plaintiff counters that both of the whistleblowing activities implicate various provisions of the ANA Code, and the care that was provided **[\*12]** to the elderly patient violates New Jersey public policy. Plf's Br. at 6-7.

CEPA, *N.J.S.A. 34:19-1, et seq.*, permits a whistleblowing employee to bring suit against an employer that retaliated against her through an adverse employment action. *Winters v. N. Hudson Reg'l Fire & Rescue, 212 N.J. 67, 89, 50 A.3d 649 (2012)*. Courts use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)* to analyze CEPA claims. *Id. at 90*. Thus, the employee carries the initial burden of establishing a *prima facie* case of retaliation. The burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (quoting *McDonnell Douglas Corp., 411 U.S. at 802*). Next, the employee must establish that "the employer's reason was false and that retaliation was the real reason." *Id.* (quoting *Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 92 (3d Cir. 1999))* (internal quotation marks and brackets omitted).

To establish a *prima facie* case under CEPA, a plaintiff must show that: (1) she reasonably believed that her employer's conduct was violating a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) she performed a "whistleblowing" activity; (3) an adverse employment action was taken against her; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action. *Brown v. City of Long Branch, 380 F. App'x 235, 239 (3d Cir. 2010)*.

To satisfy the first element of a **[\*13]** *prima facie* case, "a plaintiff must identify the authority that provides a standard against which the conduct of

the defendant may be measured." *Tinio v. Saint Joseph Reg'l Med. Ctr., 645 F. App'x 173, 178 (3d Cir. 2016)* (quoting *Hitesman v. Bridgeway, Inc., 218 N.J. 8, 31, 93 A.3d 306 (2014))*. A licensed health care professional may satisfy this element by demonstrating that a defendant's conduct or policy "constitutes 'improper quality of patient care', that is, 'violates any law or any rule, regulation or declaratory ruling adopted pursuant to law, or any professional code of ethics.'" *Klein v. Univ. of Med. & Dentistry of N.J., 377 N.J. Super. 28,42, 871 A.2d 681 (App. Div. 2005)* (citing *N.J.S.A. 34:19-3(c)(1)*, -2(f)). A plaintiff may also satisfy this standard by identifying "a clear mandate of public policy concerning the public health, safety, or welfare." *Hitesman v. Bridgeway, Inc., 218 N.J. 8, 33, 93 A.3d 306 (2014)* (citing *N.J.S.A. 34:19-3(c)(3)*). The clear public policy "must be clearly identified and firmly grounded." *Id. at 34* (quoting *Mehlman v. Mobil Oil Corp., 153 N.J. 163, 181, 707 A.2d 1000 (1993))*; *see also Tinio, 645 F. App'x at 178* ("In order for a substantial nexus to exist, the mandate of public policy "cannot be vague" and must "provide[] [a] standard by which . . . a deficiency can be ascertained.").

**a. The Elderly Patient Incident**

Plaintiff contends that the ANA Code of Ethics supports her whistleblowing claim, arguing that in *Hitesman*, the court concluded that the ANA Code could be a sufficient source to support a CEPA claim.[6] Plf's Br. at 7. In *Hitesman*, a nurse brought a CEPA claim after he **[\*14]** was allegedly terminated for voicing concerns about patients' rate of infectious diseases to the defendant employer's management. *Hitesman, 218 N.J. at 14*. The court, however, concluded that the ANA Code "does not constitute a source of law or other authority bearing a 'substantial nexus' to [Defendant's] conduct" because it did not govern defendant's patient care. *Id. at 36*. As a result, the plaintiff's CEPA claim failed as a matter of law. *Id. at 15*.

---

[6] Plaintiff references three subsections of the ANA Code: (1) Section 1.4 — the patient's right to self-determination; (2) Section 2.1 — primacy of patient's interests; and (3) Section 3.5 protection of patient health and safety. Plf's Br. at 7.

2017 U.S. Dist. LEXIS 7884, *14

Plaintiff's reliance on the ANA Code here is lacking for the same reasons. The ANA Code does not provide any general standards for obtaining a DNR or treating patients while a DNR is obtained, and it does not govern Atlantic's policies as to patient care. Thus, "it provides no standard under which a factfinder could determine whether plaintiff held an objectively reasonable belief that [Atlantic] delivered an 'improper quality of patient care." *Id. at 37*. In addition, the ANA Code does not represent a clear expression of public policy. *Id. at 37* ("Nor does the ANA Code prescribe for [defendant] a 'readily discernible course of action that is recognized to be in the clear public interest,' from which we can discern a 'clear mandate of public policy.'").

