<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MICHAEL ANDERSON, <br><br> Plaintiff, <br><br> v. <br><br> WHOLE FOODS MARKET, INC., ELITE INVESTIGATIONS, LTD., JOHN DOES 1-10, JANE DOES 1-10, ABC CORPORATION 1-10, ABC, LLC 1-10, ABC LLP 1-10, jointly, severally, individually, <br><br> Defendants. | Civil Action No. 21-12990 (SRC) <br><br> **OPINION & ORDER** |

<u>**CHESLER**, District Judge</u>

This matter comes before the Court on Defendants' motion for summary judgment. (ECF No. 58). The Court has reviewed the papers and proceeds to rule on the motion without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the following reasons, Defendants' motion will be granted, in part, and denied, in part.

**I.    BACKGROUND**

This case, which features claims for violation of the New Jersey Law Against Discrimination ("NJLAD"), false arrest, assault and battery, negligent supervision, negligent hiring, respondeat superior, and defamation, stems from an incident at the Defendant Whole Foods Market, Inc. ("Whole Foods") store location at 633 Broad Street in Newark, New Jersey.

Defendant Elite Investigations, Ltd. ("Elite") staffs plainclothes loss prevention officers and uniformed security guards, both armed and unarmed, at the Newark Whole Foods.

On October 3, 2020, Plaintiff Michael Anderson ("Plaintiff") was exiting the Newark Whole Foods when two Elite employees suspecting Plaintiff of shoplifting approached him. Def. Statement of Material Facts ("Def. Statement") at ¶ 1; Pl. Counterstatement of Material Facts ("Pl. Counterstatement") at ¶ 1. Video of the preceding moments shows Plaintiff moving throughout the store with a shopping basket and browsing the produce selection and other merchandise. See Certification of Brian W. Brown ("Brown Cert."), Exhs. F-G. Of the five videos submitted with Defendants' motion, three are video-only captures from in-store surveillance cameras aimed at the store entrance/exit ("Entrance/Exit Video"), checkout aisles five and six ("Checkout Aisles Video"), and the customer service desk ("Customer Service Desk Video"). See Brown Cert., Exh. F. The remaining two videos[1] are from the perspective of—and presumably filmed by—the store's undercover, plainclothes loss prevention officer (the "LPO"). See id.

Per Whole Foods' loss prevention policies and procedures, only undercover LPOs are authorized to detain suspected shoplifters. Brown Cert., Exh. C at T34:12-19. Beyond providing "support" for the LPO when requested, Whole Foods' employees are insulated from the process of identifying and investigating potential shoplifters. Id. at T35:23-25, 36:1. In the LPO Videos and Checkout Aisles Video, Plaintiff carries an open drink obtained from a cooler in the store. Def. Statement at ¶ 7; Pl. Counterstatement at ¶ 7. The bottom portion of a bottle[2] sticks out of his front left pants pocket. Def. Statement at ¶ 7; Pl. Counterstatement at ¶ 7. Defendants assert these two

---

[1] These videos are hereinafter referred to and cited as "LPO Video 1" and "LPO Video 2," collectively the "LPO Videos."

[2] It is undisputed the bottle was a type of oil commonly used by wearers of dreadlock hairstyles and is not sold at Whole Foods. See Pl. Counterstatement at ¶ 4.

observations gave the LPO reasonable grounds to stop Plaintiff on suspicion of shoplifting. Def. Statement at ¶ 5.

At the checkout counter, a cashier scanned and bagged Plaintiff's items, but Plaintiff stepped away before paying to continue shopping. See Checkout Aisles Video at 0:50-1:49. Throughout this sequence, Plaintiff possessed the open drink he is first seen with in the LPO Videos, and the oil bottle remained partially visible in his pocket. See id.; LPO Video 1 at 0:52. While Plaintiff was checking out, the LPO informed the Elite uniformed, armed security guard (the "Security Guard") that he believed Plaintiff might shoplift the open drink and oil bottle. See Brown Cert., Exh. D at p. 1. During the interval in which Plaintiff stepped away from the checkout aisle, the Security Guard approached the register, looked in the bag containing Plaintiff's scanned merchandise, and spoke with the cashier. See id.; Checkout Aisles Video at 2:11-2:19. The Security Guard relayed his conversation with the cashier to the LPO, who responded that Plaintiff had yet to pay for the opened drink and, regardless, still had the oil bottle in his pocket. Brown Cert., Exh. D at p. 1. Plaintiff eventually returned to the register with additional products, finished and scanned the open drink, and swiped a card to pay for all the items. [3] Checkout Aisles Video at 3:28-4:25.