Plaintiff also argues that "it is public **[*15]** policy of this state to care for hospital patients who have not given DNR orders[.]" Plf's Br. at 6. Plaintiff maintains that *In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976)*, and *Betancourt v. Trinitas Hosp., 415 N.J. Super. 301, 1 A.3d 823 (App. Div. 2010)*, are the source of this public policy. *Quinlan* and *Betancourt* address the continuation of medical care for patients who are in a persistent vegetative state. *Quinlan, 70 N.J. at 23-26*; *Betancourt, 415 N.J. Super. at 305*. While *Quilan* and *Betancourt* do generally address patient' right to life neither discusses the parameters of DNR orders. Therefore, neither case is a sufficient expression of a clear public policy regarding procedures for obtaining a DNR or specific aspects of patient treatment. "[M]erely couching complaints in terms of a broad-brush allegation of a threat to patients' safety is insufficient to establish the first prong of a CEPA claim." *Klein, 377 N.J. Super. at 42*.

Therefore, Plaintiff fails to satisfy the first element of a CEPA claim with respect to this alleged whistleblowing incident.

### b. Refusal to Work in Step-Down

Plaintiff also alleges that her refusal to work in step-down is consistent with ANA Code 4.4, which addresses the assignment and delegation of nursing activities or tasks. Plf's Br. at 7. But again, as discussed, the ANA Code does not provide any

standards for hospital staffing policies and does not represent a clear **[*16]** expression of public policy regarding nurse staffing. As a result, Plaintiff fails to satisfy the first element of a *prima facie* CEPA claim.

Because Plaintiff fails to establish the first element of a *prima facie* CEPA claim the Court need not address the remaining *prima facie* elements or Defendants' burden under the *McDonnell Douglas* framework.[7] Defendants' motion for summary judgment is granted as to the CEPA claim.

### 2. Perceived Disability Claims

Defendants argue that summary judgment should be granted for the perceived disability claims under the ADA and NJLAD because Plaintiff fails to establish that Atlantic believed she was a drug abuser. Defs' Br. at 22-25. Plaintiff does not address Defendants' arguments as to her ADA and NJLAD claims.

In the SAC, Plaintiff asserted perceived disability claims under the ADA, *42 U.S.C. § 12101, et seq.*, and NJLAD, *N.J.S.A. 10:5-2*. "Both the ADA and the NJLAD afford protections to a person who does not have a disability, but is 'perceived as' or 'regarded as' having a disability." *Dennis v. County of Atlantic, 863 F. Supp. 2d 372, 378 (D.N.J. 2012)* (citing *42 U.S.C. § 12102(3)(A)*). To prove either claim, a plaintiff must establish a *prima facie* case of discriminatory discharge by showing (1) she is disabled or perceived to have a disability; (2) she was otherwise qualified to **[*17]** perform the essential functions of the job, with or without reasonable accommodations; (3) she was fired; and (4) the employer sought someone else to perform the same work. *Id.*

---

[7] In addition, the Court notes that Plaintiff fails to provide evidence that creates a genuine issue of material fact as to whether either of the individual Defendants were even aware of Plaintiff's alleged whistleblowing activities. Plaintiff does not address either Defendants' knowledge regarding the elderly patient incident. And although Plaintiff alleges that Zarillo "was angered" by her refusal to work in step-down, Plaintiff testified that she does not know if her refusal was in fact reported to Zarillo. *See* Ritardi Cert. Ex. 4, 231:2-7.

A person may be regarded as disabled under the ADA even if they "have none of the impairments covered by the ADA" so long as she is perceived to have such an impairment. *Walker v. U.S. Sec. of the Air Force, 7 F. Supp. 3d 438, 454 (D.N.J. 2014)* (quoting *Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002))* (internal brackets omitted). "[T]he regarded-as analysis 'focuses ... on the reactions and perceptions of the persons interacting or working with him.'" *Id.* (quoting *Kelly v. Drexel Univ., 94 F.3d 102, 108-09 (3d Cir. 1996))*. Thus, the relevant inquiry is whether the employer perceived the plaintiff "as disabled within the meaning of the ADA, not whether [plaintiff] was actually disabled." *Eshelman v. Agere Sys., Inc., 554 F.3d 426, 434 (3d Cir. 2009)* (citing *Capobianco v. City of New York, 422 F.3d 47, 57 (2d Cir. 2005))*. To establish a perceived disability claim under the NJLAD, "the plaintiff must show that the employer entertained misperceptions about the plaintiff, . . . believing that the individual has a substantially limiting impairment that he or she does not have." *Incorvati v. Best Buy Co., Inc.*, No. 10-1939, 22010 U.S. Dist. LEXIS 122038, 010 WL 4807062, at *5 (D.N.J. Nov. 16, 2010) (quoting *Eckhaus v. Conal. Rail Corp.*, No. 00-5748, 22003 U.S. Dist. LEXIS 25045, 003 WL 23205042, at *9 (D.N.J. Dec. 24, 2003)).