After Plaintiff paid for his items, the LPO and Security Guard positioned themselves just outside the store exit. See Entrance/Exit Video at 0:18-0:25. The Security Guard moved in front of Plaintiff—just as Plaintiff reached the doors—and briefly extended his left arm and hand towards Plaintiff's midsection. See id. at 0:26-0:28. The Security Guard recounts he "stood next

---

[3] The Security Guard asked the cashier whether Plaintiff had paid for his drink; the cashier responded Plaintiff had done so. Brown Cert., Exh. D at p. 1. Video shows that a second, unopened drink was among Plaintiff's items, but Plaintiff had yet to scan the open drink at that time. See Checkout Aisles Video at 1:00-1:57. However, as noted above, when Plaintiff returned to the checkout counter, he in fact paid for the open drink. This development apparently was never communicated to either the LPO or Security Guard.

to [the] LPO [] and stated to [Plaintiff] that [the] LPO would like to talk to him." Brown Cert., Exh. D at p. 2. According to the Security Guard, the LPO "began to address" Plaintiff, at which point Plaintiff "became very irate." Id. Plaintiff testified the LPO pointed at him and, "there was chatter about [Plaintiff] stealing something from other people." Brown Cert., Exh. E at T217:5-14. Plaintiff further testified that it was difficult to understand what the LPO was accusing him of at that time. See id. at T217:11-18 ("I think he was … maybe not a native English speaker, and there were other people that articulated more clearly the grievance or the alleged theft."). Plaintiff asserts the Security Guard "kept his hand on [or] near his gun" during this interaction. See Pl. Counterstatement at ¶ 10. Other shoppers entered and exited the store throughout this period. Entrance/Exit Video at 0:00-0:51.

After reentering the store, Plaintiff began "yelling" at other patrons to "get your camera[s] and record this." Brown Cert., Exh. D at p. 2. Plaintiff then had a brief exchange with the LPO and walked back and forth in front of the customer service desk while motioning with his hands. Customer Service Desk Video at 0:07-1:00. Plaintiff, the LPO, Security Guard, Whole Foods Store Team Leader Odette Jarrett ("Jarrett"), and Associate Store Team Leader Manny Lopez ("Lopez") then gathered in front of the customer service desk. See id. at 1:04. For approximately nine minutes, the group stood in a semicircle and Plaintiff, the LPO, Jarrett, and Lopez gestured back and forth as they spoke. See id. at 1:05-9:45. Other customers are again visible during this time— walking back and forth through the aisle, parking their carts, and visiting the customer service desk. Id. Eventually, Lopez retrieved and handed Plaintiff a business card, after which Plaintiff moved away from the group and walked out of frame. See id. at 9:10-9:55.

4

Lopez testified that, during the conversation in front of the customer service desk, Plaintiff "was yelling a lot and very animated." Brown Cert., Exh. C at T49:17-20. The Security Guard characterized Plaintiff's speech as a "rant about political issues" and wrote that Plaintiff would not allow Jarrett the chance to respond to his complaints. Brown Cert., Exh. D at p. 2. Jarrett, in an email recapping the incident, said that Plaintiff "kept yelling the same thing over and over" before eventually asking Jarrett what she would do for him. Certification of Christopher C. Roberts ("Roberts Cert."), Exh. 1. Jarrett sent her email synopsis of the incident to Leslie Lorquet ("Lorquet"), a Whole Foods loss prevention coordinator. Id.; see Brown Cert., Exh. C at T18:20-25. The email's subject line is "[b]ad stop." Roberts Cert., Exh. 1. Jarrett states, "[t]he new undercover just made a bad stop," and provides her perspective of the incident. See id. Lopez also emailed an incident summary, which states that Plaintiff "went on for about 15 minutes before he allowed anyone to get a word in." Roberts Cert., Exh. 2. Lopez's email went to both Lorquet and Wayne Tripp, a contact at Defendant Elite. Id.; see Brown Cert., Exh. C at T18:14-19. Lopez further testified that no one involved in the incident informed other Whole Foods shoppers that Plaintiff had been investigated for shoplifting, and that the staff and security were "focus[ed] on [Plaintiff]." Brown Cert., Exh. C at T49:14-20. Lopez also asserted he did not witness the LPO, Security Guard, or any Whole Foods employee make physical contact with Plaintiff. Id. at T51:3-7.

On October 4, 2020, Plaintiff contacted the Newark Police Department and reported that he was assaulted the prior evening at the Newark Whole Foods. See Brown Cert., Exh. H. The police report contains the following account:

> [Plaintiff] stated that as he was leaving the business he was approached by two African American individuals. Actor 1 blocked Mr. Anderson from leaving the premise[s]. According to Mr. Anderson the unknown actor pushed him with his chest. Mr.

> Anderson stated that the individual continually put his hand on his firearm causing him to feel threatened.
>
> Actor 1 told Mr. Anderson that Actor 2 needed to speak to him. Actor 2 simply pointed at Mr. Anderson's pocket insinuating that he had shoplifted. Mr. Anderson states that he calmly reached for his pocket and showed the two individuals that the item in his pocket was a bottle of coconut oil he purchased at another location.