Plaintiff alleges that Atlantic perceived her as having a substance abuse problem. A drug addiction may constitute a disability. *Skinner v. City of Amsterdam, 824 F. Supp. 2d 317, 330 (N.D.N.Y. 2010)*; *In re Cahill, 245 N.J. Super. 397, 400, 585 A.2d 977 (App. Div. 1991)*. Plaintiff, however, fails to provide evidence establishing that Atlantic actually thought that she had **[*18]** such a problem. Rather, through her deposition testimony, "Plaintiff tacitly . . . concedes" that her allegations have no merit. Defs' Br. at 25; *see, e.g.*, Ritardi Cert. Ex. 4, 179:22-180:7 ("I believe that I was terminated out of revenge and that did they — do I feel like they truly thought I was a drug addict, no."); *id.* 125:23-126:5 ("He said . . . not one of them felt or was convinced as well as himself that I was a drug addict using drug, abusing drugs . . . ."); Ritardi Cert. Ex. 20, 182:7-12. Because Plaintiff does not provide facts upon which a reasonable jury could conclude that Atlantic perceived her to

be disabled, she does not set forth a *prima facie* claim under the ADA or NJLAD. Summary judgment, therefore, is granted to Defendants for Plaintiff's claims under the ADA and NJLAD.

## 3. False Imprisonment

Defendants argue that Plaintiff fails to establish that she experienced a reasonable apprehension of force such that summary judgment should be granted as to Plaintiff's claim for false imprisonment. Defs' Br. at 28-30. In response, Plaintiff contends that summary judgment should be denied because there are numerous issues of fact. Plf's Br. at 7-8.

"A person is falsely imprisoned **[*19]** when that person's freedom of movement is constrained." *Maietta v. United Parcel Serv., Inc., 749 F. Supp. 1344, 1367 (D.N.J. 1990)*. The tort of false imprisonment has two elements: (1) detention of the person against her will; and (2) lack of proper legal authority or legal justification. *Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 591, 969 A.2d 1097 (2009)*. Detention "may be effectuated by force or by threats of force communicated through conduct or words." *Maietta, 749 F. Supp. at 1367*. Threats of force "must be such as would 'induce a reasonable apprehension of force, and the means of coercion must be at hand.'" *Id.* (quoting *Earl v. Winne, 14 N.J. 119, 127, 101 A.2d 535 (1953))*.

Plaintiff does not allege that anyone physically touched or prevented her from leaving the November 14 meeting. Therefore, Plaintiff's claim hinges on whether Defendants' words or conduct created a reasonable apprehension that force would be used to restrain her. Plaintiff testified that she was never told she could not get up from her chair or leave the meeting. Ritardi Cert. Ex. 4, 157:10-15. In addition, Plaintiff does not allege that anyone raised their voice or verbally threatened her. *Id.*, 166:12-18. Plaintiff, however, "felt it to be understood that [she] could not leave," and Pasquarosa told her that she needed to sign the false confession before she left. *Id.*, 166:1-18. Plaintiff also testified that there was a security **[*20]** officer standing behind her, a second officer entered the office during the

meeting, and police officers were waiting in the hallway.[8] *Id.*, 189:20-190:10.

Giving credence to Plaintiff's version at this stage, she clearly felt pressure to stay. However, there is not a genuine issue of material fact as to whether there was a threat of force. The record is devoid of facts demonstrating that Plaintiff feared for her safety or believed that Defendants would physically prevent her from leaving the meeting. *See, e.g., Maietta, 749 F. Supp. at 1367* (granting summary judgment to defendant for false imprisonment claim where plaintiff was never told he could not leave the room, did not request to leave or fear for his safety, and defendants did not scream, yell, or verbally threaten him). At best, the facts demonstrate that Plaintiff felt internally compelled to stay and sign the confession in order to keep her job. The threat of losing a job, however, does not constitute a threat of force. *See Zavala v. Wal-Mart Stores, Inc., 393 F. Supp. 2d 295, 334 (D.N.J. 2005)*; *see also Leang, 198 N.J. at 591* (concluding that Plaintiff was not falsely imprisoned where she voluntarily went to office and chose to remain in order to better her chances of being rehired). Consequently, Defendants' motion for summary judgment is granted **[\*21]** as to this claim.

### 4. Defamation

Defendants argue that summary judgment should be granted for Plaintiff's defamation claim because Plaintiff fails to identify the source of the alleged defamatory statement and because the alleged statement was true. Defs' Br. at 31-32. Plaintiff again responds that there are jury questions such that summary judgment should be denied. Plf's Br. at 9.