Id. at p. 4. The responding officer visited the Newark Whole Foods and viewed video of the incident, after which he concluded the Security Guard did not make physical contact with Plaintiff and did not put his hands on his weapon. Id. at p. 5. The officer further recommended the "matter be unfounded," given his conclusion that no assault occurred. Id.

On October 5, 2020, Plaintiff emailed Eric Kiefer ("Kiefer"), an editor with Patch Media covering Essex County, New Jersey, that Whole Foods had "assaulted and harassed a Black shopper for stealing, which he did not, in front of the entire store Saturday night." Brown Cert., Exh. N; see Brown Cert., Exh. M at T13:4-10. Kiefer testified Plaintiff's email was the first he had heard of this incident. Brown Cert., Exh. M at T13:11-17. On October 9, 2020, Kiefer contacted Whole Foods' corporate public relations team seeking comments for an article about the shoplifting incident and subsequent developments. See Roberts Cert., Exh. 5. A Whole Foods public relations employee, Rachel Malish ("Malish"), provided Kiefer with the following statement: "Mr. Anderson's experience at our store was unacceptable. The actions of the third party Security Guard who initiated this interaction were in violation of Whole Foods Market protocol and we are investigating with their employer. We extend our sincere apologies to Mr. Anderson." Id. Malish added that Whole Foods "immediately contacted [Elite] to begin investigating the incident as it violated the expectations we have for those working in our stores." Id. Kiefer published his story on October 16, 2020. See Brown Cert., Exh. P.

6

## II.    DISCUSSION

Federal Rule of Civil Procedure 56(a) sets the standard the Court must apply to the instant motion for summary judgment. Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). It is well-established that a factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and material if, under the substantive law, the dispute would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 572 U.S. 650, 657 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The Court may not make credibility determinations or engage in any weighing of the evidence. Anderson, 477 U.S. at 255; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the nonmoving party must establish the existence of a genuine issue as to a material fact in order to defeat the motion. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). To create a genuine issue of material fact, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial. Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 571 U.S. 177 (2014). The party opposing a motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that

creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### Count One: Violation of the NJLAD

Plaintiff, who is Black, claims he was accused of shoplifting because of his race. He seeks redress under the NJLAD, which makes various forms of discriminatory practices unlawful, including racial discrimination in places of public accommodation. See N.J.S.A. 10:5-4. The New Jersey Supreme Court encourages an expansive approach to the statute, holding that "the overarching goal of the [NJLAD] to eliminate the cancer of discrimination is to be achieved through a liberal construction of its provisions." Viscik v. Fowler Equip. Co., 173 N.J. 1, 13 (2002).

As Plaintiff has not alleged facts or presented evidence that would constitute direct evidence of racial discrimination, Plaintiff must rely on circumstantial evidence to prove the LPO had a discriminatory intent or motivation. New Jersey courts apply the three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to a plaintiff's claim that a proprietor of a public accommodation has engaged in prohibited discrimination. See Viscik, 173 N.J. at 13-14; see also Victor v. State, 203 N.J. 383, 408 (2010); Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 300 (3d Cir. 2004). "[U]nder the McDonnell Douglas framework, a plaintiff retains the ultimate burden of persuasion at all times; only the burden of production shifts." Viscik, 173 N.J. at 14 (citation omitted).

McDonnell Douglas provides an analytical framework consisting of three parts: First, a plaintiff must demonstrate that he or she can establish a prima facie case of unlawful discrimination. 411 U.S. at 802; Victor, 203 N.J. at 408. A prima facie case of discrimination in a place of public accommodation has three essential elements: "(1) [The] defendant operates a place

of public accommodation; (2) the plaintiff is a member of a protected class; and (3) he or she was denied equal treatment on the basis of his or her membership in a protected class." Vandeusen v. Mabel Realty of Bordentown, LLC, 2012 WL 1664116, at *3 (D.N.J. May 11, 2012). If the plaintiff can satisfy a prima facie claim, a presumption of unlawful discrimination arises. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 492-93 (1982). Next, to rebut the presumption, the defendant must come forward with "a legitimate, non-discriminatory reason" for the denial of equal treatment. McDonnell Douglas, 411 U.S. at 802. The defendant may satisfy this burden by introducing evidence which, taken as true, would allow the factfinder to conclude that there was a nondiscriminatory reason for the disputed action. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993). The defendant need not prove, however, that the tendered reason actually motivated the decision. Burdine, 450 U.S. at 254-55. Lastly, if the defendant carries the burden of producing evidence of a legitimate reason for the action, "the burden shifts back to the plaintiff to show that the [] proffered reason was merely a pretext for discrimination." Viscik, 173 N.J. at 14; see McDonnell Douglas, 411 U.S. at 802.