To prove defamation, a plaintiff must establish that the defendant made a defamatory statement of fact concerning the plaintiff that was false and communicated to a person other than the plaintiff. A plaintiff must also establish fault. *Govito v. W.*

---

[8] Plaintiff's allegation as to the police officers is a red herring. Plaintiff does not allege that she believed that the police officers would use force to keep her in Pasquarosa's office. Instead, she infers that the officers were waiting to arrest her.

*Jersey Health Sys., Inc., 332 N.J. Super. 293, 305, 753 A.2d 716 (App. Div. 2000)* (citing *Feggans v. Billington, 291 N.J. Super. 382, 390-91, 677 A.2d 771 (App. Div. 1996))*. Statements that are substantially true are not defamatory. *Taylor v. Amcor Flexibles Inc., 669 F. Supp. 2d 501, 513 (D.N.J. 2009)*. Here, Plaintiff alleges that "[b]y falsely accusing Plaintiff of drug diversion and/or substance abuse, and by staining her professional record with her designation for RAMP, Defendants have libeled and slandered her, and damaged her personal and professional reputation." SAC ¶ 30. Plaintiff does not identify any specific defamatory statements in her complaint, but testified in her deposition that a man from an employment agency based in New York brought up her lawsuit and that it had something to do with drug **[\*22]** diversion. Ritardi Cert. Ex. 20, 26:13-28:24; 30:10-31:9. Plaintiff, however, does not know how the employment agency learned of the lawsuit and provides no evidence suggesting that Defendants communicated this information to the unnamed employment agency. *Id.*, 27:22-24. Moreover, Plaintiff initially made information about her alleged drug diversion public by filing this lawsuit. As a result, to the extent this unnamed agency learned about the lawsuit by reading Plaintiff's complaint, it does not constitute an actionable statement because it was made by Plaintiff, not Defendants. If, however, the agency learned about the lawsuit by reading Defendants' answer or other document related to this litigation it is barred by the doctrine of judicial immunity. "A statement made in the course of judicial . . . proceedings is absolutely privileged and wholly immune from liability." *Kidd v. Sup. Nursing Care, Inc., No. 08-504, 2008 U.S. Dist. LEXIS 56860, 2008 WL 2945960, at *2 (D.N.J. July 28, 2008)* (quoting *Erickson v. Marsh & McLennan Co., 117 N.J. 539, 563, 569 A.2d 793 (1990))*. As a result, Plaintiffs defamation claim fails with regard to any statement involving the employment agency.

Plaintiff also testified that her defamation claim is premised on the fact that Atlantic was not returning reference calls from potential employers and that employers are able to find out that she **[\*23]** participated in RAMP. Ritardi Cert. Ex. 20, 29:3-23; 31:10-18. These allegations, however, do not

involve any affirmative statements that were made by Defendants. Thus, Plaintiff's defamation claim fails and summary judgment is granted to Defendants.

## 5. Intentional Infliction of Emotional Distress and Negligent Investigation

Defendants argue that by asserting a CEPA claim, Plaintiff waived her right to bring the intentional infliction of emotional distress ("IIED") and negligent investigation claims. Defs' Br. at 33-37. Plaintiff does not address Defendants' arguments as to waiver.

"[O]nce a CEPA claim is 'instituted,' any rights or claims for retaliatory discharge based on a contract of employment; collective bargaining agreement; State law . . . ; or regulations or decisions based on statutory authority, are all waived." *Young v. Schering Corp., 141 N.J. 16, 29, 660 A.2d 1153 (1995)*. Causes of action that fall into this waiver provision are those that "are directly related to the employee's termination due to disclosure of the employer's wrongdoing." *Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 465 (D.N.J. 2009)* (quoting *Falco v. Cmty. Med. Ctr., 296 N.J. Super. 298, 318, 686 A.2d 1212 (App. Div. 1997))*. Causes of action that are "substantially independent" are not waived. *Id.* In this instance, Plaintiff alleges that she suffers severe emotional distress because "Defendants were reckless and **[\*24]** negligent in their accusations that Plaintiff had either diverted Dilaudid or consumed it personally." SAC && 32-35. Similarly, Plaintiff alleges that Defendants breached their duty to exercise reasonable care and thoroughness when investigating the alleged diversion of controlled substances. *Id.* && 36-39. These allegations are directly relevant to Plaintiff's CEPA claim; specifically, they pertain to Defendants' burden to establish a legitimate, nondiscriminatory reason for Plaintiff's termination. The fact that the Court did not actually reach this issue does not matter because the CEPA complaint was actually litigated and decided on the merits. Thus, the LIED and

negligent investigation claims are barred,[9] *See, e.g., Falco, 296 N.J. Super. at 317-18* (affirming dismissal of related state law claim as preempted due to decision on the merits for CEPA claim); *Urbanski v. Township of Edison, No. A-2129-12T2, 2014 N.J. Super. Unpub. LEXIS 103, 2014 WL 183966, at \*7 (App. Div. Jan. 17, 2014)* (concluding that IIED claim was barred even though CEPA claim was dismissed at summary judgment).