Here, there is no dispute Plaintiff is a member of a protected class, and Whole Foods is a place of public accommodation under the NJLAD. The remaining element Plaintiff must demonstrate, therefore, is that the LPO investigated and stopped him for suspicion of shoplifting because he is Black. Defendants argue Plaintiff has failed to produce adequate evidence of discrimination and, alternatively, that the LPO's suspicion of shoplifting was a legitimate, nondiscriminatory reason for stopping Plaintiff. Plaintiff responds by pointing to the following: (1) Statements by Whole Foods' employees that the incident was a "bad stop" and violated

applicable protocols[4]; (2) video and images which Plaintiff argues show shoppers outside Plaintiff's protected class moving about the store—carrying merchandise and otherwise acting in a manner similar to Plaintiff—without being accused of shoplifting; (3) Lopez's testimony that Elite LPOs can make "assumptions" when effectuating stops; and (4) the lack of written reports to support Lopez's testimony that past shoplifting incidents at the Newark Whole Foods involved a "mix" of "Hispanics, African American[s], Asians, [and] Caucasians." See Brown Cert., Exh. C at T16:13-21, 35:19-22; Pl. Counterstatement at ¶ 9.

Plaintiff was treated differently than shoppers outside of his protected class when the LPO stopped him on suspicion of shoplifting. However, Plaintiff has not shown that this unequal treatment was racially motivated. Conspicuously absent from the motion record, for example, is

---

[4] Defendants argue that Jarrett and Malish's statements are inadmissible lay witness testimony under Federal Rule of Evidence 701 because they neither witnessed the stop nor have been presented as experts in investigatory stops of suspected shoplifters.

While true that "statements inadmissible at trial may not be considered for purposes of summary judgment," Boyd v. Plainfield Police Dep't, 2018 WL 1526556, at *3 (D.N.J. Mar. 28, 2018), and "Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses," Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g, 57 F.3d 1190, 1202 (3d Cir. 1995), the Court need not reach the issue of whether Jarrett and Malish had a reasonable basis for their statements that the LPO's actions amounted to a "bad stop" or a stop that violated Whole Foods' protocols. These statements are admissible as party admissions under Rule 801(d)(2). Malish's statement is admissible because her communications with Kiefer reflect that she was authorized to provide the statement on behalf of Whole Foods. Additionally, Malish provided the statement pursuant to her position in Whole Foods' Global Public Relations department. Therefore, Malish was "a person whom the party authorized to make a statement on the subject" and made the statement as "the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(C)-(D). Jarrett's statement is admissible because—as Lopez testified—she drafted the incident summary in accordance with Whole Foods' internal procedures for creating and maintaining a written record in the aftermath of "incidents" such as occurred here. Therefore, Jarrett's statement was made in the course of her employment and is admissible under Rule 801(d)(2)(D). Furthermore, that Jarrett made the statement pursuant to Whole Foods' internal procedures suggests Whole Foods authorized her to make the statement, making it admissible under Rule 801(d)(2)(C).

any evidence the LPO had a history or record of racially profiling Black shoppers. Notably, the LPO had yet to establish a record of any kind at the Newark Whole Foods; he had worked there for just two days prior to this incident. Roberts Cert., Exh. 3 at T22:20-23. Nor is there any allegation that Whole Foods' loss prevention protocols direct or encourage LPOs to make racially discriminatory stops. While Lopez testified LPOs can make assumptions when stopping shoppers, there is nothing to suggest that such assumptions permissibly include anything involving a shopper's race or ethnicity. Moreover, Lopez testified that past shoplifting incidents involved patrons of diverse races. That there are no written reports documenting those incidents does not cast doubt on Lopez's otherwise uncontradicted testimony. Next, Jarrett and Malish's statements about the incident do not contain any added context supporting an inference that a "bad stop" or a stop in violation of Whole Foods' protocols means the stop was racially discriminatory.

Lastly, the video footage fails to show the LPO declined to stop similarly situated shoppers outside Plaintiff's protected class. "'[S]imilarly situated' does not mean identically situated, [but] the comparator must be similar in all relevant respects." Durst v. City of Philadelphia, 798 Fed. Appx. 710, 713 (3d Cir. 2020). For instance, the LPO Videos do not show a shopper outside Plaintiff's protected class consuming store merchandise while shopping. The LPO Videos briefly show other shoppers with bulges in their pockets, however, these bulges better resemble the commonplace, smaller shapes of wallets, cellular phones, and keys than the oil bottle Plaintiff carried. Regardless, the LPO Videos do not establish that these shoppers were outside Plaintiff's protected class, and there is no testimony or additional evidence on this issue. The Court also notes the LPO Videos show several other Black shoppers in the store who the LPO was not following or investigating. Therefore, Plaintiff fails to prove he was similarly situated to the patrons in the videos who were not stopped.