## IV. CONCLUSION

For the foregoing reasons and for good cause shown, Defendants' motion for summary judgment (D.E. 108) is **GRANTED**. An appropriate form of order accompanies this opinion.

Dated: January 20, 2017

/s/ John **[\*25]** Michael Vazquez

John Michael Vazquez, U.S.D.J.

## ORDER

### John Michael Vazpuez, U.S.D.J.

This matter comes before the Court by way of the motion for summary judgment filed by Defendants Atlantic Health Systems ("Atlantic"), Joseph Pasquarosa and Dorothy Zarillo (collectively "Defendants"). D.E. 108. Plaintiff Corinne Myers filed a brief in opposition (D.E. 118) to which Defendants replied (D.E. 121). The Court reviewed

---

[9] Even if it were not barred, summary judgment would be granted as to Plaintiff's negligent investigation claim because such a cause of action does not exist under New Jersey law. *See Campbell v. Supreme Court of New Jersey, No. 11-555, 2012 U.S. Dist. LEXIS 41650, 2012 WL 1033308, at \*3 n.5 (D.N.J. Mar. 27, 2012)* ("[T]his Court concludes that New Jersey law does not recognize 'negligent investigation's as an independent cause of cause."). Summary judgment would also be granted for Plaintiff's IIED claim because Plaintiff does not establish facts upon which a jury could conclude that Defendants' actions were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley v. Trenton Saving Fund Soc., 111 N.J. 355, 366, 544 A.2d 857 (1988)*.

2017 U.S. Dist. LEXIS 7884, *25

the submissions made in support and in opposition to the motion, and considered the motion without oral argument pursuant to *Fed. R. Civ. P. 78(b)* and *L. Civ. R. 78.1(b).* For the reasons set forth in the Court's Memorandum Opinion accompanying this Order, and for good cause shown,

IT IS on this 20th day of January, 2017

ORDERED that Defendants' motion for summary judgment (D.E. 108) is **GRANTED**; and it is further

ORDERED that the Clerk of the Court shall mark this case as **CLOSED**.

/s/ John Michael Vazquez

John Michael Vazquez, U.S.D.J.

---

**End of Document**

Brian Brown

# EXHIBIT P

137417626.1

4/7/2021                 Newark Man Boycotts Whole Foods After He's Accused Of Shoplifting | Newark, NJ Patch

**Patch**                                                    ⌂ Log in

## Newark, NJ                                                [+ Follow]

News Feed            Neighbor Posts            Classifieds            Calendar

# Newark Man Boycotts Whole Foods After He's Accused Of Shoplifting

A Newark resident says he was falsely accused of shoplifting. Now he's leading a boycott against Whole Foods AND Prudential — here's why.

Eric Kiefer, Patch Staff ℗
Posted Fri, Oct 16, 2020 at 9:35 am ET  |  Updated Fri, Oct 16, 2020 at 12:19 pm ET

Like 197        Share                                        Replies (2)



ADVERTISEMENT

https://patch.com/new-jersey/newarknj/newark-man-boycotts-whole-foods-after-hes-accused-shoplifting

Anderson0030

1/20


**EXHIBIT**
EK-1

Newark resident Michael Anderson protests at a Whole Foods supermarket in Newark, New Jersey on Oct. 3. (Photo/video courtesy of Brick City Strength and #BlackDadsMatter)

NEWARK, NJ — Michael Anderson laid in a doorway at Newark Whole Foods, propping the sliding glass doors open with his body and blocking the entrance. Wrapped in a U.S. flag and wearing a face mask, sweatpants and sneakers, he clutched a posterboard sign reading "I Am A Man" to his chest like a shield.

ADVERTISEMENT

Bail money had been gathered in advance. The camera was rolling. It was time.

"They accused me of stealing and threatened to beat me—" Anderson began to yell, trying to attract attention from nearby shoppers and passerby. But as soon as the words left his mouth, an armed security guard clad in black walked to his side. The guard grabbed at the corner of Anderson's sign and tried to lift it away.

Subscribe >

His reaction was swift: "Do not touch my sign!"