Alternatively, Plaintiff's NJLAD claim fails because Defendants have proffered a legitimate, nondiscriminatory reason for the stop, and Plaintiff has not presented evidence sufficient to create a jury question as to whether that reason was pretextual. Defendants assert the LPO stopped Plaintiff because Plaintiff consumed a drink sold by Whole Foods without first paying for it and had a bottle of oil in his pocket. The incident reports from Jarrett and the Security Guard reflect the LPO communicated the open drink and oil bottle as his reasons for watching and stopping Plaintiff, and the videos do not contradict this nondiscriminatory justification. Indeed, it is plausible that Plaintiff's consumption of the drink prior to paying and the oil bottle in his pocket would draw scrutiny from the LPO, who was charged with preventing the loss of store merchandise. Therefore, Defendants have met their "relatively light" burden at this stage. See Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). Plaintiff argues his behavior gave the LPO no grounds to suspect him of shoplifting but provides no evidence "from which a fact finder could reasonably either (1) disbelieve the [] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the [disputed] action." See Iadimarco v. Runyon, 190 F.3d 151, 166 (3d Cir. 1999) (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). Here, Plaintiff rehashes the same arguments which this Court has already found lack the evidence necessary to support a reasonable jury's finding that the LPO stopped Plaintiff because of Plaintiff's race. These contentions are insufficient to raise a genuine issue as to whether Defendants' proclaimed legitimate, nondiscriminatory reason for the stop is either a fabrication or pretext for racial discrimination.

Therefore, Defendants are entitled to summary judgment on Count One.

**Count Two: False Arrest**

To prevail on a claim of false imprisonment or false arrest,[5] a plaintiff must prove two elements: (1) That there was an unwilful arrest or detention and (2) that the arrest or detention lacked legal authority (i.e., probable cause). Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).

The claimant must first demonstrate an arrest, meaning a constraint on freedom of movement resulting from "force, or the threat of force, on the part of the defendant." See Roth, 576 F. Supp. at 265. "If the words or conduct are such as to induce a reasonable apprehension of force and the means of coercion is at hand, a person may be as effectually restrained and deprived of liberty as by prison bars. Unless it is clear that there is no reasonable apprehension of force, it is a question for the jury whether the submission was a voluntary act, or brought about by fear that force would be used." Earl v. Winne, 14 N.J. 119, 127-28 (1953).

Second, the plaintiff must show a lack of legal justification for the detention. The legal justification to detain an individual for shoplifting is found in N.J.S.A. 2C:20-11(e), which states:

> A law enforcement officer, or a special officer, or a merchant, who has probable cause for believing that a person has willfully concealed unpurchased merchandise and that he can recover the merchandise by taking the person into custody, may, for the purpose of attempting to effect recovery thereof, take the person into custody and detain him in a reasonable manner for not more than a reasonable time, and the taking into custody by a law enforcement officer or special officer or merchant shall not render such person criminally or civilly liable in any manner or to any extent whatsoever.

---

[5] "In New Jersey, [false imprisonment and false arrest] are merely separate names for the same tort." Roth v. Golden Nugget Casino/Hotel, Inc., 576 F. Supp. 262, 265 (D.N.J. 1983).

Probable cause exists when "'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant … [a reasonable] belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 175 (1949) (quoting Carroll v. United States, 267 U.S. 132, 162 (1925)). Probable cause is determined by the "totality of the circumstances," United States v. Myers, 308 F.3d 251, 276 (3d Cir. 2002), and is an "objective [test], based on 'the facts available to the officers at the moment of arrest,'" Quinn v. Cintron, 629 Fed. Appx. 397, 399 (3d Cir. 2015) (quoting Barna v. City of Perth Amboy, 42 F.3d 809, 819 (3d Cir. 1994)). The arresting officer's subjective state of mind "does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." Quinn, 629 Fed. Appx. at 399 (quoting Devenpeck v. Alford, 543 U.S. 146, 153 (2004)).

Although the Security Guard's account of the stop represents that he merely stood next to the LPO as the LPO stopped Plaintiff, the Entrance/Exit Video shows the Security Guard engaging Plaintiff by positioning himself to block Plaintiff's egress while extending his left arm and hand across Plaintiff's body. If the LPO had confronted Plaintiff alone, whether Plaintiff had a reasonable apprehension of force would be a closer call. But because the uniformed, armed Security Guard directly impeded Plaintiff's effort to leave the store, there is an issue of material fact as to whether Plaintiff had a reasonable apprehension of force during the stop. See Earl, 14 N.J. at 127-28.

With respect to probable cause, there is no dispute the LPO was the sole person staffed at the Newark Whole Foods with authority to investigate and stop patrons for shoplifting. At the time of the stop, the LPO had observed Plaintiff consume a drink retrieved from a cooler inside the store without first paying for it. The LPO also observed that Plaintiff had a bottle of oil in his pants

pocket, with the bottom portion of the bottle protruding. The LPO believed that Plaintiff had paid for neither the drink nor the bottle of oil, incorrectly believing the latter was Whole Foods' merchandise. As to the drink, viewing the evidence in light most favorable to Plaintiff, the LPO apparently ceased his investigation and decided to stop Plaintiff <u>before</u> Plaintiff finished checking out. Consequently, the LPO did not witness Plaintiff pay for the drink. The LPO also did not further inquire into the cashier's statement that Plaintiff had already paid for a drink. Regarding the oil bottle, the LPO did not see Plaintiff place the bottle in his pocket. Despite a significant portion of the bottle of oil being visible, the LPO failed to identify that it was not a product sold by Whole Foods. Indeed, there is no evidence nor testimony that the bottle resembled <u>any</u> product sold by Whole Foods.