"Move!" the guard retorted, pointing his finger and making another reach for the sign.

ADVERTISEMENT

Anderson0031

"Do not touch me!" Anderson repeated loudly. "Do not touch my sign! I'm engaging in public civil disobedience!"

As customers began gathering to see what the commotion was about, the guard continued to grab at the sign, ripping small pieces away each time until Anderson finally displayed a flash of anger, yelling "Get the f*** off of me!" Stymied, the guard moved away. And for eight more minutes, the stage would be all Anderson's.

ADVERTISEMENT

Here's the narrative that followed.

**ACCUSED OF SHOPLIFTING**

According to Anderson, he walked into Whole Foods on the evening of Oct. 3, clad in sweat pants and a hoodie and carrying an item he bought at another store for $5.99. As he left the supermarket, an armed security officer "deliberately collided" with him, pushing him backwards.

As two other Whole Foods employees approached him, including a manager, Anderson tried to leave the store. After several minutes of trying to learn why he was being stopped, he was finally told that he was in possession of a "stolen item."

ADVERTISEMENT

Anderson0032

It's a hard hit to a person's reputation when they're accused of shoplifting in their own neighborhood. But when they're a Harvard University graduate, a former investment banker, an author, a social justice activist and the co-founder of a financial technology platform, it has an extra powerful sting.

Anderson produced a receipt to back up his explanation – a safeguard that had become a part of his daily routine – and handed it to the staff members. Meanwhile, the security officer kept his hand near his gun, he said.

It wasn't just embarrassing, Anderson said. It was a "violation of his humanity."

Eventually, Anderson was allowed to leave. But the damage had already been done, he told Patch.

"I couldn't believe it," Anderson recalled. "I really don't like people physically touching me ... I was upset, enraged and furious."

A spokesperson for Whole Foods said the security guard involved in the incident works for a third-party company that it contracts with at the Newark location.

Whole Foods confirmed that Anderson only interacted with two Whole Foods Market team members during the situation, and both approached him after he had been stopped by third-party security.

"Our store leadership approached Mr. Anderson to help resolve the situation," a spokesperson told Patch. "Their intentions were never to embarrass or draw attention to the customer."

"Mr. Anderson's experience at our store was unacceptable," the spokesperson added. "The actions of the third-party security officer who initiated this interaction were in violation of Whole Foods Market protocol and we are investigating with their employer. We extend our sincere apologies to Mr. Anderson."

**'I AM A MAN'**

Anderson said that he tried to reach out to Whole Foods after the incident, but didn't get a

ADVERTISEMENT

Anderson0033

This time, he went prepared.

After refusing to move for an armed security guard, Anderson laid in the doorway for eight minutes and 46 seconds, the same amount of time a police officer kneeled on the neck of George Floyd before his death in Minneapolis, Minnesota.

Invoking the name of Floyd wasn't done lightly in a city that saw a massive, 12,000 person protest in the wake of his death. But as Anderson pointed out during his "Die-In" protest at Whole Foods, Floyd was killed after leaving a local grocery store and being accused of using a counterfeit bill, a situation not all that different from his own.

"That's how they tried to do me Saturday night, saying that I was stealing something that's mine!" Anderson hollered.

"What if I didn't have the emotional intelligence to respond how I did?" Anderson asked, refusing to budge from between the doors. "I come here every day. I am a man, and you will treat me like a man!"

His efforts met with a mixed reaction from a sparse crowd. Several customers simply chose to step over him and enter the store, never glancing down at him. But others took note — and didn't like it one bit.

"I won't be shopping here," a passerby can be heard saying off-camera in Anderson's video of the event, which gained more than 55,000 views on Instagram in a week.

Anderson said he didn't face any charges or jail time after the protest.

Watch video footage below. **EDITOR'S NOTE: Contains strong language.**

10/06/2020 8:46 DIE-IN #WholeFoodsNewark Racism



ADVERTISEMENT

Anderson0034

Patch asked Anderson to comment on Whole Foods' apology. He wasn't impressed.

Here was his reply:

> "I do not find this apology sincere or wholly accurate. An entire team of Whole Foods staff – including senior leadership – participated in the indecent act of harassment and assault. The security guard that the company blames merely responded to the directives of leadership and instructions from another Whole Foods employee. In fact, the person who self-identified as the GM was verbally abusive and continued to berate me after I was physically assaulted. If Whole Foods Market protocol is to racially profile and then blame outsourced staff, the investors behind this project need to be held accountable for how their 'social impact' capital is deteriorating the quality of life for Newark's Indigenous population of color. Obviously, the store itself is unwilling to be responsible for subjecting good people to second-class treatment."