Moreover, given that Jarrett and Malish's statements qualify as vicarious admissions, they are probative as to whether the LPO had probable cause to detain Plaintiff. Specifically, Malish's statement that the stop violated Whole Foods' protocols is probative insofar as those protocols seek to prevent investigative stops that lack probable cause under common law, and Jarrett's characterization of the incident as a "bad stop" can colloquially be regarded as an implicit admission that the actions of the Security Guard and LPO were without probable cause. Under the totality of the circumstances, there is a genuine issue of material fact as to whether the LPO's observations supported a reasonable belief that Plaintiff was shoplifting and gave him and the Security Guard probable cause to detain Plaintiff under N.J.S.A. 2C:20-11(e).

Consequently, Defendants' motion for summary judgment is denied on Count Two.

### Count Three: Assault and Battery

Whereas "[t]he tort of battery rests upon a nonconsensual touching," <u>Leang v. Jersey City Bd. of Educ.</u>, 198 N.J. 557, 591 (2009) (citing <u>Perna v. Pirozzi</u>, 92 N.J. 446, 461 (1983)),

"[c]ommon law assault occurs when a defendant 'intends only to cause apprehension' that battery is imminent," Corradetti v. Sanitary Landfill, Inc., 912 F. Supp. 2d 156, 161 (D.N.J. 2012). Otherwise stated, an assault occurs when (1) someone acts "intending to cause a harmful or offensive contact … or an imminent apprehension of such a contact" to another and (2) that person experiences such imminent apprehension. Leang, 198 N.J. at 591 (quoting Wigginton v. Servidio, 324 N.J. Super. 114, 129 (App. Div. 1999)).

Here, Plaintiff's deposition does not contain any allegations or statements that Defendants' employees made physical contact with his person. Furthermore, the videos of the incident do not show any such contact. While the police report indicates that Plaintiff told the reporting officer the Security Guard bumped Plaintiff with his chest, this hearsay statement is irrelevant given Plaintiff's failure to support it with sworn testimony during his deposition. Therefore, Defendants are entitled to summary judgment on Plaintiff's battery claim.

As to Plaintiff's assault claim,[6] the angle of the Entrance/Exit Video obscures the Security Guard's lower half from view, preventing the Court from evaluating whether he places his hand on his firearm during the stop. The remainder of the footage, particularly the Customer Service Desk Video, does not show the Security Guard—or any other employee—place his hand on his weapon, or otherwise act in a threatening manner toward Plaintiff. Even assuming the Security Guard placed his hand on his firearm during the stop, and taking as true that Plaintiff felt threatened and fearful during the interaction, these facts alone would not support a reasonable fact finder concluding that Plaintiff experienced an imminent apprehension of a harmful or offensive contact.

---

[6] Defendants' reliance on the Newark Police Department's report in support of their motion for summary judgment on the assault claim is largely misplaced. See generally Brown Cert., Exh. H. The responding officer's conclusion that no assault occurred is mere opinion and does not constitute direct evidence of any fact. Moreover, the officer's conclusion related to the criminal charge of simple assault—the elements of which are entirely different from common law assault and battery. See N.J.S.A. 2C:12-1(a).

See Houck v. Ferrari, 57 F. Supp. 3d 377, 385 (D.N.J. 2014). Therefore, Defendants are entitled to summary judgment on Plaintiff's assault claim.

Given the foregoing, Defendants' motion for summary judgment is granted on Count Three.

### Counts Four and Six: Negligent Supervision and Negligent Hiring

A negligent supervision claim requires proof the defendant: (1) "[K]new or had reason to know of the particular unfitness, incompetence, or dangerous attributes" of the employee at issue; (2) "could reasonably have foreseen that such qualities created a risk of harm to other persons"; and (3) "the defendant's negligence proximately caused the plaintiff's injuries." Collick v. William Paterson Univ., 2016 WL 6824374, at *18 (D.N.J. Nov. 17, 2016), aff'd in part, remanded in part on other grounds, 699 Fed. Appx. 129 (3d Cir. 2017). Correspondingly, negligent hiring necessitates proof that (1) the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons" and (2) "that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury." G.A.-H. v. K.G.G., 238 N.J. 401, 416 (2019) (quoting Di Cosala v. Kay, 91 N.J. 159, 173 (1982)).