Anderson added that he doesn't plan to relent with his protests until "Whole Foods and its investors contribute fairly to the community they profit from."

"Every week we will protest until our demands are met," he pledged.

## INVESTING IN NEWARK

Anderson has since launched a boycott against not only Whole Foods, but Prudential Financial, the Newark-based, Fortune 500 investment company that owns part of the building where the supermarket is located.

Prudential and the other owners of the building don't manage the day-to-day operations of Whole Foods, including issues related to its security or personnel. But Anderson says

ADVERTISEMENT

Anderson0035

It's about economic justice.

"Whole Foods and Prudential must be held accountable for how their investments may employ Black Americans in marginal positions, but contribute to an economic regime in which white corporations reap massive rewards, while indigenous Black communities experience a wealth transfer that excludes their participation at the highest levels," Anderson argued.

"Our humanity is not being represented congruently with white corporate profits," he added. "Blacks have no stake in 'the New Newark.'"

Anderson isn't alone in his concerns about a lack of money flowing into New Jersey's Black communities.

In June, a Black-owned investment firm in Newark claimed racial bias in a lawsuit against the state of New Jersey, alleging that officials said the state's pension was averse to hiring money-management firms owned by minorities.

"Systemic discrimination and racism continue to permeate America's financial services industry," Blueprint Capital Advisors stated in the civil complaint. "Although such racial resentment, suspicion, and destruction are most horribly illustrated by the burning of 'Black Wall Street' almost 100 years ago, many of the white Americans who dominate the worlds of banking and investment today still, consciously and unconsciously, act to prevent Black Americans from achieving success on the same basis, terms, and level as their white colleagues."

- See related article: Black-Owned Newark Investment Firm Sues NJ, Alleges Racial Bias

Anderson claimed that Prudential's executive board is entirely white, an accusation that doesn't match the company's annual report (Prudential says that 80 percent of its nonemployee directors are "diverse.") Anderson also alleged that Prudential "manages a trillion dollars in assets," yet invests "zero percent" of it in Black businesses, developers and asset managers.

When Patch reached out to Prudential to comment about Anderson's boycott campaign, a spokesperson pointed to a "billion dollar commitment" that the company has made to

ADVERTISEMENT

Anderson0036

Over the past decade, Prudential says its investments in Newark have included more than $500 million in infrastructure projects, $438 million in "impact investments" and $197 million in grants to nonprofits.

The list includes:

- Building Prudential Tower with more than $52 million of Newark vendor goods
- Contributing $2 million to help transform Military Park
- Putting $6 million into Georgia King Village, an affordable housing complex
- Donating more than $29 million to the New Jersey Performing Arts Center
- Channeling $5.25 million into AeroFarms, an indoor farm in Newark

Other local investments from Prudential include:

**ASSET BUILDING** – "In January 2018, Prudential came together with local nonprofits, government officials and other corporations to create the Newark Asset Building Coalition to offer tax preparation help, financial coaching, assistance for first-time homebuyers and other wealth-building programs for all Newarkers."

**THINKING LOCAL** – "Prudential has been proud to serve as a catalyst for the city's Live, Here, Buy Local Initiative. As a part of this initiative, we helped launch Newark2020 in 2017 to put 2,020 Newark jobseekers into full-time employment by 2020 – a goal that was met ahead of schedule, connecting 2,279 Newark residents to local jobs as of June 2020."

**INTERNET AID** – "To help bridge the digital divide in Newark, Prudential worked with municipal leaders and Newark-based corporations to install fiber internet service at no charge to low-income residents in Newark."

Prudential has also been involved with local COVID-19 relief in Newark, the company says on its website.

- "We waived April and May rent for our tenants in Newark, New Jersey—most of whom are small business owners—to help reduce layoffs from local businesses."

ADVERTISEMENT

Anderson0037

- "We're deploying more than $1 million in crisis-relief funding, including $500,000 to support small businesses in Newark and the New Jersey Pandemic Relief Fund."

- "We're working with longstanding nonprofit partners in Newark and across New Jersey to support their relief efforts for individuals and families."

"In 1875, Prudential founder John Dryden chose Newark as the home for an idea that would change America forever: life insurance for everyday families," the company states. "The city has been our home for more than 140 years. That's why we've committed more than $1 billion to Newark, spreading economic and social opportunity across the city, creating meaningful and lasting change."



Michael Anderson and supporters rally in Newark, NJ as part of a boycott against Whole Foods and Prudential Financial. (Photo courtesy of Brick City Strength and #BlackDadsMatter)

ADVERTISEMENT

In Essex County, the stark paradox of wealth and poverty is hard to ignore.