Plaintiff argues the statements from Malish and Jarrett tend to show the LPO was not trained in Whole Foods' loss prevention protocols or was otherwise incompetent, and that Defendants had either actual or constructive knowledge of this circumstance. A reasonable jury, however, could not rely solely on the statements that the incident was a "bad stop" or one that violated Whole Foods' protocols to find that either Whole Foods or Elite knew or should have known the LPO was unfit, incompetent, or dangerous. Plaintiff has provided no evidence of what,

if any, training the LPO received, or employment records documenting the LPO's deficient job performance. Neither has Plaintiff served any expert reports in this matter. Strikingly, the only information before the Court concerning the LPO's background and work history is Lopez's testimony that the LPO was staffed at the Newark Whole Foods for just two days prior to the incident with Plaintiff.

Therefore, Defendants are entitled to summary judgment on Counts Four and Six.

### Count Five: Respondeat Superior

"[R]espondeat superior recognizes a vicarious liability principle pursuant to which a[n] [employer] will be held liable in certain cases for the wrongful acts of [its] … employees." See Carter v. Reynolds, 175 N.J. 402, 408 (2003) (citation omitted). "The imposition of vicarious liability upon employers for the acts of an employee ... is based upon the idea that the employee is the agent or, 'arm' of the employer." G.A.-H., 238 N.J. at 415 (citing Davis v. Devereux Found., 209 N.J. 269, 287 (2012)). An employer is liable for an employee's actions if the plaintiff proves (1) the existence of an employer-employee or equivalent relationship and (2) "that the tortious act … occurred within the scope of" that relationship. Carter, 175 N.J. at 409.

Here, there is no dispute the LPO and Security Guard were Elite's employees at the time of the incident. The agreement between Elite and Whole Foods provides that one of its purposes is to facilitate Elite providing "guard services"—staffing plainclothes store detectives as well as armed and unarmed uniformed guards—at Whole Foods stores. Although the agreement does not further define the meaning or scope of "guard services," a reasonable jury could conclude the LPO was providing such services when he stopped Plaintiff on suspicion of shoplifting. See Davis, 209 N.J. at 303 ("When the employee's conduct—however aggressive and misguided—originated in his or her effort to fulfill an assigned task, the act has been held to be within the scope of

18

employment."). Given the foregoing, and the Court's finding that Plaintiff should be allowed to proceed with his false arrest claim, summary judgment is denied on Count Five as to Elite.

On the surface, Elite—and, by proxy, its employees—is an independent contractor for Whole Foods. See Muhammad v. New Jersey Transit, 176 N.J. 185, 196 (2003) (defining an independent contractor as someone "who, in carrying on an independent business, contracts to do a piece of work according to his own methods without being subject to the control of the employer as to the means by which the result is to be accomplished") (quoting Bahrle v. Exxon Corp., 145 N.J. 144, 157 (1996)). Therefore, unless Plaintiff can show a genuine issue of material fact as to whether an exception applies, Whole Foods is immune for any tortious conduct committed by Elite through its employees. See Basil v. Wolf, 193 N.J. 38, 62 (2007). One situation in which the principal loses its immunity is where its interactions with the independent contractor resemble an employer-employee relationship, i.e., "where the principal retains control of the manner and means of doing the work that is the subject of the contract." Id. at 63-64 (citing Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. 425, 431 (1959)); see Mavrikidis v. Petullo, 153 N.J. 117, 135 (1998). To satisfy the "control" test, the principal must wield more than a "general power" of supervision extending only to the work's end goal or product; the principal's supervision and control should extend, for example, to the methods the independent contractor employs to achieve that goal. Marion v. Pub. Serv. Elec. & Gas Co., 72 N.J. Super. 146, 153 (App. Div. 1962). "In such a case the employer is responsible for the negligence of the independent contractor even though the particular control exercised and its manner of exercise had no causal relationship with the hazard that led to the injury, just as in the case of a simple employer-employee situation." Mavrikidis, 153 N.J. at 135 (quoting Bergquist v. Penterman, 46 N.J. Super. 74, 85 (App. Div. 1957)).

19

Although Whole Foods purports to grant Elite detectives autonomy in deciding when to stop patrons for shoplifting, the cumulative evidence nevertheless raises a material issue of fact as to whether Whole Foods—through its loss prevention protocols—controls the manner and methods of Elite detectives' work. Lopez testified Whole Foods has a written asset protection policy and protocols governing loss prevention, such as sending written narratives to the loss prevention coordinator after certain incidents.  Significantly, Lopez emailed his incident narrative not only to Lorquet, the loss prevention coordinator, but also to Wayne Tripp at Elite. Malish's statement on behalf of Whole Foods was that the stop violated Whole Foods' protocols and expectations,[7] and Whole Foods was investigating the incident with Elite. Given the foregoing, and the agreement's provision that Whole Foods may dismiss any Elite employee from a store upon twenty-four hours' notice, Plaintiff has shown a material, genuine factual dispute as to whether Whole Foods exerts sufficient control over Elite employees' manner and methods of work to justify piercing Whole Foods' immunity.