The county has the most homeless residents in the entire state, the overwhelming bulk of whom live in Newark. But just a 20-minute drive away in the Millburn/Short Hills area, two of the "400 richest people in America" reside in a neighborhood filled with huge mansions.

- See related article: Coronavirus Is Exposing Racial Gaps In NJ, Advocates Say

In Newark, Black households account for nearly half of the 282,000 estimated residents of the city.

According to a study released in October 2019 – which Prudential helped to pay for – Black and Latinos households in Newark lag across multiple measures of financial security. Both make less than the city median income of $34,826, earning $31,872 and $33,975 respectively, while Asians do slightly better at $37,229 and whites make $49,146.

Additionally, both Blacks and Latinos are on average two times as likely to live in poverty compared to white households, and three times as likely to be liquid asset poor.

"This means they lack the savings necessary to live above the poverty level for just three months if they lose a job, face a medical crisis or suffer an income disruption or emergency," the study says.

Things have been changing over the past decade in New Jersey's largest city, however.

In 2018, Mayor Ras Baraka said Newark's dogged pursuit to land Amazon's new headquarters is a sign that corporate America is finally taking note of the city's vast potential. Although Newark eventually lost the race for Amazon's new HQ, it showed that the Brick City is now a big player on the U.S. stage, he said.

"Four years ago, if you watched television, listened to the radio, read the newspaper or social media, you would have seen a bleak and negative narrative that was forced upon us and shaped the way people around the country viewed our great city," Baraka said.

"It was so pervasive that some of us believed it too, and it ripened into cynicism and

ADVERTISEMENT

Anderson0039

However, just four years later there's been so much progress going on that the media can no longer ignore it."

- See related article: Don't Believe The Cynicism, Newark Is On The Rise
- See related article: Newark's $10M Mulberry Commons Will Empower City, Mayor Says

Part of that progress has been the revival of several ailing properties such as the Hahne & Company Building, where the Newark Whole Foods is located.

The 400,000 square-foot building at 609 Broad Street stood vacant after shutting its doors nearly three decades ago. But the abandoned property – which once stood as a glittering downtown department store – regained much of its former glory after a $174 million facelift was finished in 2017. In addition to 160 new apartments, 64 of which are set aside for low-income families, the Hahne building is now home to a range of restaurants and retail stores.

The renovation was financed through a partnership of public, nonprofit and private groups, including sizable commitments from the New Jersey Housing and Mortgage Finance Agency and New Jersey Economic Development Authority. Private equity was provided by Prudential Financial, L+M Development Partners and Goldman Sachs Urban Investment Group.

The project's supporters, including then-mayor Cory Booker, trumpeted the signing of Newark's first Whole Foods as a major win for the city.

"We know that Whole Foods Market brings with them a deep commitment to community engagement and advancement, and we welcome them as a long-term stakeholder in our city's continued success," Booker said.

- See related article: Hahne and Company Building In Newark Revived To Fanfare
- See related article: Newark's 1st Whole Foods Opens For Business

Other Newark city officials have echoed that same call, insisting that true social change can only come with an ongoing investment from corporate America.

ADVERTISEMENT

Anderson0040

Newark. Participants would get between $250 and $500 per month, or a lump sum of $9,000 to cover an 18-month period.

However, the future of the pilot will depend on finding enough cash from the "local, state and national foundation and donor community" to keep it going, officials said.

- See related article: 'Guaranteed Income' For Every Newark Resident? Here's The Plan

In the past year, Newark officials have been actively recruiting investors to put money into other social justice programs in the city.

Last month, a star-studded cast of supporters announced the launch of the Newark 40 Acres and a Mule Fund, a program that aims to put millions of dollars of capital directly into the hands of the city's Black and Latinx business owners.

The program has already seen support from celebrities such as Shaquille O'Neal and the Rev. Al Sharpton. So far, it's been promised $2 million towards an ambitious, $100 million goal.

Corporate contributors include AT&T, Panasonic, the Nelson Mullins Law Firm, New Jersey Community Capital, PSE&G and Popular Bank.

- See related article: Newark Makes Bold, $100M Pledge To Black, Latinx Business Owners

But despite the waves of change rippling through the city, there are still many residents – including Anderson – who are suspicious when it comes to corporate investment in Newark. And they're not standing down now, he said.

"Every week, a Prudential asset in Newark will be the site of a 'Blackout,'" Anderson wrote last week in an op-ed on Patch Newark's neighbor post section. "#BlackoutNewark will not stop."

#BlackOutNewark back tomorrow. F* your apologies? Give us what you owe us #BlackOutWholeFoods #BlackOutPrudential @ Newark, New Jersey https://t.co/hGEAeYhsFo

ADVERTISEMENT

Anderson0041