Therefore, Whole Foods' motion for summary judgment on Count Five is denied.

### Count Seven: Defamation

Under New Jersey law, to prove defamation a plaintiff must establish, in addition to damages:

> [T]hat the defendant (1) made a defamatory statement of fact (2) concerning the plaintiff (3) which was false, and (4) which was communicated to a person or persons other than the plaintiff. The fifth element that must be proven is fault. Where … plaintiff is a private figure and the speech is about an exclusively private concern, a traditional negligence standard of fault is applicable, which is defined as communicating the false statement while acting

---

[7] The Court also considers Jarrett's "bad stop" characterization, to the extent it is relevant.

> negligently in failing to ascertain the truth or falsity of the statement
> before communicating it.

Feggans v. Billington, 291 N.J. Super. 382, 390-91 (App. Div. 1996) (citations omitted). "The need to demonstrate damages is waived when the defamation is oral and can be categorized as slander per se. In such a case, damages are presumed." McLaughlin v. Rosanio, Bailets & Talamo, Inc., 331 N.J. Super. 303, 313 (App. Div. 2000) (citing Ward v. Zelikovsky, 136 N.J. 516, 540 (1994)). "It is also well settled that accusation of criminal conduct constitutes slander per se." Jobes v. Evangelista, 369 N.J. Super. 384, 397 (App. Div. 2004) (citations omitted).

Plaintiff contends Defendants' employees accused him of shoplifting during the encounter captured in the Customer Service Desk Video. However, that video contains no audio, and the statements and testimony of Defendants' employees are consistent and uncontradicted that they were focused solely on deescalating the situation rather than pursuing the shoplifting investigation. Lopez, Jarrett, and the Security Guard recounted that it was difficult to speak at all while interacting with Plaintiff, due to Plaintiff's animated emotional state. Beyond bald, unsupported allegations, Plaintiff has produced no evidence to establish "the threshold issue in every defamation action"—a false statement of fact. See Lutz v. Royal Ins. Co. of Am., 245 N.J. Super. 480, 492 (App. Div. 1991). Specifically, Plaintiff has provided no proof that anyone seen in the Customer Service Desk Video made a statement asserting or implying that Plaintiff had shoplifted.

Respecting the initial stop, captured on the Entrance/Exit Video, Plaintiff testified the LPO pointed at him and, "there was chatter about [Plaintiff] stealing something from other people." Brown Cert., Exh. E at T217:5-14. Plaintiff also testified that other, unspecified persons "articulated more clearly the grievance or the alleged theft," but Plaintiff failed to unequivocally state that either the LPO or Security Guard accused him of shoplifting. See id. at T217:15-18. Even assuming that either the LPO or Security Guard were behind the "chatter" about stealing or

explanation of why Plaintiff was stopped and that these qualify as defamatory statements, Plaintiff has presented no evidence, beyond the fact that other shoppers entered and exited the store during that time, that either the LPO or Security Guard communicated these statements to a third party.

Plaintiff has presented statements from two business partners—Kevin Burrows ("Burrows") and Kendrick Nguyen ("Nguyen")—that they declined to pursue business opportunities with Plaintiff after learning of the incident. See Roberts Cert., Exhs. 6-7. However, Burrows stated he learned about the incident on social media, whereas Nguyen later testified he would "guess" he first learned of the shoplifting accusation through communications with Plaintiff himself. Brown Cert., Exh. J at T31:21-25. Given the only evidence of anyone publicizing this incident is Plaintiff's email to the journalist, Kiefer, the statements of Burrows and Nguyen do not raise a factual dispute as to whether one of Defendants' employees informed a third party that Plaintiff had shoplifted from Whole Foods.

Because a reasonable fact finder could not conclude that Plaintiff has shown the requisite elements to prevail on his defamation claim, Defendants are entitled to summary judgment on Count Seven.

### III.   CONCLUSION

For the reasons discussed, Defendants have demonstrated there are no genuine issues of material fact precluding summary judgment on Counts One, Three, Four, Six, and Seven and are entitled to judgment as a matter of law on same. As to Counts Two and Five, Plaintiff has raised genuine, material factual issues that bar summary judgment for Defendants. Therefore, Defendants shall be granted summary judgment on all but Count Two and Count Five. A conforming Order follows.

\*\*\*

22

Therefore, **IT IS** on this 31st day of May, 2024,

**ORDERED**, as follows:

1.  Defendants' motion for summary judgment [ECF No. 58] is hereby **GRANTED**, in part,

    and **DENIED**, in part;

2.  Summary judgment is **GRANTED** to Defendants on Count One, Count Three, Count

    Four, Count Six, and Count Seven; and

3.  Defendants' motion for summary judgment is **DENIED** as to Count Two and Count Five.


<br>

s/ Stanley R. Chesler
_____
STANLEY R. CHESLER
United States District Judge

23